# PLAN SUPPLEMENT CONTENTS

The Kennewick Public Hospital District (d/b/a Trios Health) (the "District" or the "Debtor") files this Plan Supplement Further to Section 11.2 of the Debtor's Second Amended Plan for the Adjustment of Debts Dated May 17, 2018 [ECF No. 868] (as may be amended, supplemented, or modified from time to time, the "Plan").1 The Plan Supplement contains the following:

**EXHIBIT 1:** Form of RCCH Transaction Agreement;

**EXHIBIT 2:** Form of Community Care Agreement;

**EXHIBIT 3:** Form of Articles Governing Creditors Trust;

**EXHIBIT 4:** Placeholder for Form of Medical Office Building Lease (as amended and restated) (to come);

**EXHIBIT 5:** Form of New Hospital Lease;

**EXHIBIT 6:** Current 13-week Cash Flow Forecast;

**EXHIBIT 7:** Description of the Hospital Related Real Property;

**EXHIBIT 8:** Description of the Medical Office Building Related Real Property; and

**EXHIBIT 9:** Updated Summary of Appraisals.

To obtain copies of any of the materials included in this Plan Supplement, please contact Garden City Group, LLC, the voting and solicitation agent retained by the Debtor in this Chapter 9 Case (the "Balloting Agent"), by: (a) calling the Debtor's case hotline at 1-888-320-6834; (b) visiting the Debtor's website for this Chapter 9 Case at http://cases.gardencitygroup.com/kphd/; and/or (c) writing to the Balloting Agent at Kennewick Public Hospital District, c/o GCG, P.O. Box 10438, Dublin, OH 43017-4038. You may also obtain copies of any pleadings filed in the Chapter 9 Case for a fee via PACER at http://www.waeb.uscourts.gov/. Please be advised that the Balloting Agent is authorized to provide copies of the Plan Supplement, but may not advise you as to whether you should vote to accept or reject the Plan.

---

1    Capitalized terms used but not otherwise defined herein shall have the same meaning as set forth in the Plan.

53057908.2

# EXHIBIT 1

# Form of RCCH Transaction Agreement

**MASTER ASSET PURCHASE AGREEMENT**[1]

**by and between**

**KENNEWICK PUBLIC HOSPITAL DISTRICT**

**D/B/A TRIOS HEALTH**

**and**

**RCCH TRIOS HEALTH, LLC**

**Dated as of [●], 2018**

---

[1] Subject to review and comment.

4834-6370-2626.19
-6370-262.

## SUMMARY OF CONTENTS

| | | |
|---|---|---|
| **ARTICLE I** | DEFINITIONS | 2 |
| **ARTICLE II** | PURCHASE AND SALE; CLOSING | 10 |
| **ARTICLE III** | REPRESENTATIONS OF SELLER | 15 |
| **ARTICLE IV** | REPRESENTATIONS OF PURCHASER | 29 |
| **ARTICLE V** | BANKRUPTCY COURT MATTERS | 30 |
| **ARTICLE VI** | COVENANTS OF THE PARTIES | 31 |
| **ARTICLE VII** | CONDITIONS TO OBLIGATIONS OF PURCHASER | 38 |
| **ARTICLE VIII** | CONDITIONS TO OBLIGATIONS OF SELLER | 40 |
| **ARTICLE IX** | INDEMNIFICATION | 41 |
| **ARTICLE X** | TERMINATION | 43 |
| **ARTICLE XI** | NOTICES | 44 |
| **ARTICLE XII** | MISCELLANEOUS | 45 |

## EXHIBITS

| | |
|---|---|
| **Exhibit A** | Hospital Lease Closing Agreement |
| **Exhibit B** | MOB Lease Closing Agreement |
| **Exhibit C-1** | Equipment Lessor Group 1 Purchase Agreement |
| **Exhibit C-2** | Equipment Lessor Group 2 Purchase Agreement |
| **Exhibit D** | Facilities |
| **Exhibit E** | Seller Knowledge Persons |
| **Exhibit F** | Purchaser Knowledge Persons |
| **Exhibit G** | Community Care Agreement |
| **Exhibit H** | Description of Kennewick Public Hospital District |

# MASTER ASSET PURCHASE AGREEMENT

**THIS MASTER ASSET PURCHASE AGREEMENT** is made and entered into as of [●], 2018, by and between, RCCH Trios Health, LLC, a Delaware limited liability company ("Purchaser"), and Kennewick Public Hospital District, d/b/a Trios Health, a Washington municipal corporation ("Seller"). Purchaser and Seller are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

# R E C I T A L S

**WHEREAS**, Seller is a debtor in chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") and, on June 30, 2017, filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Washington (the "Bankruptcy Court");

**WHEREAS**, Seller owns and operates (i) Trios Southridge Hospital, an acute care hospital located at 3810 Plaza Way, Kennewick, Washington, and (ii) Trios Women's & Children's Hospital, an acute care hospital located at 900 S. Auburn Street, Kennewick, Washington (collectively, the "Hospital");

**WHEREAS**, Seller owns a 28.42% membership interest in High Desert Surgery Center, LLC, a Washington limited liability company ("High Desert Surgery"), and a 33⅓% membership interest in The Tri-Cities Cancer Center, a Washington nonprofit corporation ("Tri-Cities Cancer", and together with High Desert Surgery, the "Joint Ventures");

**WHEREAS**, pursuant to the terms and conditions of the Hospital Lease Closing Agreement, a copy of which is attached hereto as Exhibit A, Hospital Lessor (as defined in Section 1.1 below) and Seller agreed to the following: (i) immediately upon receipt of the Confirmation Order, such parties will terminate the existing ground lease relating to the Hospital Lease Premises (as defined in Section 1.1 below) cause fee simple ownership of the Hospital Lease Premises to be conveyed to Hospital Lessor and enter into the Interim Hospital Lease (as defined in Section 1.1 below) (which will expire at the Closing, but only if the Closing occurs), and (ii) at the Closing, Hospital Lessor will execute and deliver to Purchaser the Hospital Lease;

**WHEREAS**, pursuant to the terms and conditions of the MOB Lease Closing Agreement, a copy of which is attached hereto as Exhibit B, MOB Lessor (as defined in Section 1.1 below) and Seller agreed to the following: (i) immediately upon receipt of the Confirmation Order, such parties will terminate the existing ground lease relating to the MOB Lease Premises (as defined in Section 1.1 below) enter into the Interim MOB Lease (as defined in Section 1.1 below) (which will expire at the Closing, but only if the Closing occurs), and (ii) at the Closing, cause fee simple ownership of the MOB Lease Premises to be conveyed to MOB Lessor and MOB Lessor will execute and deliver to Purchaser the MOB Lease;

**WHEREAS**, Purchaser intends to seek the agreement of Equipment Lessors Group One (as defined in Section 1.1 below), pursuant to the terms and conditions of the Equipment Lessor Group One Purchase Agreement, a copy of which is attached hereto as Exhibit C-1, to terminate certain agreements and transfer to Purchaser all equipment relating thereto in exchange for a payment from Purchaser at the Closing but only if the Closing occurs;

**WHEREAS**, Purchaser intends to seek the agreement of Equipment Lessors Group Two (as defined in Section 1.1 below), pursuant to the terms and conditions of the Equipment Lessor Group Two Purchase Agreement, a copy of which is attached hereto as Exhibit C-2, to terminate certain agreements

17-02025-FPC9   Doc 905   Filed 06/01/18   Entered 06/01/18 14:57:43   Pg 5 of 118

and transfer to Purchaser all equipment relating thereto in exchange for a payment from Purchaser at the Closing but only if the Closing occurs;

**WHEREAS**, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, certain of the assets relating to the ownership and operation of the Business (as hereinafter defined) and, to the extent transferable under applicable Law, all of Seller's membership interests in the Joint Ventures, and Purchaser desires to assume from Seller, and Seller desires to assign to Purchaser, certain of Seller's obligations and liabilities with respect to the operation of the Business, in each case in accordance with the terms and conditions of this Agreement;

**WHEREAS**, Seller desires to continue to support the health and wellness of residents of its community and desires to establish a fund for the purpose of providing reimbursement for certain expenses incurred in connection therewith;

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual covenants and other agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties covenant and agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    <u>Defined Terms</u>.

As used in this Agreement, the following defined terms shall have the meanings indicated below:

"<u>Affiliate</u>" means any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing; provided, however, that "Affiliate" shall not include (a) officers or directors of the Parties and their subsidiaries or (b) any Person that directly or indirectly owns equity securities of RCCH or any Affiliate or portfolio company of any such Person other than RCCH and its subsidiaries.

"<u>Agreement</u>" means this Master Asset Purchase Agreement as from time to time amended, modified or supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

"<u>Assets</u>" has the meaning set forth in <u>Section 2.1(a)</u>.

"<u>Assumed Contracts</u>" has the meaning set forth in <u>Section 2.1(a)(vi)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

"<u>Balance Sheet Date</u>" means [●], 2018.

"<u>Bankruptcy Case</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

4834-6370-2626.19

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 6 of 118

"Bankruptcy Disclosure Statement" means the disclosure statement relating to the Bankruptcy Plan filed with the Bankruptcy Court on April 16, 2018 [Docket No. 793] including, without limitation, all exhibits and schedules to such disclosure statement, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified, or supplemented from time to time, and which shall be in form and substance acceptable to Purchaser.

"Bankruptcy Plan" means the Plan for the Adjustment of Debts filed by Seller in the Bankruptcy Court on April 16, 2018 relating to Case No. 17-02025-9 [Docket No. 794] as it may be amended, supplemented, or modified from time to time with the consent of RCCH, including all of its annexed exhibits and schedules.

"Books and Records" means all existing patient, medical staff, employee, accounting, business, marketing, corporate, partnership, limited liability company and other files, documents, instruments, papers, books and records, including without limitation, financial statements, budgets, ledgers, journals, deeds, titles, policies, manuals, minute books, stock certificates and books, equity transfer ledgers, contracts, franchises, permits, supplier lists, reports, computer files and data, retrieval programs and operating data or plans.

"Business" means the business and operation of the Facilities and the Assets.

"Business Day" means a day other than Saturday, Sunday, or any day on which the principal commercial banks in the State of New York are authorized or obligated to close under the Laws of such state.

"Business Employee" means each active and inactive employee of Seller and its Affiliates providing services primarily for the Business.

"Certificate of Need" means a final and nonappealable written decision issued by the Washington State Department of Health authorizing the provider to incur certain expenses or to develop new health care services.

"CHAMPUS/Tricare" has the meaning set forth in Section 3.12(a).

"Claim" has the meaning set forth in Section 9.3(e).

"Closing" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.6.

"Closing Statement" has the meaning set forth in Section 2.7(g).

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Company Plan" means (a) each "employee benefit plan," as such term is defined in Section 3(3) of ERISA (whether or not the plan is subject to ERISA), (b) each equity bonus, equity ownership, equity option, equity purchase, equity appreciation rights, phantom equity or other equity plan (whether qualified or nonqualified), (c) each bonus, deferred compensation or incentive compensation plan, (d) each employment, consulting, severance pay, change in control, or other similar plan, arrangement, policy or commitment, and (e) any holiday or vacation practice or other paid-time off program, or workers

compensation plan or program, in which any Business Employee has participated in since January 1, 2012, or has accrued benefits that have not yet been paid in full, regardless of the sponsor(s) of such "employee benefit plan."

"Competing Business" means, except as otherwise agreed in writing, the business of owning, operating, leasing, developing, constructing or managing acute care hospitals, ambulatory surgery centers, imaging centers, medical clinics, physician practices, physician clinics or any other health care service offered (or anticipated by Purchaser to be offered) by or in connection with the Hospital on or after the date hereof; provided, however, that a business in which a Grandfathered Interest is held shall not be deemed to be a Competing Business except in the event that such interest no long qualifies as a Grandfathered Interest, in which case such business may be a Competing Business.

"Confirmation Order" shall be a Final Order (as defined in the Bankruptcy Plan) of the Bankruptcy Court in form and substance acceptable to Purchaser and Seller approving, among other things, this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated herein. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Encumbrances (other than Permitted Encumbrances) and claims; (ii) Purchaser and Seller have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and at arm's length; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 12.2 hereof; and (v) this Agreement and the transactions contemplated herein may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 9 trustee of Seller.

"Constituent Documents" means, for any corporation, partnership, limited partnership, limited liability company or other organization, its Charter, Articles of Incorporation, Certificate of Incorporation, bylaws, partnership agreement, operating agreement, certificate of limited partnership, certificate of formation and other similar formation and governance documents, each as amended to the relevant date.

"Contract" means any agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness, purchase order, commitment or other contract (i) to which Seller is a party or (ii) by which any Assets are bound or which otherwise relates primarily to the Facilities or the Business as of the Closing Date, including those listed on Schedule 3.9.

"Cost Reports" has the meaning set forth in Section 3.12(d).

"Court Order" means any judgment, order, award or decree of any federal, state, local or other court or judicial or quasi-judicial tribunal and any award in any binding arbitration proceeding.

"Damages" means actual out of pocket losses, damages, claims, costs, fines, fees, expenses, Taxes, penalties, interest obligations and deficiencies (including lost profits, multiplied damages, diminution of value, consequential damages, special damages, incidental damages or other unforeseen damages) or expenses, whether or not arising from or in connection with any Third-Party Claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing); provided that Damages shall not include punitive or exemplary damages except to the extent awarded in connection with a Third-Party Claim.

"Effective Time" has the meaning set forth in Section 2.6.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 8 of 118

"Encumbrance" means any mortgage, pledge, assessment, security interest, lease, sublease, lien, adverse claim, levy, right of way, easement, encroachment, covenant, charge, restriction, variance, liability or other encumbrance of any kind, or any conditional sale contract, title retention contract, or other agreement, arrangement or understanding to give or to refrain from giving any of the foregoing.

"Equipment Lessors Group One" means, collectively, EverBank Commercial Finance, Inc., Hitachi Capital America Corp., Key Government Finance, Inc., and Philips Medical Capital, LLC.

"Equipment Lessors Group Two" means, collectively, Canon Financial Services, Inc., Cisco Systems Capital Corporation, Insight Investments, LLC, Intuitive Surgical, Inc., MB Financial Bank, N.A., TCF Equipment Finance, Inc., and Telerent Leasing Corporation.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.1(b).

"Excluded Contracts" has the meaning set forth in Section 2.1(b)(iv).

"Excluded Liabilities" has the meaning set forth in Section 2.2(b).

"Expense Leases" means all of those leases, subleases and occupancy agreements pursuant to which Seller or any of its Affiliates, as lessee, holds a leasehold interest in any portion of the Real Property.

"Facilities" means the Hospital and the healthcare facilities and operations related to physician practices affiliated with the Hospital, all as listed on Exhibit D.

"GAAP" has the meaning set forth in Section 3.6.

"Government Programs" has the meaning set forth in Section 3.12(a).

"Government Receivables" means any Medicare, Medicaid and other third-party patient claims due from beneficiaries or governmental third-party payors arising from the rendering of services to patients at the Facilities, billed and unbilled, recorded or unrecorded, accrued and existing in respect to services rendered up to the Effective Time which by law may not be assigned.

"Governmental Authority" means any national, state or local government; any political subdivision thereof; any other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency (including Medicare and Medicaid administrative contractors), department, bureau, commission or entity (to the extent that the rules, regulations or orders of such organization or authority have the force of Law); or any arbitrator with authority to bind a party at law.

"Grandfathered Interest" means (i) Seller's current 100% interest in BF Elder Services and Seller's current 33⅓% interest in Tri-Cities Cancer but, in each case, only to the extent held consistent with the terms and conditions of this Agreement and (ii) an ownership interest in a Competing Business owned by Seller on the Closing Date as set forth on Schedule A hereto and approved in writing by Purchaser; provided, however, that, after the Closing Date, any increase in Seller's ownership, unless it occurs without any action on the part of Seller, its designee, or its Affiliate, in or attainment of a management, officer or board position with a Competing Business, including any governing board relating to a Competing Business such as a community board or other organization, shall not, unless approved in writing by Purchaser, be a Grandfathered Interest and, provided further, in the event any

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 9 of 118

business in which Seller holds a Grandfathered Interest expands the services it owns, leases, operates or manages, changes its location, adds a new location or increases its level of service, such ownership interest shall, unless approved in writing by Purchaser, cease to be a Grandfathered Interest.

"Healthcare Fraud Laws" has the meaning set forth in Section 3.15(h).

"Healthcare Providers" has the meaning set forth in Section 3.15(g).

"High Desert Surgery" has the meaning set forth in the Recitals.

"Hired Employees" has the meaning set forth in Section 6.9.

"Historical Financial Statements" has the meaning set forth in Section 3.6.

"HITECH Act" means the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 (Public Law 111-5), as amended.

"Hospital" has the meaning set forth in the Recitals.

"Hospital Lease" means that Hospital Facility Lease by and between Hospital Lessor and Purchaser, to be entered into at Closing.

"Hospital Lease Premises" all real property related to the operation of the Hospital as set forth in the Hospital Lease, including a building, located at 3810 Plaza Way, Kennewick, WA 99338, containing approximately 168,200 gross square feet of space. Notwithstanding the foregoing, the Hospital Lease Premises do not include the MOB Lease Premises or the two parcels adjacent to the Hospital Lease Premises.

"Hospital Lessor" means Kennewick Holdings, LLC.

"Indemnifying Party" has the meaning set forth in Section 9.3(e).

"Indemnitee" has the meaning set forth in Section 9.3(e).

"Information" has the meaning set forth in Section 6.12.

"Intellectual Property" means any patents, trademarks, trade names, service marks, trade secrets, copyrights, or other intellectual property rights or licenses.

"Interim Hospital Lease" means that certain Amended and Restated Hospital Facility Lease by and between Seller, as lessee, and Hospital Lessor, as lessor, dated as of [•], 2018.

"Interim MOB Lease" means that certain Amended and Restated MOB Lease by and between Seller, as lessee, and MOB Lessor, as lessor, dated as of [•], 2018.

"Joint Ventures" has the meaning set forth in the Recitals.

"Knowledge of Purchaser" (and any similar expression) means, as to a particular matter, the actual knowledge of any Person with respect to Purchaser specified on Exhibit F after reasonable inquiry by such Person of officers, directors, employees, and agents of Purchaser or of any Affiliate of Purchaser with respect to the matters at hand.

"Knowledge of Seller" (and any similar expression) means, as to a particular matter, the actual knowledge of any Person with respect to Seller specified on Exhibit E after reasonable inquiry by such Person of officers, directors, employees, and agents of Seller or of any Affiliate of Seller with respect to the matters at hand.

"Law" means any statute, law, ordinance, rule, regulation, code, pronouncement, resolution, order, writ, injunction, judgment, decree, ruling, promulgation, policy, treaty directive, interpretation or guideline issued by any Governmental Authority.

"Leased Real Property" means that portion of the Real Property that is leased in connection with the operation of the Business pursuant to the Expense Leases.

"Licensed Intellectual Property" has the meaning set forth in Section 3.14(b).

"Material Adverse Effect" means a material adverse effect on the Business, Assets, Liabilities, results of operations or financial condition of Seller (taken as a whole), other than an effect resulting from any one or more of the following: (a) the effect of any change in the United States or foreign economies or securities or financial markets in general, (b) the effect of any change that generally affects the industry in which Seller operates, (c) the effect of any change arising in connection with earthquakes, hurricanes, flooding or other weather-related matters, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date of this Agreement, (d) the effect of any action taken by Purchaser with respect to the transactions contemplated hereby, (e) the effect of any changes in applicable law or accounting rules, (f) the failure of Purchaser to meet any of its internal projections, or (g) any effect resulting from the public announcement or awareness of this Agreement, compliance with terms of this Agreement, or the consummation of the transactions contemplated hereby.

"Material Contracts" has the meaning set forth in Section 3.9(a).

"Medicaid" has the meaning set forth in Section 3.12(a).

"Medicare" has the meaning set forth in Section 3.12(a).

"MOB Lease" means that MOB Lease by and between MOB Lessor and Purchaser, to be entered into at Closing.

"MOB Lease Premises" means the building located at 3730 Plaza Way, Kennewick, WA 99338 as set forth in the MOB Lease, containing approximately 161,885 rentable square feet of space and the land as described in the MOB Lease.

"MOB Lessor" means DOC-3730 Plaza Way MOB, LLC.

"Non-Consented Contract" has the meaning set forth in Section 6.17(b).

"Non-Recourse Party" has the meaning set forth in Section 12.18.

"Off-the-Shelf Software" means any software that (i) is readily available to the general public on consistent terms; (ii) is subject to a non-exclusive license; (iii) has not been substantially modified for use by Seller or (iv) was licensed by Seller for less than $50,000.

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 11 of 118

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of the Bankruptcy Court or other Governmental Authority.

"Owned Intellectual Property" has the meaning set forth in Section 2.1(a)(viii).

"Owned Real Property" means all Real Property owned by Seller in fee simple.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Patient Receivables" has the meaning set forth in Section 2.1(a)(xiii).

"Payment Programs" has the meaning set forth in Section 3.12(f).

"Permits" means all licenses, permits, franchises, rights, registrations, approvals, authorizations, consents, waivers, exemptions, releases, certificates of need, certificates of occupancy, variances or orders of, or filings with, or otherwise issued by, any Governmental Authority.

"Permitted Encumbrance" means except as discharged in the Bankruptcy Case, (a) any Encumbrance for Taxes or other governmental charges or assessments which are not due and payable as of the Closing Date (Encumbrances arising under Section 430(k) of the Code, ERISA or with respect to the Company Plans are not Permitted Encumbrances), (b) any Encumbrance of any landlord, carrier, warehouseman, mechanic or materialman and any like Encumbrance arising in the ordinary course of business for sums that are not delinquent more than thirty (30) days, (c) Laws regulating the use or enjoyment of the applicable property, provided such Laws do not materially adversely affect the use or operation of any Facility in accordance with the manner it is currently being used or operated, (d) all Real Property Leases disclosed on Schedule 3.10(c), (e) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security, (f) with respect to any Leased Real Property, Encumbrances which encumber the fee interest in such property, which do not materially adversely affect the use or operation of any Facility in accordance with the manner it is currently being used or operated, and (g) all Encumbrances, including, without limitation, all matters shown on the title insurance policies or surveys obtained by Purchaser as of the date of this Agreement, which do not materially adversely affect the marketability of the Real Property or the use or operation or occupancy of the Facilities in accordance with the manner currently being used or operated.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability company, union, association, court, agency, government, tribunal, instrumentality, commission, arbitrator, board, bureau or other entity or authority.

"Proceeding" means any audit, examination or other proceeding.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Indemnitee" has the meaning set forth in Section 9.1.

"RCCH" means RegionalCare Hospital Partners Holdings, Inc., a Delaware corporation.

"Real Property" means all real property that is owned, leased, used or occupied in connection with the operation of the Business, and all rights, privileges, easements and appurtenances thereto, including the real property and real property interests set forth on Schedule 3.10(a).

"Real Property Leases" means the Expense Leases and the Revenue Leases.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 12 of 118

"Revenue Leases" means all of those leases, subleases and occupancy agreements pursuant to which Seller or any of its Affiliates, as lessor/sublessor has granted to a Person that is not an Affiliate of Seller a leasehold interest or occupancy right in any portion of the Real Property including without limitation: (i) leases of land to third-party developers in connection with development/construction of health care related projects at the Facilities; (ii) medical office leases, subleases and occupancy agreements; (iii) leases, subleases and occupancy agreements for other medical uses, services or facilities; and (iv) leases, subleases and occupancy agreements for food services and other ancillary services at the Facilities, including as examples and not as limitations, wireless communication services, gift shops, pharmacies or florist shops.

"Schedule Supplement" has the meaning set forth in Section 12.19.

"Seller" has the meaning set forth in the Preamble.

"Seller Cost Reports" has the meaning set forth in Section 6.11.

"Survival Period" means the period from the date hereof until the last date on which a representation, warranty, covenant or other obligation survives pursuant to Section 9.3(b).

"Tax" or "Taxes" means (a) any federal, state, local or foreign income, gross receipts, license, business, payroll, employment, excise, leasehold excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, hospital provider, hospital franchise fee, unrelated business income, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, unclaimed/abandoned property, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto whether disputed or not, (b) any liability for payment of amounts described in clause (a) whether as a result of transferee liability or otherwise through operation of law, and (c) any liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person.

"Tax Returns" means any return, estimate, disclosure, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third-Party Claim" has the meaning set forth in Section 9.3(f).

"Title Policy" has the meaning set forth in Section 7.8.

"Transaction Documents" means the Hospital Lease, the MOB Lease, the Community Care Agreement, [_____] and any other agreements contemplated herein.

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Tri-Cities Cancer" has the meaning set forth in the Recitals.

1.2     Interpretation. The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement, they

shall be deemed to be followed by the words "without limitation." All terms defined in this Agreement shall have the defined meanings contained herein when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and, as appropriate, to the masculine, feminine and neuter genders of such terms. References to a Person are also to its successors and permitted assigns. Unless the context otherwise requires, references to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof.

## ARTICLE II
## PURCHASE AND SALE; CLOSING

2.1     <u>Purchase and Sale of Assets</u>.

(a)     On and subject to the terms and conditions set forth in this Agreement, at the Closing or such later date as provided herein or in the Bankruptcy Plan, Purchaser agrees to purchase and acquire from Seller, and Seller agrees to sell, assign, transfer, convey and deliver to Purchaser, all of the assets used or held for use in, or otherwise relating to the Business, free and clear of Encumbrances, except for Permitted Encumbrances, including the following assets (other than the Excluded Assets) for the consideration specified in this <u>Article II</u> (the "<u>Assets</u>"):

(i)     cash, short-term investments and cash equivalents, except as otherwise necessary to establish the Plan Fund (as defined in the Bankruptcy Plan) in accordance with Article V.IV of the Bankruptcy Plan;

(ii)     all owned tangible personal property located at the Facilities and used in connection with the Business, including all major, minor or other equipment, vehicles, furniture and furnishings, listed in <u>Schedule 2.1(a)(ii)</u> hereto;

(iii)     all supplies and inventory located at the Facilities on the Closing Date;

(iv)     assumable deposits, prepaid expenses and claims for refunds in connection with the Facilities whether or not they exist as of the Closing;

(v)     to the extent assignable or transferable under Law, all financial, patient, medical staff, personnel and other records relating to the Business in whatever format, paper, electronic or otherwise (including, without limitation, equipment records, medical administrative libraries, medical records, patient billing records, documents, catalogs, books, records, files, operating manuals and current personnel records);

(vi)     all rights and interests of Seller in, to and under all Contracts that are identified as "Assumed Contracts" on <u>Schedule 3.9</u>, which shall include the new collective bargaining agreements of the Seller (collectively, the "<u>Assumed Contracts</u>"), which Schedule may be filed within thirty (30) days after the entry of the Confirmation Order;

(vii)     to the extent assignable or transferable, all licenses, consents, permits, provider agreements and corresponding provider numbers relating to the operation of the Business, the Facilities or the Assets (including, without limitation, any pending approvals);

(viii)     all rights and interests in all names, trade names, trademarks and service marks (or variations thereof) owned by Seller and used in the operation of the Business, the Facilities or

the Assets, the current list of which is set forth in Schedule 2.1(a)(viii) hereto, all goodwill associated therewith, and all applications and registrations associated therewith and all patents, domain names, trade secrets, copyrights, software, computer programs and other intellectual property rights owned by Seller and used in the operation of the Business, the Facilities or the Assets (collectively, the "Owned Intellectual Property");

(ix)     all goodwill associated with the operation of the Business, the Facilities or the Assets;

(x)     all of Seller's right, title and interest in and to the Real Property together with all improvements, any construction in progress, any other buildings and fixtures thereon, and all rights, privileges and easements appurtenant thereto (including Seller's leasehold interests in the Leased Real Property pursuant to the Expense Leases), to the extent assignable or transferrable in compliance with applicable Law; all licenses, permits, approvals and qualifications relating to any Real Property issued to Seller by any Governmental Authority;

(xi)     all other assets, other than the Excluded Assets, of every kind, character or description owned by Seller and used or held for use in the operation of the Business, whether or not reflected on the Historical Financial Statements, and any additions thereto;

(xii)     to the extent assignable, all warranties (express or implied) and warranty rights and claims assertable by (but not against) Seller related to the Assets;

(xiii)     all accounts receivable (other than Government Receivables) arising from the rendering of services to patients at the Facilities or in connection with the Business, billed and unbilled, recorded or unrecorded, with collection agencies or otherwise, accrued and existing in respect of services rendered up to the Closing Date ("Patient Receivables");

(xiv)     all rights to receive funds attributable to patient receivables related to Government Receivables;

(xv)     the bank accounts listed in Schedule 2.1(a)(xv), including the funds held in such accounts;

(xvi)     all claims, rights, interests, causes of action, defenses, counterclaims, cross-claims, third-party claims, or rights of offset, recoupment, subrogation or subordination and judgments in favor of Seller (including rights to or claims under any insurance policy issued to or for the benefit of the Seller) and, to the extent assignable or transferrable, all warranties (express or implied) and rights and claims assertable by (but not against) Seller related to the Assets;

(xvii)     to the extent assignable, Seller's 28.42% membership interest in High Desert Surgery;

(xviii)     all amounts payable to Seller in respect of Government Program payors pursuant to retrospective settlements (including, without limitation, pursuant to Medicare, Medicaid and CHAMPUS/TRICARE Cost Reports filed or to be filed by Seller for periods ending on or prior to the Closing Date) and all appeals and appeal rights of Seller relating to such settlements, including Cost Report settlements, for periods ending on or prior to the Closing Date;

(xix)     all rights to Tax refunds, credits or claims related to the Facilities or the Assets resulting from the periods ending on or prior to the Closing Date;

4834-6370-2626.19

(xx)     all insurance proceeds (other than payments of Patient Receivables) arising in connection with the operation of the Facilities or the Assets on or prior to the Closing Date and all insurance proceeds relating to the Excluded Assets and Excluded Liabilities;

(xxi)     prepaid costs and other assets associated with any Company Plans; and

(xxii)     all property of the foregoing types, arising or acquired by Seller between the date hereof and the Closing Date.

Seller shall convey good and marketable title to the Assets to Purchaser free and clear of Encumbrances, except for Assumed Liabilities and Permitted Encumbrances.

(b)     Notwithstanding the foregoing, Seller will retain and not transfer, and Purchaser will not purchase or acquire, those assets of Seller set forth on Schedule 2.1(b)[2], which shall include but not be limited to the following (collectively, the "Excluded Assets"):

(i)     all Books and Records relating exclusively to the Excluded Assets and Excluded Liabilities, and Constituent Documents, all corporate records or filings of Seller and its Affiliates, as well as all records which by Law Seller is required to maintain in its possession;

(ii)     any reserves or prepaid expenses exclusively relating to Excluded Assets or Excluded Liabilities;

(iii)     all rights of Seller under this Agreement and its related documents;

(iv)     all rights and interests of Seller in, to and under all Contracts identified that are not Assumed Contracts (the "Excluded Contracts");

(v)     Seller's legal name, Kennewick Public Hospital District, and variations thereof;

(vi)     all claims, causes of action, judgments and insurance proceeds in favor of or assertable by Seller exclusively associated with or arising out of any of the Excluded Assets and/or the Excluded Liabilities; and

(vii)     all property of the foregoing types arising or acquired by Seller between the date hereof and the Closing Date.

2.2     Assumption of Liabilities.

(a)     As of the Closing Date, Purchaser will assume and become responsible for the payment and performance of and will discharge, except as otherwise discharged in the Bankruptcy Case, in accordance with their respective terms the following liabilities, but no other liabilities (the "**Assumed Liabilities**"):

(i)     the obligations with respect to the Assumed Contracts and the Real Property Leases that first accrue, arise or are to be performed after the Closing Date; and

---

[2] Schedule may include Ayers Property, interest in BF Elder Services and interest in Tri-Cities Cancer.

4834-6370-2626.19

(ii)    the obligations, if any, with respect to the Hired Employees (as specifically identified in writing by Purchaser prior to the Closing).

(b)    Except as provided in Section 2.2(a), Purchaser shall not assume at the Closing, or otherwise, any liability of Seller including the Excluded Liabilities defined below. Seller will satisfy or be responsible for in accordance with the Bankruptcy Plan all Excluded Liabilities. "Excluded Liabilities" means any debt, obligation, expense or liability, whether or not disclosed in the Schedules, of Seller that is not an Assumed Liability, including the following:

(i)    those claims and obligations, if any, specified in Schedule 2.2(b) hereto;

(ii)    any liabilities or obligations associated with or arising out of any of the Excluded Assets;

(iii)    any Tax liabilities or obligations, whether or not accrued, assessed or currently due or payable, (a) of Seller, whether or not they relate to the Assets or the Facilities, (b) relating to the Assets or the Facilities in respect of any taxable period (or portion thereof) ending on or prior to the Effective Time (other than the Assumed Liabilities under Section 2.2(a)(ii) as of the Effective Time), (c) resulting from the consummation of the transactions contemplated herein, except as otherwise specifically provided in this Agreement; (d) imposed on Purchaser or its Affiliates as a transferee or successor, pursuant to any tax indemnification or sharing agreement, or similar contract or arrangement, or otherwise, which Taxes relate to the Assets or the Facilities with respect to an event or transaction occurring before the Effective Time, and (e) relating to the Excluded Assets;

(iv)    any debt, obligation, expense, or liability of Seller arising out of or incurred as a result of any acts or omissions of Seller occurring after the Effective Time;

(v)    any liability arising out of any failure to perform any obligation of Seller pursuant to an Excluded Contract;

(vi)    any liability related to assets used or held for use exclusively in relation to High Desert Surgery or Tri-Cities Cancer and not owned by Seller;

(vii)    any liabilities associated with debt, loans or credit facilities of Seller and/or the Business; and

(viii)    all debts, expenses, liabilities and obligations of any Person, including Seller, relating to any of the Assets, Facilities or the Business arising out of or incurred in connection with events or circumstances existing on or prior to the Closing Date including (A) claims or potential claims relating to events that occurred prior to the Closing Date; (B) Cost Report liabilities and obligations in respect of periods ending on or prior to the Closing Date or any other liability in respect of provider agreements; (C) employment and employer claims or other investigations or actions; (D) breach of any Contract or commitment; (E) liabilities or obligations related to recovery audit contractor audits; and (F) liabilities and obligations of Seller relating to any oral agreements, oral contracts or oral understandings with any referral sources.

2.3    Cure Amounts.  The amounts, if any, as determined by an order of the Bankruptcy Court, necessary to cure all defaults and to pay all actual pecuniary losses that have resulted from any defaults on the part of Seller under the Assumed Contracts shall be set forth in the final assumption and cure notice and in accordance with Article V.IV of the Bankruptcy Plan, Seller shall deposit into the Plan Fund any cure amounts set forth therein at the Closing, such that all Assumed Contracts may be assigned

by Seller and assumed by Purchaser as set forth herein and in accordance with section 365 of the Bankruptcy Code *provided, however,* that the Seller, with the consent of Purchaser, may reject any executory contract or unexpired lease within thirty (30) days after the determination of any cure amount related thereto. This Agreement shall not constitute an agreement for Purchaser to pay any cure amounts or assume any Assumed Contracts if the Bankruptcy Court determines, after notice and a hearing and giving effect to the provisions of section 365 of the Bankruptcy Code, that an attempted assignment thereof, without obtaining a consent from any applicable third party, would constitute a breach thereof or in any way negatively affect the rights of Seller or Purchaser, as the assignee, and no breach of this Agreement shall have occurred by virtue of such nonassignment. If the Bankruptcy Court determines, after notice and a hearing and giving effect to the provisions of section 365 of the Bankruptcy Code, that such third-party consent is required, then Purchaser shall have the option of not taking such assignment, or seeking the consent of such third party. At Purchaser's option, if such consent is sought but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Assumed Contract.

       2.4    <u>Administrative Claims Amount</u>. The amounts, if any, as determined by the Bankruptcy Court, allowed under Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including any amounts described in Section 2.3 of this Agreement. The Administrative Claims amount determined in accordance with Section 2.4 of this Agreement shall not exceed $500,000.

       2.5    <u>Consideration</u>. In consideration of the sale and delivery of the Assets by Seller to Purchaser, Purchaser shall assume the Assumed Liabilities.

       2.6    <u>Closing</u>. Subject to the satisfaction (or due waiver) by the appropriate Party of all the conditions precedent to Closing specified in <u>Articles VII</u> and <u>Articles VIII</u> hereof, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at Nashville, Tennessee, offices of Waller Lansden Dortch & Davis, LLP, located at 511 Union Street, Suite 2700, Nashville, Tennessee 37219, on the last Business Day of the month in which all conditions precedent specified in <u>Articles VII</u> and <u>Articles VIII</u> hereof are satisfied (or duly waived), or at such other place, or earlier date and time as shall be mutually agreed upon in writing by the Parties. The date on which the Closing takes place is referred to herein as the "<u>Closing Date</u>." Unless otherwise agreed by the Parties, the transactions contemplated by this Agreement shall be effective for accounting purposes as of 12:01 a.m., on the first day of the calendar month immediately following the Closing Date (the "<u>Effective Time</u>").

       2.7    <u>Closing Deliveries</u>. At the Closing, Seller and Purchaser shall deliver the following documents unless otherwise waived in writing by the Party to whom such document is to be delivered but only if the Closing occurs pursuant to the terms and conditions of this Agreement:

       (a)    <u>Bill of Sale</u>. Seller will deliver to Purchaser a General Assignment, Conveyance and Bill of Sale, fully executed by Seller, conveying to Purchaser good title to the Assets, free and clear of all Encumbrances other than the Permitted Encumbrances and the Assumed Liabilities.

       (b)    <u>Assignment and Assumption Agreement for Assumed Contracts</u>. Seller and Purchaser will deliver an Assignment and Assumption Agreement, fully executed by Seller and Purchaser, assigning to Purchaser all of Seller's right, title and interest in, to and under the Assumed Contracts and providing for Purchaser's assumption of the Assumed Liabilities.

       (c)    <u>Assignment and Assumption Agreement for Real Property Leases</u>. Seller and Purchaser will deliver an Assignment and Assumption Agreement, fully executed by Seller and

17-02025-FPC9   Doc 905   Filed 06/01/18   Entered 06/01/18 14:57:43   Pg 18 of 118

Purchaser, assigning to Purchaser all of Seller's right, title and interest in, to and under the Real Property Leases and providing for Purchaser's assumption of the Seller's liabilities thereunder.

(d)     Deeds.  Seller will deliver to Purchaser Special Warranty Deeds, conveying to Purchaser fee simple title to the Owned Real Property, free and clear of all Encumbrances other than the Permitted Encumbrances.

(e)     Evidence of Insurance.  Seller will deliver evidence of continuing insurance coverage required under Section 6.2 of this Agreement.

(f)     Closing Certificates and Documents.  Seller shall deliver the other certificates and documents required to be delivered by Seller pursuant to Article VII; and Purchaser shall deliver the other certificates and documents required to be delivered by Purchaser pursuant to Article VIII.

(g)     Closing Statement. Seller and Purchaser will deliver a closing statement, fully executed by Seller and Purchaser, in a form to be mutually agreed by the parties (the "Closing Statement").

(h)     Community Care Agreement. Seller and Purchaser will deliver a Community Care Agreement, fully executed by Seller and Purchaser, substantially in the form set forth on Exhibit G (the "Community Care Agreement").

(i)     Power of Attorney.  Seller will deliver the power of attorney consistent with Section 6.4.

(j)     Title Company Documents.  Seller will deliver such documents as may be reasonably required to obtain the Title Policy.

(k)     Patriot Act Certification. Seller will deliver to Purchaser or its designee a certification, executed by Seller, making for the benefit of Purchaser or its designee customary representations and warranties regarding Patriot Act compliance.

(l)     Tax Clearance Certificate. Seller shall deliver a tax clearance certificate from the Washington Department of Revenue to Purchaser showing no tax due from Seller.

2.8     Proration.  Except as discharged in the Bankruptcy Case, through the Closing Date, Purchaser and Seller shall prorate, if applicable, real estate and personal property Taxes, power and utility charges plus all other income and expenses which are normally prorated upon the sale of assets of a going concern.  Whenever possible, such prorations shall be based on actual, current payments by Seller and to the extent such actual amounts are not available, such prorations shall be estimated as of the Closing Date based on actual amounts for the most recent comparable billing period.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

3.1     Existence and Capacity; Bankruptcy Plan.

(a)     Seller is a Washington municipal corporation legally existing under the Laws of the State of Washington, has the requisite power and authority to own or lease its assets and to conduct its

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 19 of 118

business as currently conducted. Seller owns, directly or indirectly, beneficially or equitably, a [●] interest in High Desert Surgery and a [●] interest in Tri-Cities Cancer. Except, with respect to High Desert Surgery, in its Operating Agreement, dated [●], and with respect to Tri-Cities Cancer, in its [●], dated [●], no party other than Seller owns or holds any right of first refusal or other rights with respect to such interests.

(b) Seller represents and warrants, as set forth in the Bankruptcy Plan and Bankruptcy Disclosure Statement, that its existence, capacity, and its authorization to enter into and consummate the transactions contemplated herein, are as provided and set forth in the Bankruptcy Plan and Bankruptcy Disclosure Statement and that the Confirmation Order authorizes the consummation of the transactions contemplated herein.

3.2 <u>Authorization</u>. The execution, delivery and performance by Seller of this Agreement and the Transaction Documents pursuant to the terms of this Agreement, and the consummation by Seller of the transactions contemplated hereby and thereby (1) are within the power and authority of Seller and are not in contravention of the terms of Law or Seller's Constituent Documents, (2) have been duly authorized and approved by all necessary action on the part of Seller, and (3) except as provided in Section 6.7, do not require any approval, consent or filing required to made by Seller with any governmental agency or authority bearing on the validity of this Agreement. No Proceedings on the part of Seller, other than those described in the prior sentence, are necessary to authorize the execution, delivery and performance of this Agreement or the Transaction Documents. This Agreement has been duly and validly executed and delivered by Seller. This Agreement constitutes, and upon execution and delivery by Seller, the Transaction Documents will constitute, the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms (assuming the valid authorization, execution and delivery hereof and thereof by Purchaser and any other parties thereto).

3.3 <u>Subsidiaries</u>. Other than (i) the Joint Ventures and (ii) BF Elder Services, Seller does not have an ownership interest, direct or indirect, in any Person, nor does Seller own or hold any right of first refusal or other rights with respect thereto.

3.4 <u>No Conflicting Agreements; Consents</u>. Except as set forth in <u>Schedule 3.4</u>, neither the execution and delivery of this Agreement or any of the Transaction Documents nor the consummation of any of the transactions contemplated hereby or thereby will: (a) violate, conflict with, result in a material breach or termination of the terms, conditions or provisions of, constitute a default (or an event which, with notice or lapse of time or both would constitute a default) under, or result in the termination or in a right of termination or cancellation of, or accelerate the performance required by, or result in being declared void, voidable or without further binding effect (i) the Constituent Documents of Seller, (ii) any Court Order to which Seller is a party or by which Seller is bound, or (iii) any requirements of Law affecting Seller; or (b) require a permit, approval, consent or authorization from, or the making by Seller of any declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 6.7</u> and except for such approvals, consents or authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of Seller to perform its obligations hereunder. Upon entry of the Confirmation Order, any consents which would otherwise be required in connection with any Contracts assigned to Purchaser, shall be deemed to have been given or, alternatively, shall not be binding upon Purchaser. Similarly, any provision in any Contract assigned to Purchaser which might otherwise violate or otherwise create a breach under any assigned Contract, or which would otherwise violate any Law or require consent, approvals or authorizations from any Person, including any Governmental Authority, shall be deemed not effective by operation of the Confirmation Order.

4834-6370-2626.19

3.5    <u>Ownership of Properties</u>.

   (a)    Effective at the Closing in accordance with terms and conditions of this Agreement, the Confirmation Order shall vest in Purchaser good title to all of the Assets, free and clear of any Encumbrance, except for Permitted Encumbrances.

   (b)    <u>Schedule 2.1(a)(xv)</u> contains a list of all bank accounts, lock boxes, safe deposit boxes and post office boxes maintained in the name of or controlled by Seller and included in the Assets along with the names of the persons having access thereto.

   (c)    Except as provided in the Constituent Documents of the Joint Ventures, no outstanding rights, agreements or other commitments made by Seller currently exist (including purchase options, rights of first refusal or rights of first offers), and as of the Closing, no outstanding rights, agreements or other commitments made by Seller will exist (including purchase options, rights of first refusal or rights of first offers), that give any Person a current or future right to purchase any material interests in the personal property, including without limitation interests in corporations, partnerships, limited liability companies or other entities (including the Joint Ventures), owned by Seller including the Assets.

3.6    <u>Financial Statements</u>.  <u>Schedule 3.6</u> contains copies of the following: (i) the audited balance sheet of the Business as of December 31, 2016 and December 31, 2017; (ii) the unaudited balance sheet of the Business as of the Balance Sheet Date; (iii) the audited income statement of the Business for the 12-month period ended on December 31, 2015, December 31, 2016, and December 31, 2017; and (iv) the unaudited income statement for the [●] month period ending on the Balance Sheet Date (collectively, the "<u>Historical Financial Statements</u>"). The Historical Financial Statements have been prepared from and in accordance with the Books and Records of Seller, fairly present in all material respects the financial position and results of operations of the Business as of the dates and for the periods indicated, and, except as set forth in <u>Schedule 3.6</u>, have been prepared in accordance with accounting principles generally accepted in the United States of America, as consistently applied by Seller ("<u>GAAP</u>"). The books of account and other financial records of the Business, all of which have been delivered or made available to Purchaser, represent actual, bona fide transactions and have been maintained in accordance with sound business practices. All accounts receivable constituting a part of the Assets represent and constitute bona fide indebtedness owing to Seller for services actually performed or for goods or supplies actually provided in the amounts indicated on the Historical Financial Statements, with no known set-offs, deductions, compromises, or reductions (other than reasonable allowances for bad debts and contractual allowances in amounts consistent with historical policies and procedures of Seller and which were taken into consideration in the preparation of the Historical Financial Statements). Seller has made available to Purchaser a complete and accurate aging report of all active accounts receivable constituting a part of the Assets and a schedule of all accounts receivable. All the inventory and supplies constituting any part of the Assets are substantially of a quality and quantity usable and salable in the ordinary course of business of the Facilities. Obsolete items have been written off the Historical Financial Statements.

3.7    <u>Absence of Undisclosed Liabilities</u>.  Except as disclosed in <u>Schedule 3.7</u> and to the Knowledge of Seller, Seller does not have any material liabilities of any nature (whether accrued, absolute, contingent or otherwise) that are of a type required to be disclosed or reflected in financial statements of the Business in accordance with GAAP except for (i) liabilities reflected or reserved against in the Historical Financial Statements (including any notes thereto) and (ii) liabilities incurred in the ordinary course of business since the Balance Sheet Date and that are not (individually or in the aggregate) material to the Business.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 21 of 118

3.8    Absence of Changes.  Except as disclosed in Schedule 3.8, since the Balance Sheet Date, there has not been any transaction or occurrence in which Seller or any of its Affiliates, in connection with the Facilities, has:  (a) suffered any material damage, destruction or loss (whether or not covered by insurance) with respect to or affecting the Business or the Facilities; (b) sold, transferred or otherwise disposed of, or permitted to lapse any material right to use, any of the Assets except in the ordinary course of business; (c) granted or incurred any obligation for any material increase in the compensation of any employee who is employed at the Facilities except in the ordinary course of business; (d) made any change in any method of accounting or accounting principle, practice, or policy in respect of the Business; (e) made or entered into a commitment to make any capital expenditure at the Facilities in excess of $25,000; or (f) agreed, so as to legally bind Purchaser, whether in writing or otherwise, to take any of the actions set forth in this Section 3.8 and not otherwise permitted by this Agreement.

3.9    Contracts.

(a)    Schedule 3.9 sets forth a true and complete list of Contracts, including each Contract that (i) provides for aggregate payments to or from Seller in excess of $10,000 per contract year; (ii) is with any physician, physician group or medical practice or any other Person that refers patients or items or services reimbursed under a federal health care program to the Facilities; (iii) is a managed care or third-party payor contract; (iv) is an employment or severance contract; (v) is a collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization, (vi) guarantees any indebtedness or obligation of any Person; (vii) limits the ability of Seller to engage freely in any line of business in any geographic area or to compete with any Person; (viii) establishes any joint venture, partnership or other similar joint ownership entity or arrangement; (ix) relates to the management of the Facilities; (x) that is a consent decree of any Governmental Authority to which Seller is bound; (xi) (A) grants or acquires any right to use any Intellectual Property (other than contracts granting rights to use readily available commercial software available to consumers for a combined license and maintenance fee or subject to "shrink wrap" or "click through" license agreements) or (B) restricts the right of Seller or permits any third party to use any Intellectual Property; (xii) is an agreement between Seller and its respective officers, except for agreements that will be terminated as of the Closing Date without liability to Purchaser after the Closing Date; (xiii) Real Property Lease, or (xiv) is a Tax sharing agreement or Tax allocation agreement (collectively, the "Material Contracts").  True and correct copies of all Material Contracts (other than Excluded Contracts) have been made available to Purchaser.

(b)    Except as provided in the Confirmation Order or as set forth on Schedule 3.9:  (i) each Material Contract is valid, binding and enforceable against Seller and, to the Knowledge of Seller, against the other party or parties to such Material Contract, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, and (ii) Seller has duly performed its obligations under each Material Contract to which it is a party (to the extent that such obligations to perform have arisen).

(c)    Except as expressly set forth on Schedule 3.9 and except as would not reasonably be expected to have a Material Adverse Effect:  (i) Seller is not in breach or default (nor would there be a breach or default with notice or lapse of time or both as a result of events that have occurred) under any Material Contract, and (ii) there is no pending, or to the Knowledge of Seller, threatened breach or default under any Material Contract.

(d)    Except as expressly set forth on Schedule 3.9, no Material Contract, the assignment of which is not otherwise provided for under the Bankruptcy Plan, requires consent to the assignment and assumption of such Contract by Purchaser.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 22 of 118

(e)     Except as set forth on Schedule 3.9 and to Seller's Knowledge, since the date that is six (6) months prior to the date of this Agreement, (i) Seller has not received any written notice or claim of termination, breach, default or proposed revision to the terms of any Material Contract that is a managed care or third-party payor contract and (ii) to Seller's Knowledge, no such termination, breach or default has been threatened or such revision proposed.

3.10    Real Property.

(a)     Schedule 3.10(a) sets forth the addresses and legal descriptions for all Owned Real Property and the addresses and leased premises descriptions for all Leased Real Property.  Seller is the sole owner of the Owned Real Property and the sole lessee of the Leased Real Property and will convey to Purchaser at Closing fee simple title to the Owned Real Property, and valid leasehold title to the Leased Real Property, free and clear of all Encumbrances other than the Permitted Encumbrances.

(b)     Except as set forth on Schedule 3.10(b), there are no rights of first refusal, rights of first offer, options to purchase or lease, or any similar rights or options to purchase or transfer any portion of the Owned Real Property.

(c)     Schedule 3.10(c) lists all Revenue Leases and Expense Leases to which Seller or its Affiliate is a party. To the Knowledge of Seller, except as otherwise set forth on Schedule 3.10(c): (i)  the lessors named in the respective Expense Leases of the Leased Real Property (under which Seller is the lessee) are the fee owners of the Leased Real Property leased thereunder, (ii) none of the Revenue Leases under which Seller is the landlord is subject to any option to renew, options to purchase, rights of first refusal, rights of first offer or any similar rights, (iii) neither Seller nor its Affiliate as tenant under any Expense Lease is entitled to any rebate, concession or free rent, (iv) no tenant under any Revenue Lease is entitled to any rebate, concession or free rent, (v) no commitments have been made to any tenant under any Revenue Lease for material repairs or improvements other than for normal repairs and maintenance in the future and (vi) no rents due under any Revenue Leases have been assigned or hypothecated to, or encumbered by Seller, as landlord.

(d)     Except as set forth on Schedule 3.10(d), to the Knowledge of Seller, (i) each Real Property Lease is legal, valid, binding and in full force and effect; (ii) there are no material ongoing disputes with respect to such Real Property Leases; and (iii) neither Seller nor any of its Affiliates who is party under any Real Property Lease is in material breach or default under such Real Property Leases and, to the Knowledge of Seller, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or default, or permit the termination, modification or acceleration of rent under such Real Property Leases.

(e)     Schedule 3.10(e) sets forth an accurate and complete list and rent roll of all existing Revenue Leases, including the following information with respect to each: (i) the physical address and premises covered; (ii) the date; (iii) the legal name of the tenant, licensee or occupant; (iv) the term; (v) the base rent payable thereunder; (vi) any delinquent rents or any prepaid rent; (vii) the nature and amount of the security deposits thereunder, if any; and (viii) any options to renew or extend such Revenue Lease.

(f)     Schedule 3.10(f) describes all construction work, if any, which Seller has contracted for and which is presently in progress on any portion of the Real Property.

(g)     To the Knowledge of Seller, all buildings, structures, facilities, equipment and other material items of tangible property and assets included in the Assets are free from material defects and in good operating condition and repair, ordinary wear and tear excepted, and are usable in the regular

and ordinary course of business, and conform in all material respects to all applicable laws, ordinances, codes, rules and regulations relating to their use and operation by Seller.

(h)     Seller has not received written notice from any Governmental Authority of, and to the Knowledge of Seller there is not: (i) any pending or, threatened condemnation proceedings affecting the Real Property, or any part thereof; (ii) any violations of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Real Property, or any part thereof, which have not heretofore been cured; or (iii) any pending or, threatened injunction, decree, Order, writ or judgment outstanding, nor any claims, litigation, administrative actions or similar Proceedings against Seller or any Affiliate of Seller or any Real Property, relating to the ownership, lease, use or occupancy of such Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of any Real Property or any part thereof or in any material respect prevent or limit the present operation of the improvements on the Real Property or any part thereof.

(i)     No brokerage or leasing commissions or other compensation are due or payable to any Person, firm, corporation or other entity with respect to, or on account of, any Real Property Lease or any extensions or renewals thereof.

3.11     Employees; Labor Matters; Employee Benefit Plans.

(a)     (i) Except as set forth on Schedule 3.11(a), there is no unfair labor practice or labor arbitration Proceeding pending, or to the Knowledge of Seller, threatened against Seller, (ii) to the Knowledge of Seller, there are no organizational efforts with respect to the formation of a collective bargaining unit presently being made or threatened involving employees of Seller, and (iii) there is no labor strike, material slowdown or material work stoppage or lockout actually pending or, to the Knowledge of Seller, threatened against or affecting Seller, and Seller has not experienced any strike, material slowdown or material work stoppage or lockout in the past three (3) years, (iv) Seller is current in the payment to all employees of Seller of wages, salaries, commissions, bonuses and other direct compensation for services performed for Seller, and in the payments of all amounts required to be reimbursed to such employees of Seller, (v) Seller is in compliance in all material respects with all applicable laws respecting labor, employment, fair employment practices, terms and conditions of employment, workers' compensation, occupational safety, plant closings, and wages and hours with respect to the employees of Seller, (vi) Seller has withheld all amounts required by Law or by agreement to be withheld from the wages, salaries, and other payments to the employees of Seller, and (vii) with respect to all wages earned by the employees of Seller through the Closing, Seller is not liable for any arrears of wages, Taxes or penalties for failure to comply with any of the foregoing.

(b)     Schedule 3.11(b) contains a list of all Business Employees, which includes, for each Business Employee, the Business Employee's (1) name and current job title, (2) date of hire, (3) current base salary or hourly rate of compensation, (4) accrued paid time off, and (5) status as a full-time employee or part-time employee. Except as disclosed on Schedule 3.11(b), Seller is not a party to any oral (express or implied) or written (i) employment agreement, (ii) consulting agreement or (iii) independent contractor agreement with any individual or entity related to the Facilities, the Business or the Assets.

(c)     Each Company Plan is a "governmental plan" as defined in Section 3(32) of ERISA and Section 414(d) of the Code. All Company Plans have been operated and administered in material compliance with their terms and applicable Law, including the Code and any applicable state law. There are no pending claims, lawsuits or actions relating to any Company Plan (other than ordinary course claims for benefits) and, to the Knowledge of Seller, none is threatened. Purchaser will have no liability after the Closing under any Company Plan.

4834-6370-2626.19

(d)     Neither the Seller nor any affiliate has never contributed to, or had an obligation to contribute to, any plan that is a multiemployer plan within the meaning of Section 3(37) of ERISA. No Company Plan is a "defined benefit plan" within the meaning of Section 414(j) of the Code. For purposes of this Section 3.11(d), the term "affiliate" is any entity which, together with Seller, would be treated as a single employer under Sections 414(b), (c), (m) or (o) of the Code.

(e)     Full payment has or will, prior to the Closing Date, have been made of all amounts which the Sellers or any affiliate is directly or indirectly required, under applicable law, the terms of any Company Plan or any agreement relating to any Company Plan to have paid as a contribution, premium or other remittance thereto or benefit thereunder if such payment has a deadline on or before the Closing Date. The Seller has made adequate provisions for reserves or accruals in accordance with GAAP to meet contribution, benefit or funding obligations arising under applicable law or the terms of any Company Plan or related agreement. There will be no change on or before the Closing Date in the operation of any Company Plan or any documents with respect thereto which will result in an increase in the benefit under such Company Plans, except as may be required by law. No prohibited transaction(s) (within the meaning of Section 503 of the Code) has occurred in respect of the Company Plans.

(f)     No Company Plan provides for, and no written or oral agreements have been entered into promising or guaranteeing, the continuation of medical, dental, vision, life or disability insurance coverage for any current or former employee of Seller beyond termination of employment, except as required by the Consolidated Omnibus Reconciliation Act of 1985, as amended, or similar applicable laws.

(g)     For each Company Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter as to its qualification (or, in the case of a standardized form or paired plan, a favorable opinion or notification letter) and nothing has occurred, whether by action or failure to act, that could reasonably be expected to adversely affect the qualified status of any such Company Plan or the exempt status of any such trust.

(h)     There are no pending or, to Seller's Knowledge, threatened claims by or on behalf of the Company Plans or by any Business Employee alleging a breach or breaches of fiduciary duties or violations of other applicable state or federal law which could result in liability on the part of the Seller or the Company Plans under such laws, nor is there any reasonable basis for such a claim.

(i)     Seller has at all times complied and currently complies in all material respects with the continuation coverage requirements for their welfare benefit plans, including the Consolidated Omnibus Reconciliation Act of 1985, as amended, or similar applicable laws, the Patient Protection and Affordable Care Act, and any applicable state statutes mandating health insurance coverage for employees.

(j)     Except as set forth on Schedule 3.11(j) hereto, all returns, reports, disclosure statements and premium payments required to be made under the Code with respect to the Company Plans have been timely filed or delivered. All reports required under the Patient Protection and Affordable Care Act have been timely and accurately filed or delivered. The Company Plans have not been audited or investigated by either the Internal Revenue Service or any applicable state agency within the last five (5) years, and there are no outstanding audit issues with reference to the Company Plans pending before said governmental agencies. To Seller's Knowledge, no event has occurred and no condition exists that would subject the Seller or any affiliate to any tax, fine, lien, penalty or other liability imposed by the Code or other applicable laws, rules and regulations with respect to each Company Plan.

(k)     No payment that is owed or may become due to any director, officer, employee, or agent of the Seller or any affiliate that result in liability for an excise tax under Section 4960 of the Code; nor will the Seller nor any affiliate be required to "gross up" or otherwise compensate any such person because of the imposition of any tax on a payment to such person.

(l)     The consummation of the transactions contemplated hereby will not, either alone or in combination with another event, (1) entitle any Business Employee to severance pay or other compensation or benefit under a Company Plan, (2) accelerate the time of payment or vesting of any compensation or benefits under any Company Plan for any Business Employee, or (3) increase the amount of compensation due any current or former Business Employee.

3.12    Government Program Participation/Accreditation/Commercial Payor Programs.

(a)     The Facilities have historically received (i) Medicare and Medicaid reimbursement and are eligible to receive payment without restriction under Title XVIII of the Social Security Act ("Medicare") and Title XIX of the Social Security Act ("Medicaid") and are "providers" or "suppliers" with valid and current provider or supplier agreements and with one or more provider or supplier numbers with the federal Medicare, all applicable state Medicaid and any successor programs through Medicare or Medicaid administrative contractors, and (ii) payments under the military health care programs set forth in Chapter 55 of Title 10 of the United States Code ("CHAMPUS/Tricare") or its predecessor programs and are "providers" with valid and current provider agreements and with one or more provider numbers with CHAMPUS/Tricare and any successor programs through Medicare or Medicaid administrative contractors (collectively, the "Government Programs").  Schedule 3.12(a)(a)(i) sets forth a true, complete and correct list of all Seller's provider numbers and identifies those Facilities that are operated as PPS excluded facilities or units.  A true and correct copy of each of such agreements has been previously delivered to Purchaser by Seller. Except as described on Schedule 3.12(a)(ii) and to the Knowledge of Seller, the Facilities are in compliance with the conditions of participation for the Government Programs, and there is not pending or, to the Knowledge of Seller, threatened any material Proceeding or investigation under the Government Programs involving the Business or Seller.

(b)     Each of the Facilities is duly accredited by an applicable healthcare facility accreditation program, with no contingencies and, to the Knowledge of Seller, has complied in all material respects with such accreditation requirements.  There is no pending or, to the Knowledge of Seller, threatened action to terminate, revoke or modify any such accreditation.  Seller has previously delivered to Purchaser true, correct and complete copies of the Facilities' most recent Medicare and Medicaid certification survey reports and healthcare facility accreditation survey reports, including any statements of deficiencies and plans of correction related thereto.

(c)     Seller has not been excluded from participation in any Government Program, nor to the Knowledge of Seller, is any such exclusion threatened.  Seller performs, in accordance with its policies, reviews of (i) the "List of Excluded Individuals/Entities" from the United States Health and Human Services Office of Inspector General, (ii) the "List of Excluded Individuals/Entities" from the System for Award Management, and (iii) the "Specially Designated Nationals (SDN) and Blocked Persons" list from the U.S. Treasury, to confirm that none of the officers or directors of Seller, nor any of the Business Employees, have been excluded from participation in any Government Program.  No current employee of the Business has been excluded from participating in any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)).  None of the Facilities or any current officer, director, governing board member or managing employee (as such term is defined in 42 U.S.C. §1320a-5(b)) of Seller has been excluded from Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C.§1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b.

4834-6370-2626.19

(d)     Seller has filed or will cause to be filed all cost reports for all periods ending on or prior to the Closing Date for the Facilities and all other reports that are required by Law or contract to have been filed or made with respect to the purchase of services of the Facilities by third-party payors, including Government Programs and other insurance carriers (the "Cost Reports").  True and correct copies of all Cost Reports for the prior three (3) fiscal years of the Facilities have been delivered to Purchaser. To the Knowledge of Seller, all of such Cost Reports accurately reflect the information required to be included thereon and such Cost Reports do not claim and neither the Facilities nor Seller has received reimbursement in any amount in excess of the amounts provided by Law or any applicable agreement. Schedule 3.12(d) indicates which of such Cost Reports have not been audited and finally settled and a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such Cost Reports.  To the Knowledge of Seller, there are no facts or circumstances, other than those described on Schedule 3.12(d), which may reasonably be expected to give rise to any material disallowance under any Cost Reports.

(e)     To the Knowledge of Seller, Seller has operated all of its Facilities in material compliance with all rules and regulations, including under applicable Government Programs. To the Knowledge of Seller, all of Seller's billing practices with respect to the Facilities to all Government Programs have been and are in compliance in all material respects with all applicable Laws. To the Knowledge of Seller, all of Seller's billing practices with respect to the Facilities to all private insurance companies, have been and are in compliance in all material respects with all applicable Laws, and the polices of such private insurance companies. Seller has registered with the QNet Exchange as required by The Centers for Medicare and Medicaid Services under its Hospital Quality Initiative Program.  Seller has submitted all material quality data with respect to all Facilities required under the Hospital Quality Initiative Program to The Centers for Medicare and Medicaid Services or its agent for all calendar quarters concluded prior to the date of this Agreement, except for any quarter for which the respective reporting deadlines have not yet expired.  All such submissions of quality data have been made in all material respects in accordance with applicable reporting deadlines and in the form and manner required by The Centers for Medicare and Medicaid Services.  Seller has not received notice of any reduction in reimbursement under the Medicare program with respect to the Facilities resulting from its failure to report quality data to The Centers for Medicare and Medicaid Services or its agent as required under the Hospital Quality Initiative Program.  Seller has provided Purchaser with the Hospital Quality Initiative Program "validation results" received by Seller with respect to the Facilities for all calendar quarters concluded prior to the date of this Agreement, except for any quarter for which the respective reporting deadlines have not yet expired.

(f)     Seller currently participates in health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans, and other third-party reimbursement and payment programs ("Payment Programs").  Except as set forth on Schedule 3.12(f), to the Knowledge of Seller, there are no material outstanding overpayments or refunds due to any Payment Program.  To the Knowledge of Seller, all claims for reimbursement relating to the Facilities or the Business that Seller has submitted are timely, comply in all material respects with all applicable Laws and all Payment Program contracts, provider manuals, policies and reimbursement requirements governing reimbursement and payment of claims and do not contain any material errors, omissions or disallowances.  Except as set forth on Schedule 3.12(f), to the Knowledge of Seller, Seller has not received notice of any material disallowance, overpayment, refund or dispute regarding any such reimbursement claims, and there are no facts or circumstances which may reasonably be expected to give rise to any disallowance, overpayment, refund or dispute other than those that occur in the ordinary course of business.

3.13  <u>Taxes</u>.

(a)     Seller has timely filed, or caused to be timely filed, with the appropriate Governmental Authorities all Tax Returns which are required to be filed by it.  All such Tax Returns are true, correct and complete in all material respects.  All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been timely paid.  Seller is not the beneficiary of any extension of time within which to file any Tax Return.  There are no Encumbrances on any of the assets of Seller with respect to Taxes.  No statute of limitations in respect of Taxes has been waived and no extension of time with respect to a Tax assessment or deficiency has been agreed to by or on behalf of Seller.

(b)     Seller has not received notice of any deficiencies for Taxes claimed, proposed or assessed by any Governmental Authority for which Seller may have any liability.  To the Knowledge of Seller, there are no pending or threatened audits, investigations or claims for or relating to any material liability in respect of Taxes for which Seller may have any liability.   There are no matters under discussion by Seller with any Governmental Authorities with respect to Taxes that may result in an additional amount of Taxes for which Seller may have any liability. Seller is not a party to any agreement providing for the allocation or sharing of, or indemnification for, Taxes.  Seller does not have any liability for any Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise.

(c)     To the Knowledge of Seller, Seller has complied with all applicable Laws relating to the payment and withholding of Taxes (including, but not limited to, withholding in connection with payments to employees, independent contractors, creditors, partners or other third parties) and has, within the time and manner prescribed by Law, withheld and paid over to the proper Governmental Authorities all amounts required to be withheld and paid over under all applicable Laws. All Internal Revenue Service Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed in all material respects.  All persons who have provided services to Seller have been classified by Seller as independent contractors for Tax purposes were properly classified.

(d)     Except for the Joint Ventures, none of the Assets is a joint venture, partnership or other arrangement that is or should be treated as a partnership for federal income tax purposes.

(e)     Seller (i) is a political subdivision exempt from taxation to the extent described in Section 115 of the Code and (ii) is not a private foundation within the meaning of Section 509(a) of the Code.

(f)     Except as set forth on <u>Schedule 3.13(f)</u>, the Real Property, Facilities and the Assets are, and shall be through the Closing Date, exempt from all real and personal property Taxes and there are no municipal assessments, for betterments or otherwise, on, related to or, to Seller's Knowledge, under consideration for the Real Property.

(g)     The Seller has (i) timely paid all sales and use Taxes required to be paid under applicable Laws, (ii) properly collected and remitted all sales Taxes required under applicable Laws and (iii) for all sales that are exempt from sales Taxes and that were made without charging or remitting sales or similar Taxes, received and retained any appropriate tax exemption certificates and other documentation qualifying such sale as exempt.

(h)     Seller has timely filed or caused to be timely filed with the appropriate Governmental Authority all reports required to be filed with respect to any unclaimed property.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 28 of 118

(i)     High Desert Surgery is treated as a partnership for federal income tax and applicable state tax purposes.  To the Knowledge of Seller, High Desert Surgery has filed all Tax Returns required to be filed by it, and all Taxes due and owing by High Desert Surgery (whether or not shown on any Tax Return) have been paid.

3.14    Intellectual Property.

(a)     Schedule 3.14(a) contains a true, complete and correct list of the Owned Intellectual Property; provided, however, with respect to copyrights, such Schedule 3.14(a) only includes copyrights that have been registered with the United States Copyright Office. All Owned Intellectual Property is owned by Seller free and clear of all liens, claims, and encumbrances. Except as described in Schedule 3.9, Seller has not granted any license to any Person or entity relating to any of the Owned Intellectual Property.

(b)     To the Knowledge of Seller, Schedule 3.14(b) contains a true, complete and correct list of all material Intellectual Property (other than the Owned Intellectual Property and Off-the-Shelf Software) that is used in connection with the Business (the "Licensed Intellectual Property") and constitutes all Intellectual Property (other than Owned Intellectual Property and Off-the-Shelf Software) used in connection with the operation of the Facilities.

(c)     Except as set forth on Schedule 3.14(c), Seller owns or has the right to use all Intellectual Property as is necessary to conduct the Business as currently operated by Seller.  To the Knowledge of Seller, no infringement exists by Seller on the Intellectual Property rights of any other Person that results in any way from the operation of the Business. To the Knowledge of Seller, there is no infringing use by any other Person of any of the Owned Intellectual Property or any of the Licensed Intellectual Property. No Court Orders or Proceedings are pending, or to the Knowledge of Seller, threatened against Seller that challenge the validity of, or Seller's ownership of or right to use, any of the Owned Intellectual Property or the Licensed Intellectual Property, and Seller knows of no basis therefore. Further, pursuant to Section 365(n) of the Bankruptcy Code none of Licensed Intellectual Property's licenses have been terminated or otherwise impaired such that Purchaser may have full use and implementation of such licenses following the Closing.

(d)     Except as set forth on Schedule 3.14(d), all patents, registered copyrights and registered trademarks that are a portion of the intellectual property of Seller and applications with respect thereto, (i) have been duly maintained including without limitation the proper, sufficient and timely submission of all necessary filings and fees, (ii) have not lapsed, expired or been abandoned, and (iii) are not the subject of any opposition, interference, cancellation, or other Proceeding before any Governmental Authority.

3.15    Permits; Compliance With Laws.

(a)     The Hospital is duly licensed as an acute care hospital pursuant to the applicable laws of the State of Washington.  All material Permits issued or granted by a Governmental Authority and owned or held by or issued to Seller in connection with the current operation of the Facilities are set forth on Schedule 3.15(a) and true and complete copies of such Permits have been provided to Purchaser. Such Permits constitute all Permits necessary for the conduct of the Business and the operation of the Facilities as currently operated.  Seller is the duly authorized holder of all such Permits.  To the Knowledge of Seller, each Facility's pharmacies, laboratories and all other ancillary departments located at such Facility or operated for the benefit of such Facility (and are owned or operated by Seller), which are required to be licensed are licensed by the appropriate Governmental Authority.

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 29 of 118

(b)     To the Knowledge of Seller, Seller and the Facilities are in compliance in all material respects with all Permits required by Law, and there are no provisions in, or agreements relating to, any such Permits which preclude or limit in any respect Seller from operating any of the Facilities as they are currently operated.  There is not now any pending or, to the Knowledge of Seller, threatened action by or before any Governmental Authority to revoke, cancel, rescind, modify or refuse to renew any of the Permits, and all of the Permits are and shall be in good standing now and as of the Closing Date.

(c)     No application for any Certificate of Need, Exemption Certificate or declaratory ruling has been made by Seller with the Washington State Department of Health or other applicable agency which is currently pending or open before such agency, and no such application filed by Seller within the past three (3) years has been ultimately denied by any commission, board or agency or withdrawn by Seller. Seller has not filed, supported or presented opposition to any such applications filed by another hospital or health agency within the past three (3) years.  Seller has neither any such applications pending nor any approved which relate to projects not yet completed.  Seller has properly filed all required applications which are complete and correct with respect to any and all improvements, projects, changes in services, zoning requirements, construction and equipment purchases, and other changes for which approval is required under any applicable federal or state Laws, rule or regulation.

(d)     In each case to the extent pertaining to the Business, (1) Seller has not received any notice of material noncompliance with any applicable Law relating to the employment of personnel, including any Law relating to wages, hours, equal employment, occupational safety and health, workers' compensation, unemployment insurance, collective bargaining, affirmative action and the payment and withholding of social security and other Taxes; (2) to the Knowledge of Seller, Seller has withheld all amounts required by Law or agreement to be withheld from the wages or salaries of the employees of Seller, and Seller is not liable for any arrears of any Tax or penalties for failure to comply with the foregoing; and (3) to the Knowledge of Seller, Seller has, as of the Closing Date, made all filings required under applicable Laws or agreements that apply to Seller with respect to any of the Business Employees.

(e)     To the Knowledge of Seller, Seller and its Affiliates have complied in all material respects with all applicable Laws concerning the employment of any Business Employees (including but not limited to, as applicable, the Labor Management Relations Act, the National Labor Relations Act, Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Family and Medical Leave Act, the Americans with Disabilities Act, the Fair Labor Standards Act and employment laws of the State of Washington) and have not received written notice of material noncompliance from a Governmental Authority with respect to such Laws.

(f)     Except as set forth in Schedule 3.15(f), during the past three (3) years, Seller has not performed or permitted the performance of any experimental or research procedures or studies involving patients in the Hospital.

(g)     To the Knowledge of Seller, all of Seller's contracts with physicians or entities in which physicians or immediate family members of physicians are equity owners (collectively, "Healthcare Providers") involving services, supplies, payments or any other type of remuneration, whether such services or supplies are provided by a Healthcare Provider to Seller or by Seller to a Healthcare Provider and all of Seller's leases of personal or real property with Healthcare Providers, whether such personal or real property is provided by a Healthcare Provider to Seller or by Seller to a Healthcare Provider, are in material compliance with applicable Law, are in writing and provide for a fair market value compensation in exchange for such services, space or goods.

(h)     To the Knowledge of Seller, Seller and each Facility have been and presently are, and for the last three (3) fiscal years have been, in material compliance with all Laws of any

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 30 of 118

Governmental Authority having jurisdiction over the Business or the assets of Seller, including but not limited to the False Claims Act, the Federal Health Care Program Anti-Kickback Statue, 42 U.S.C. § 1320a-7b(b), the physician self-referral provisions of the Ethics in Patient Referrals Act, as amended (42 U.S.C. Section 1395nn), and all similar and related statutes and regulations and the corresponding fraud and abuse, false claims and anti-self-referral statutes in Washington and any regulations promulgated pursuant to any of the foregoing referenced statutes (the "Healthcare Fraud Laws"). To the Knowledge of Seller, Seller has timely filed all material reports, data, and other information required to be filed with such commissions, boards, bureaus, and agencies regarding the assets of Seller and the Facilities.

(i)     To the Knowledge of Seller and except as would not be expected to result in a Material Adverse Effect, none of Seller, the Facilities, or any of Seller's respective officers, directors, or managing employees has engaged in any activities that are prohibited under the Healthcare Fraud Laws, or the regulations promulgated thereunder, or under any other statutes or regulations, or which are prohibited by applicable rules of professional conduct.

(j)     To the Knowledge of Seller, Seller and the Facilities are in compliance in all material respects with the administrative simplification provisions required under the Health Insurance Portability and Accountability Act of 1996, and its implementing regulations as amended by the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 (Public Law 111-5), as amended, including the electronic data interchange regulations and the health care privacy regulations, as well as applicable state laws having similar subject matter, as of the applicable effective dates for such requirements.

3.16    Environmental Conditions.  To the Knowledge of Seller, Seller and its Affiliates are and have been at all times during Seller's or its Affiliates' ownership or operation of the Business, the Facilities and the Real Property, in compliance in all material respects with applicable environmental Laws.  To the Knowledge of Seller, neither Seller nor any of its Affiliates nor any other Person has stored or used any toxic or hazardous waste, pollutants or substances, including friable asbestos, polychlorinated biphenyls petroleum, petroleum products, byproducts, or other hydrocarbon substances, substances defined or listed as a "hazardous substance," "toxic substance," "toxic pollutant" or similarly identified substance or mixture, in or pursuant to any environmental Law on any of the Real Property, except as necessary to the conduct of the Business, and then in material compliance with applicable environmental Laws.  To the Knowledge of Seller, neither Seller nor any of its Affiliates nor, any other Person has disposed of, released or permitted the release of any such substances on any of the Real Property, except in material compliance with applicable environmental Laws.  Seller has not assumed or undertaken or otherwise become subject to any liability or corrective, investigatory or remedial obligation of any other person relating to any environmental Law.  To the Knowledge of Seller, there is no underground storage tank on property owned, leased or operated by Seller or any of the Facilities.

3.17    Legal Proceedings, Court Orders.

(a)     Schedule 3.17(a) contains an accurate list of (i) all pending actions, suits, Proceedings, audits or investigations which involve employees of the Facilities (in their capacity as employees) or the Business, and to which the Facilities, Seller, or any of its Affiliates is a party, (ii) all active actions, suits, Proceedings, audits or investigations to which the Facilities, Seller or any of its Affiliates is a party, and (iii) all active actions, suits, Proceedings, audits or investigations with respect to the Facilities or the Business to which Seller or any Affiliate of Seller is a party. Other than as set forth in Schedule 3.17(a), there are no actions, suits, Proceedings, audits or investigations pending or, to the Knowledge of Seller, threatened against the Facilities, Seller, or any of its Affiliates, with respect to the

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 31 of 118

Facilities, the Business or Seller. Except as set forth on Schedule 3.17(a), Seller is not subject to any Court Order with respect to the Facilities or the Business.

(b)        Except as set forth in the Bankruptcy Plan, Seller and its Affiliates (a) are not party to, or is otherwise bound by, any consent decree with any Governmental Authority; (b) are not party to an outstanding Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services; (c) have no reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority. Except as set forth in the Bankruptcy Plan and to the Knowledge of Seller, Seller and its Affiliates (i) have not, at any time during the past three (3) years, been the subject of any government payor program investigation conducted by any federal or state enforcement agency; (ii) have not, at any time during the past three (3) years, been a defendant in any *qui tam*/False Claims Act litigation and no such litigation is threatened; (iii) have not, during the past three (3) years, been served with or received any search warrant, subpoena, civil investigative demand, or contact letter from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the healthcare businesses conducted by Seller) that could result in a Material Adverse Effect and (iv) have not, during the past three (3) years, received any material written complaints (or material complaints through their compliance "hotline") from employees, independent contractors, vendors, physicians, or any other person that would indicate that Seller has violated any Law or regulation. No material audit or material investigation has been conducted by Seller pursuant to its compliance program during the last three (3) years. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the Office of Inspector General of the Department of Health and Human Services.

(c)        During the past three (3) years, Seller and its Affiliates have not received written notice of noncompliance with any statutes, restrictions, regulations and ordinances applicable thereto, including, but not limited to, the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 or any applicable parking ordinances.

3.18    Insurance. Schedule 3.18 includes a list of all insurance policies maintained by or for the benefit of the Facilities or Seller, including fire and extended coverage and casualty, professional liability, general liability and other forms of insurance. Schedule 3.18 sets forth each policy's applicable deductibles, coverage limits and whether or not the insurance policies provide coverage on an occurrence basis. All of such policies are in full force and effect with no premium arrearage. Except as set forth on Schedule 3.18, Seller has not received any written notice or other communication from any such insurance company canceling or amending any of such insurance policies, and, to the Knowledge of Seller, no such cancellation or amendment is threatened.

3.19    Medical Staff. Seller has delivered to Purchaser a true and correct copy of the by-laws and the rules and regulations of the medical staff of the Hospital, as well as a list of all current members of the medical staff. There are no adverse actions pending with respect to any medical staff members of the Hospital or any current applicant thereto for which a medical staff member or current applicant has requested a judicial review hearing which has not been scheduled or has been scheduled but has not been completed, and there are no pending or, to the Knowledge of Seller, threatened disputes with current applicants or medical staff members of the Hospital.

3.20    Transaction. The transaction contemplated by this Agreement is an arm's length transaction. Seller represents that it has undertaken a marketing process with respect to the Assets, has chosen Purchaser as the highest and best offer available to the Seller. Purchaser is not an affiliate or otherwise an insider of the Seller and it has conducted the negotiation of the transaction contemplated herein in an arm's length manner. There has been no collusion with respect to the terms of this

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 32 of 118

Agreement between Purchaser and Seller in connection with the transaction contemplated herein. Seller has not paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

4.1 <u>Organization</u>. Purchaser is a Delaware limited liability company, duly organized, validly existing and in good standing under the Laws of the State of Delaware. Purchaser is an indirect wholly-owned subsidiary of RCCH.

4.2 <u>Corporate Authorization</u>. The execution, delivery and performance by Purchaser of this Agreement and the other agreements to be entered into by Purchaser pursuant to this Agreement, and the consummation by Purchaser of the transactions contemplated hereby and thereby are within Purchaser's corporate powers, are not in contravention of the terms of Purchaser's Constituent Documents, and have been duly authorized and approved by the board of directors of Purchaser and have been duly and validly executed and delivered by Purchaser. On or prior to the Closing Date, the other agreements to be entered into by Purchaser pursuant to the terms of this Agreement will have been duly and validly executed and delivered by Purchaser. This Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its respective terms (assuming the valid authorization, execution and delivery hereof and thereof by Seller).

4.3 <u>No Conflicting Agreements; Consents</u>. Neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated hereby will violate, conflict with, result in a breach or termination of the terms, conditions or provisions of, constitute a default (or an event which, with notice or lapse of time or both would constitute a default) under, or result in the termination or in a right of termination or cancellation of, or accelerate the performance required by, or result in being declared void, voidable or without further binding effect. None of (i) the Constituent Documents of Purchaser, (ii) any material agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness or other contract to which assets of Purchaser are a party or by which Purchaser is bound, (iii) any Court Order to which Purchaser is a party or by which a Purchaser is bound, or (iv) any material requirements of Law affecting Purchaser, will materially impair the ability of Purchaser to perform its obligations hereunder or prevent the consummation of the transactions contemplated hereby or thereby. Neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated hereby will require a material permit approval, consent or authorization from, or the making by Purchaser of any material declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 6.7</u> and except for such approvals, consents, authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of Purchaser to perform its obligations hereunder or which would not prevent the consummation of the transactions contemplated hereby or thereby; or violate any Law applicable to Purchaser.

4.4 <u>Legal Proceedings, etc</u>. There are no material actions, suits or Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser which would materially impair the ability of Purchaser to perform its obligations hereunder or under the other agreements contemplated hereby to be entered into by Purchaser or could reasonably be expected to delay or prevent the consummation of the transactions contemplated hereby or thereby.

4834-6370-2626.19

# ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1     <u>Competing Transaction</u>.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids.  From the date hereof (and any prior time) and until the Confirmation Order is entered by the Bankruptcy Court, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Assets, alone or in connection with the sale or other disposition of any other asset of Seller.  In addition, until the Confirmation Order is approved by the Bankruptcy Court, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Assets and perform any and all other acts related thereto which are required by the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the Assets to prospective purchasers.

5.2     <u>Bankruptcy Court Filings</u>.

(a)     Seller shall not withdraw or modify, or propose to withdraw or modify, in a manner adverse to Purchaser the approval and recommendation of the transactions contemplated herein, except as required by the Bankruptcy Court.  Seller shall promptly make any filings, take all actions and use commercially reasonable efforts to obtain any and all approvals and orders necessary or appropriate for consummation of the transactions contemplated hereby, subject to its obligations to comply with any and all orders of the Bankruptcy Court.  As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court this Agreement as part of the Plan Supplement (as such term is defined in the Bankruptcy Plan) which Plan Supplement shall be approved pursuant to the Bankruptcy Plan and the Confirmation Order, each of which shall be, in form and substance reasonably satisfactory to Purchaser.  Purchaser agrees to cooperate as reasonably requested by Seller to assist in obtaining required approvals of the Bankruptcy Court. With respect to each Assumed Contract, Purchaser shall provide adequate assurance of future performance of each such agreement as required by section 365 of the Bankruptcy Code.  Seller shall comply with the Bankruptcy Code and all other Laws and Orders promulgated thereunder in obtaining the Confirmation Order.  Between the date of this Agreement and the Closing Date, Seller shall not, directly or indirectly, except as required by the Bankruptcy Court, enter into any transaction, take any action, or knowingly by inaction permit an event to occur, which would result in any of the representations or warranties of Seller herein contained not being true and correct at and as of the Closing Date.  From and after the date hereof, Seller shall not take any action which is intended, or fail to take any action the intent of which failure to act would be, (i) to prevent or materially impede the vesting, upon the Closing, of the Assets in Purchaser free and clear of all Encumbrances and claims and interests of all creditors, claimants and interest holders having claims against or interests in Seller; or (ii) to result in the reversal, voiding, modification or staying of the Confirmation Order.

(b)     In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought of the Confirmation Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser within one (1) Business Day a copy of the related notice of appeal or order of stay or application for reconsideration.  Seller shall also provide Purchaser with written notice, and copies of any other or further notice of appeal, motion or application filed in connection with any appeal from, or application for reconsideration of, either of such orders and any related briefs.

(c)     Notwithstanding the foregoing, the Seller shall establish the Plan Fund, in accordance with Article V.IV of the Bankruptcy Plan, for the purpose of, among other things, paying any

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 34 of 118

and all expenses or amounts arising from or in connection with the following: (i) any cure costs pursuant to Section 2.3; (ii) any prorations pursuant to Section 2.8; (iii) the filing of terminating Seller Cost Reports pursuant to Section 6.11; and (iv) the fees, expenses and disbursements of Seller and its respective brokers, agents, advisors, attorneys and accountants and other amounts incurred in connection with the transactions contemplated hereby.

# ARTICLE VI
# COVENANTS OF THE PARTIES

6.1     Conduct Prior to the Closing.  On and after the date hereof and prior to the Closing Date, except as otherwise approved in writing by an authorized officer of Purchaser, as permitted by this Agreement:

(a)     Seller shall do the following: (i) carry on its business pertaining to the Facilities in substantially the same manner as presently conducted and not make any material change in personnel, operations, finance, accounting policies, or Real Property or personal property pertaining to the Facilities; (ii) maintain the Facilities and all parts thereof in substantially the same operating condition, ordinary wear and tear excepted; (iii) perform in all material respects all of its obligations under agreements relating to or affecting the Facilities or the Assets; (iv) keep in full force and effect present insurance policies or other comparable insurance pertaining to the Facilities; (v) use reasonable commercial efforts to maintain and preserve its business organizations intact, retain their present employees at the Facilities, and maintain its relationships with physicians, suppliers, customers, and others having business relations with the Facilities; (vi) as permitted by Law, provide Purchaser and its counsel, accountants, bankers and other representatives or consultants with reasonable access during normal business hours, to all of the Assets, properties, facilities, employees, agents, accountants and Books and Records of Seller relating to the Business; (vii) notify Purchaser promptly in writing of, and contemporaneously will provide Purchaser with true and complete copies of any and all information or documents relating to any event, transaction or circumstance occurring prior to or after the date hereof of which Seller has Knowledge that causes or would cause any covenant or agreement of Seller under this Agreement to be breached, or that renders or would render untrue or incorrect any representation or warranty of Seller contained in this Agreement as if such representation or warranty were made on or as of the date of such event, transaction or circumstance; and (viii) assist and cooperate with Purchaser and its representatives and counsel in obtaining all Permits which Purchaser deems necessary or appropriate and in the preparation of any document or other material which may be required by any Governmental Authority as a predicate to or as a result of the transactions contemplated herein.

(b)     Seller shall not, without the prior written consent of Purchaser, enter into, amend or terminate any of the Contracts, enter into any contract or commitment, or incur or agree to incur any liability which would constitute a Contract, including renewals or extensions; increase compensation payable or to become payable or make any bonus payment to or otherwise enter into one or more bonus agreements with any employee at the Facilities; or create, assume, or permit to exist any new debt, mortgage, pledge, or other lien or encumbrance upon any of the Assets, whether now owned or hereafter acquired.

6.2     Insurance.  To the extent that Seller has any insurance policies underwritten on a "claims-made" basis and which will not continue in full force and effect following the Closing Date, Seller shall obtain, at its sole cost and expense, extended reporting coverage, or "tail" insurance, covering claims made during the [●] period following Closing.

6.3     Additional Financial Information.  From the date the Bankruptcy Court enters the Confirmation Order until the earlier of the Closing or the termination of this Agreement in accordance

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 35 of 118

with its terms, within five (5) Business Days after they are created (but in any event no later than twenty (20) days following the end of each calendar month prior to Closing, if any), Seller shall deliver to Purchaser true and complete copies of the unaudited balance sheets and the related unaudited statements of income of, or relating to, Seller for each month then ended, together with a year-to-date compilation and the notes, if any, related thereto, which shall have been prepared from and in accordance with the Books and Records of Seller, and shall fairly present in all material respects the financial position and results of operations of the Facilities as of the date and for the period indicated, all in accordance with GAAP consistently applied.

6.4     Use of Controlled Substance Permits.  To the extent permitted by applicable Law, Purchaser shall have the right, for a period not to exceed that later of (1) one hundred twenty (120) days following the Closing Date or (2) until such time as Purchaser obtains new licenses and registrations for itself relating to controlled substances and the operations of pharmacies, to operate under the licenses and registrations of Seller relating to controlled substances and the operations of pharmacies. In furtherance thereof, to the extent required, Seller shall execute and deliver to Purchaser at or prior to the Closing a limited power of attorney relating to Seller's federal and state controlled substances permits and pharmacy licenses.

6.5     Notification of Certain Matters.  From the date the Bankruptcy Court enters the Confirmation Order until the Closing Date, Seller shall give prompt written notice to Purchaser of (a) the occurrence, or failure to occur, of any event, circumstance or fact that is reasonably likely to cause any representation or warranty of Seller contained in this Agreement to be untrue in any material respect and (b) any failure of a Seller to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.  The content of any notice or update delivered by Seller to Purchaser prior to the Closing Date pursuant to this Section 6.5 shall not be deemed to amend or supplement the Schedules or to modify the applicable representations, warranties and covenants contained in this Agreement or the Transaction Documents contemplated herein for purposes of determining whether applicable conditions precedent in Article VII are satisfied or for purposes of determining or calculating Seller's indemnification obligations set forth in Article IX.

6.6     Closing Conditions.  Each Party will use commercially reasonable efforts to cause each of the conditions set forth in Articles VII and Articles VIII (for which such Party has responsibility) to be satisfied as soon as reasonably practicable, but in all events on or prior to the Closing Date.  Subject to the other provisions hereof, each Party shall cooperate fully with the other and its respective officers, directors, employees, agents, counsel, accountants and other designees, at the requesting Party's expense, in connection with any action reasonably required to be taken as a part of requesting Party's obligations hereunder.

6.7     Regulatory and Other Approvals.  Seller and Purchaser will (a) use commercially reasonable efforts to obtain, as promptly as practicable, all Permits, filings, approvals, authorizations and clearances of Governmental Authorities listed in Schedule 6.7 hereto and to make the filings and declarations with Governmental Authorities listed in Schedule 6.7 hereto, (b) provide such information and communications to applicable Governmental Authorities as is necessary in connection with the foregoing or in connection with obtaining any of the Permits, approvals, authorizations and clearances of Governmental Authorities or making any filings or declarations with Governmental Authorities in accordance with Section 6.7, and (c) cooperate with the other Party in obtaining or making, as soon as practicable, any Permits, approvals, authorizations, clearances, filings and declarations of or with Governmental Authorities that are required to be obtained or made pursuant to Section 6.7. Notwithstanding the foregoing, neither Seller, Purchaser, nor any of their respective Affiliates or direct or indirect equity owners shall be required to agree to any structural or conduct remedy or to litigate.

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 36 of 118

6.8     Post-Closing Access. Subsequent to the Closing Date, Purchaser and Seller shall (a) provide to the other reasonable access, including, if applicable, exercise of commercially reasonably efforts by Purchaser to provide access to cooperate with Seller's attempts to comply with the requirements of the Washington State Public Records Act, to information, documents or computer data relating to the Business on or prior to the Closing Date, at the sole cost and expense of the requesting party and (b) make available to the other, at no charge to the requesting Party (other than, if providing witnesses, reimbursement will be provided by the requesting Party all reasonably incurred out-of-pocket costs and expenses, but not including internal time charges), the personnel of such Person and its Affiliates to the extent reasonably required in connection with Proceedings relating to the Business on or prior to the Closing Date. Notwithstanding the foregoing, the parties acknowledge that the Purchaser is not subject to the Washington State Public Records Act and that Purchaser's obligation set forth in the preceding sentence is limited to providing Seller, at Seller's expense, with access to records created prior to, and transferred to Purchaser at, the Closing. Notwithstanding the foregoing, Purchaser will, at its election, be deemed to have complied with its obligations pursuant to item (a) above through delivery to Seller of a copy of the applicable information, documents or computer data.

6.9     Employee Matters. On the Closing Date, Seller shall terminate all employees of Seller and its Affiliates providing services for the Business, and Purchaser shall be permitted to hire such at-will employees as Purchaser elects in its sole discretion, who are in good standing, subject to Purchaser's customary background checks and drug screening requirements (the "Hired Employees") with such benefits as may be established in accordance with Purchaser policies and subject to any applicable collective bargaining agreements. Seller shall provide any notices required by Law and notices relating to any Company Plan. Seller shall cause Company Plans to be amended as reasonably requested by Purchaser. Nothing herein shall be deemed to affect or limit in any way normal management prerogatives of Purchaser with respect to employees or to create or grant to any such employees third-party beneficiary rights or claims of any kind or nature. Within the period of ninety (90) days before the Closing Date, Seller shall not, and within ninety (90) days following the Closing Date, Purchaser shall not, take any action that would result in liability with respect to Hired Employees pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101 *et seq*, or similar applicable law. Subject to the terms and conditions herein, Purchaser acknowledges that Purchaser intends to continue employing Seller's or its Affiliate's H-1B sponsored employees, if any, and abide by the attestations stated in the certified ETA Form 9035, Labor Condition Application, for each sponsored employee. If a Hired Employee accepts a position with Purchaser, Seller will (y) not enforce any noncompetition covenant in effect between the Hired Employee and Seller that would apply to such Hired Employee's employment with Purchaser and (z) not, without the consent of such Hired Employee, reduce or eliminate any amounts or obligations pursuant to any employment agreement or similar agreement with any Hired Employee to such Hired Employee as a result of such Hired Employee's employment with Purchaser. All such amounts and obligations shall be Excluded Liabilities.

6.10    Tax Matters.

(a)     Seller shall prepare or cause to be prepared and file or cause to be filed all Tax Returns relating to the Assets and the Facilities with respect to all taxable periods ending on or prior to the Closing Date. Seller shall be responsible for and shall pay any Taxes arising or resulting from or in connection with the ownership of the Assets and the Facilities for all taxable periods (or portion thereof) ending on or prior to the Closing Date. Following the Closing Date, the Parties shall cooperate with each other and shall make available to the other, and as reasonably requested and at the expense of the requesting Party, to any Governmental Authority, all information, records or documents relating to Tax liabilities or potential Tax liabilities of such Parties hereunder solely related to the Assets and the Facilities, and shall preserve all such information, records and documents (to the extent a part of the Assets delivered by Seller at Closing) at least until the expiration of any applicable statute of limitations

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 37 of 118

or extensions thereof. Seller agrees, upon request of Purchaser, to consent to reasonable tax elections and to use its commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Taxes that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby). Seller shall request that High Desert Surgery make an election under Section 754 of the Code and the Treasury Regulations thereunder (and any corresponding election under state, local and foreign tax law) on its federal Tax Return, if such election is not currently in effect, to adjust the basis of the assets of High Desert Surgery as provided in Section 743 of the Code. Sellers shall provide Purchaser with a copy of such Section 754 election within ten (10) days after it has been filed with the Internal Revenue Service.

(b)     Following the Closing Date, the Parties agree that Purchaser shall prepare a tax allocation of  the Assumed Liabilities and all other capitalized costs among the various tax asset classifications in accordance with and as provided by Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provisions of state or local Law, as appropriate); and the valuations and appraisals prepared by the accounting firm or other qualified appraisal firm selected by Purchaser. Purchaser shall deliver a copy of the such allocation to Seller upon its completion. Purchaser and Seller shall report, act and file all Tax Returns (including, but not limited to Internal Revenue Service Form 8594), Cost Reports and other information filings, to the extent required, in all respects and for all purposes consistent with such allocation. Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Purchaser may reasonably request to prepare such allocation. Each of Seller, Purchaser and their respective Affiliates shall adhere to, and be bound by, such allocation for all Tax purposes and shall take no position contrary thereto (whether in audits, Tax Returns, or otherwise in connection with Tax matters) unless required to do so by applicable Tax Law.

(c)     The Parties agree that (i) the termination of the existing ground lease relating to the Hospital Lease Premises and rejection of the Interim Hospital Lease; and (ii) the termination of the existing ground lease relating to the MOB Premises and rejection of the Interim MOB Lease shall be deemed terminations of such leases and contracts for purposes of Revised Code of Washington 84.36.810(2)(f) and Washington Administrative Code 458-16-150.

6.11    Cost Reports. After the Closing, as soon as required by applicable Law, Seller shall file or cause to be filed the final cost reports relating to the Business for the period prior to the Closing required to be filed with the Medicare or Medicaid programs or any other third- party payor or Governmental Body ("Seller Cost Reports").  Seller Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.  Seller shall provide Purchaser with copies of the Seller Cost Reports within a reasonable period of time prior to the filing thereof in order for Purchaser to review and provide Seller with comments thereon solely regarding reimbursement issues for periods after the Closing.  Seller shall consider, but not be required to make, Purchaser's changes and shall determine in its reasonable discretion whether or not to incorporate Purchaser's comments into any Seller Cost Reports, by amendment or otherwise.  Seller shall provide to Purchaser copies of all such documents promptly after filing.  Seller shall not open, re-file, or amend any Seller Cost Reports that would materially and adversely affect Purchaser without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed. Seller shall be responsible for preparing, certifying, attesting and maintaining clinical data and information necessary for demonstrating meaningful use of certified healthcare technology as required under 42 U.S.C. §1395ww (n)(3) and implemented by 42 C.F.R. §495 in respect of the Facilities relating to the time periods prior to Closing.  For those federal fiscal years preceding 2016, meaningful use shall be as set out in the applicable implementing regulations.  For calendar year or federal fiscal years 2016 and forward, meaningful use shall be determined as set out in implementing regulations applicable as of December 15, 2015, and as such Rules may be amended in the future. If Seller breaches or fails to comply with this Agreement and fails to cure or if failure is of such a

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 38 of 118

nature that it could not reasonably be cured and Seller does not within 30 days of receipt of notice from Purchaser, commence to cure and thereafter proceed, with due diligence to cure such breach, then Purchaser may, at is election, pursue specific performance of such breached covenant or agreement in this Agreement or perform such covenant or agreement on behalf of Seller and, to the extent sums are expended in connection therewith (including reasonable attorneys' fees), provide Seller with an invoice therefor together with reasonable evidence of payment and such amounts shall be reimbursed to Purchaser within 10 days of Seller's receipt of such invoice.

6.12    <u>Confidentiality</u>.  Except as required by applicable Law, including any filings necessary for approval of this Agreement and the Bankruptcy Plan, each Party agrees that any and all information provided to it pursuant to this Agreement, together with analyses, compilations, studies or other documents or records prepared by any Party, which contain or otherwise reflect or are generated from such information (collectively, the "<u>Information</u>"), will be kept confidential. Notwithstanding the forgoing, the Parties agree that Purchaser shall be permitted to provide the Information to Affiliates of Purchaser and to direct or indirect owners of Purchaser or its Affiliates and any financing source for Purchaser (each of the foregoing shall be deemed "representatives" for purposes of this <u>Section 6.12</u>). The foregoing restrictions with respect to the Information shall not apply to any information which (i) is on the date hereof or hereafter becomes generally available to the public other than as a result of a disclosure, directly or indirectly, by the Party receiving the Information or its representatives, (ii) was available to the Party receiving the Information on a non-confidential basis prior to its disclosure, or (iii) becomes available to the Party receiving the Information on a non-confidential basis from a source other than a party to this Agreement or its representatives, which source was not itself bound by a confidentiality agreement.

6.13    <u>Misdirected Payments</u>.  Subject to <u>Section 2.1(a)(xx)</u>, Seller and Purchaser covenant and agree to remit, with reasonable promptness, to the other any payments received, which payments are on or in respect of Assets purchased at the Closing by Purchaser or Excluded Assets retained at the Closing by Seller.

6.14    <u>Joint Ventures</u>.

(a)    <u>Tri-Cities Cancer</u>.    Seller shall cooperate with Purchaser in connection with the contemplated reorganization of Tri-Cities Cancer. Unless otherwise consented to by the Parties in writing, Seller shall, solely as directed by Purchaser, exercise its rights with respect to Tri-Cities Cancer, including (in each case, solely as directed by Purchaser) (i) withdrawal as a member from Tri-Cities Cancer, (ii) transferring its interest in Tri-Cities Cancer to Purchaser for no additional consideration; or (iii) selling its interest in Tri-Cities Cancer to Purchaser's designee on terms and conditions approved by Purchaser; provided, however, that Seller will not agree, consent or permit any action to be taken with respect to  Tri-Cities Cancer, without Purchaser's written consent.

(b)    <u>High Desert Surgery</u>.    Seller shall use commercially reasonable efforts to obtain the consents required to transfer its interest in High Desert Surgery to Purchaser at Closing; provided, however, if Seller cannot obtain the required consents on or before Closing, then Seller's interest in High Desert Surgery will be deemed an Excluded Asset. If Seller's interest in High Desert Surgery is deemed an Excluded Asset, unless otherwise consented to by the Parties in writing, Seller shall, solely as directed by Purchaser, exercise its rights with respect to High Desert Surgery, including (in each case, solely as directed by Purchaser) (i) withdrawal as a member from High Desert Surgery, (ii) transferring its interest in High Desert Surgery to Purchaser for no additional consideration; or (iii) selling its interest in High Desert Surgery to Purchaser's designee on terms and conditions approved by Purchaser; provided, however, that Seller will not agree, consent or permit any action to be taken with respect to High Desert Surgery, without Purchaser's written consent.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 39 of 118

6.15 <u>Casualty</u>. If, prior to the Closing Date, any part of the Assets is damaged, lost or destroyed (whether by fire, theft, vandalism or other cause or casualty) in whole or in part, Purchaser may require Seller to transfer the proceeds (or the right to the proceeds) of applicable insurance to Purchaser at Closing, and Purchaser may replace or restore the damaged, lost or destroyed property.

6.16 <u>Non-Competition</u>. During the term of the Hospital Lease and any renewal or extension thereof, neither Seller nor any of its Affiliates shall, directly or indirectly, own, lease, manage, be employed by, hold or acquire any direct or indirect ownership interest in, or otherwise have any financial interest in or hold any management, officer or board position with a Competing Business, including any governing board of or for an enterprise that operates a Competing Business such as a community board or other organization, that is located within Kennewick Public Hospital District, as described on <u>Exhibit H</u> hereto; provided, however, that Seller will not be precluded from providing services that are not, as of the time that Seller provides notice to Purchaser that it intends to provide such service, provided by Purchaser or contemplated to be provided by Purchaser and Purchaser does not respond to Seller within ninety (90) days of receipt of such notice that it contemplates providing such service; provided, further, however, that Seller will not be precluded from providing free wellness services for residents of Kennewick Public Hospital District, so long as Seller does not make direct or indirect monetary payment to or for the benefit of a Competing Business; provided further, however, that Seller will not be precluded from owning, leasing, managing, operating controlling or participating in a Competing Business that provides only one or more of the following: (A) counseling services, (B) the following health education programs: nutrition, oral health, exercise programs or cooking classes, or (C) health care programs in schools. Nothing in this <u>Section 6.16</u> is intended to prevent (i) Seller from having a financial relationship with a Competing Business which financial relationship has been specifically approved by RCCH in writing, (ii) Seller from owning, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person, or (iii) a member of the Board of Commissioners of Seller from being employed by a Competing Business that is located within Kennewick Public Hospital District. Seller agrees that the restrictions contained in this <u>Section 6.16</u> are reasonable and necessary to protect the legitimate interests of RCCH and Purchaser and that any violation of this provision would result in damages to RCCH and Purchaser which cannot be compensated by money alone. Seller agrees that RCCH and Purchaser will each be entitled to injunctive relief without proving actual damages or posting any bond. If a court shall hold that the duration or scope (geographic or otherwise) of the agreement contained in <u>Section 6.16</u> is unreasonable, then, to the extent permitted by Law, the court may prescribe a duration or scope (geographic or otherwise) that is reasonable and judicially enforceable. The parties agree to accept such determination, subject to their rights of appeal, which the parties hereto agree shall be substituted in place of any and every offensive part of <u>Section 6.16</u>, and as so modified, <u>Section 6.16</u> shall be as fully enforceable as if set forth herein by the parties in the modified form.

6.17 <u>Consents and Notices</u>.

(a) <u>Assumed Contracts - Requesting Consents</u>. As soon as reasonably practicable after the date hereof, and only to the extent required under section 365 of the Bankruptcy Code, Seller shall request in writing consent to assign and, prior to the Closing Date, shall cooperate with Purchaser's reasonable attempts to obtain the requisite consents to assign the Assumed Contracts to be assigned to Purchaser pursuant to the terms hereof.

(b) <u>Assumed Contracts - Denied Consents</u>. To the extent that the sale, assignment, transfer, conveyance, or delivery, or attempted sale, assignment, transfer, conveyance, or delivery, to Purchaser of any Contract would require the consent of any third party as set forth on <u>Schedule 3.9</u>, and

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 40 of 118

only to the extent required under section 365 of the Bankruptcy Code, and such consent shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery thereof if such assignment or attempted assignment would constitute a breach of the Contract or result in the loss or diminution thereof (each, a "Non-Consented Contract"). Seller shall cooperate with Purchaser until the earlier of (i) sixty (60) days after the Closing or (ii) it becomes reasonably apparent that such consent will not be forthcoming, to obtain the consent of such other party to each Non-Consented Contract to the assignment of such Non-Consented Contract to Purchaser. In the event such consent to assign a Non-Consented Contract is not obtained within such period, such Non-Consented Contract shall be deemed to be an Excluded Contract. In the event such consent to assign a Non-Consented Contract is obtained within such period, Seller shall execute an Assignment Agreement relating to such Non-Consented Contract. To the extent that any Non-Consented Contract cannot be assigned to Purchaser during such time period, Purchaser and Seller shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the Parties the economic and operational equivalent of the assignment of such Non-Consented Contract to Purchaser. Purchaser shall, as agent, sublicensee or subcontractor for Seller, satisfy the liabilities and obligations of Seller thereunder arising from and after the Closing Date. Notwithstanding the foregoing, Seller shall not have any obligation to breach any Non-Consented Contract.

(c)     As soon as reasonably practical, without limiting the generality of Section 6.7, between the date of this Agreement and the Closing Date, Seller and Purchaser will, to the extent required by law, file all reports or other documents required or requested by Governmental Authorities under Laws concerning the transactions contemplated hereby, and comply promptly with any requests by any Governmental Authority for additional information concerning such transactions, so that the transactions will be approved by all necessary Governmental Authorities as soon as reasonably possible after the execution and delivery of this Agreement. In furtherance of the obligations under this Section 6.17(c) and Section 6.7, Seller and Purchaser will submit a letter of intent in conformance with Washington Administrative Code section 246-310-080 with respect to the proposed transactions to the Washington State Department of Health, and thirty (30) days after the submission of the such letter of intent, Seller and Purchaser will submit a Certificate of Need application with respect to the proposed transactions to the Washington State Department of Health in accordance with applicable Certificate of Need regulations under the Laws of the State of Washington.

6.18    Seller Existence . On the Closing Date and for a period of the term of the Hospital Lease and any renewal or extension thereof, Seller will remain in existence as a Washington municipal corporation.

6.19    Antitrust Matters.

(a)     Purchaser and Seller shall each use their reasonable best efforts to (1) address any inquiry, proceeding or investigation by any Governmental Authority (including the Antitrust Division of the United States Department of Justice, the Federal Trade Commission and any State Attorney General) into the potential competitive effects of this Agreement or the transactions contemplated herein; and (2) defend this Agreement and the transactions contemplated herein against any action, suit or Proceeding brought by any person, including but not limited to any Governmental Authority so that the Parties shall satisfy the conditions set forth in Sections 7.4 and 8.4. no later than December 31, 2018.

(b)     In furtherance of the foregoing, Purchaser and Seller shall, and shall cause their respective counsel to, cooperate in the submission of any memoranda, white papers, filings, correspondence or other written or oral communications explaining or analyzing the likely effects of this Agreement and the transactions contemplated herein to any Governmental Authority. Neither Purchaser

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 41 of 118

nor Seller nor or any of their respective Affiliates or their respective counsel shall independently contact any Governmental Authority or participate in any meeting or any other substantive discussion or communication with any Governmental Authority in respect of any such filings, applications, investigation or other inquiry without giving the other party, in each case, where reasonably practicable and to the extent permitted by applicable Laws, prior reasonable notice of such meeting or such other substantive discussion or communication, the opportunity to confer with each other regarding appropriate contacts with and responses to personnel of said Governmental Authority, the opportunity to review and comment on the contents of any representations (oral or otherwise) expected to be communicated at such meeting or such other substantive discussion, and, to the extent permitted by the relevant Governmental Authority, the opportunity to attend and participate at such meeting or such other substantive discussion. Subject to applicable Law, Purchaser, on the one hand, and Seller, on the other hand, will provide each other with copies of all substantive correspondence, filings or communications between them or their outside counsel, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated herein.

(c)     Notwithstanding the foregoing, Purchaser shall, in all cases in good faith consultation with Seller, (a) determine whether the parties will voluntarily contact or notify any Governmental Authority regarding this Agreement and the transactions contemplated herein; (b) determine the strategy for contacting or notifying or addressing any questions or inquiries from (or investigations by) any Governmental Authority regarding this Agreement and the transactions contemplated herein or responding to any action, suit, or Proceeding brought by any Governmental Authority; and (c) determine the final content of any substantive oral or written communications with any applicable Governmental Authority, provided that Purchaser shall in good faith consider all views and input provided by Seller.

(d)     For the avoidance of doubt, in connection with Purchaser performing its obligations under this <u>Section 6.19</u>, Purchaser shall not be required to (a) sell or otherwise dispose of, hold separate or agree to sell or dispose of, any Assets or any assets, categories of assets or businesses of Purchaser or any of its Affiliates, (b) terminate existing relationships, contractual rights or obligations, or (c) take or commit to take any action that limits its freedom of action with respect to, or its ability to retain, the Assets, the Business or other assets of Purchaser or any of its Affiliates or take any action that would have an adverse effect on the business, assets, liabilities, results of operations or condition (financial or otherwise) of Purchaser or any of its Affiliates.

**ARTICLE VII**
**CONDITIONS TO OBLIGATIONS OF PURCHASER**

Except as may be waived by Purchaser, the obligations of Purchaser to purchase the Assets and to consummate the transactions contemplated hereby on the Closing Date shall be subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

7.1     <u>Compliance with Agreement</u>.  On and as of the Closing Date:  (a) all representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects with the same force and effect as if made on and as of the Closing Date (other than those representations and warranties that address matters only as a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period); (b) Seller shall have performed and complied with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date and (c) Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed on behalf of Seller by an officer thereof, certifying the fulfillment of the conditions specified in (a) and (b) of this Section.

7.2     Officer's Certificate.  At the Closing, Purchaser shall have received copies of the following, in each case certified as of the Closing Date by an officer of Seller:  (a) resolutions of Seller authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein; (b) the signature and incumbency of the officers authorized to execute and deliver such agreements at the Closing; and (c) true and complete copies of the Constituent Documents for Seller.

7.3     CON, Consents, Authorizations, Etc. Purchaser shall have received documentation or other evidence satisfactory to Purchaser in its sole discretion that (a) the Washington State Department of Health granted a Certificate of Need pursuant to the Laws of the State of Washington approving the purchase and sale of the Assets by Purchaser and Seller and (b) all required Permits from all Governmental Authorities whose approval is required have been granted (or reasonable assurance from the applicable Governmental Authorities that such Permits shall be issued promptly following the Closing Date and be effective as of the Effective Time)  (i) to consummate the transactions herein contemplated and (ii) to operate the Business as currently operated by Seller except for any such Permits the failure of which to obtain would not result in a Material Adverse Effect.

7.4     No Action or Proceeding.  On the Closing Date, (a) no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be outstanding, (b) no action, suit, investigation or Proceeding brought by any Governmental Authority shall be pending before any court or other Governmental Authority to restrain, enjoin or otherwise prevent the consummation of this Agreement or the transactions contemplated hereby, and (c) no inquiry, Proceeding or investigation by any Governmental Authority, which action, suit, inquiry, investigation or Proceeding, in the reasonable opinion of Purchaser, may result in a decision, ruling or finding that has or would reasonably be expected result in a Material Adverse Effect.

7.5     FIRPTA Certificate.  Seller shall have delivered to Purchaser a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that Seller is not a "foreign person" as defined in Section 1445 of the Code.

7.6     Adverse Change.  Since the Effective Time, there shall not have occurred any event, change or occurrence that has had a Material Adverse Effect, and Seller shall not have suffered any liability, whether or not covered by insurance, which would have a Material Adverse Effect.

7.7     Material Consents.  Purchaser shall have obtained or received all consents, waivers and estoppels of third parties that are material to the consummation of the transactions contemplated in this Agreement as specified in Schedule 7.7 and only to the extent such consent is required under section 365 of the Bankruptcy Code.  Seller shall have furnished to Purchaser, in form and substance reasonably satisfactory to Purchaser, assignments or other instruments of transfer and consents and waivers by others, necessary or appropriate to transfer to and effectively vest in Purchaser all right, title, and interest in and to the Assets, in proper statutory form for recording if such recording is necessary or appropriate.

7.8     Title Policy.  A title insurance company selected by Purchaser shall be ready, willing and able to issue a pro forma of the Owner's Title Policy (the "Title Policy") (or marked title commitment containing no additional exceptions to title to the Real Property) to Purchaser, which Title Policies shall be issued from a commitment or commitments for title insurance. The Title Policy shall be issued on an ALTA Form 2006 Owner's Title Policy in an amount determined by Purchaser and shall insure to Purchaser good and marketable, fee simple title to the Owned Real Property and leasehold title to the Leased Real Property, in each case, subject only to (i) the Permitted Encumbrances and (ii) Taxes for the

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 43 of 118

current and subsequent years "not yet due and payable." The Title Policy shall have all standard and general exceptions deleted so as to afford full "extended form coverage" and shall contain such endorsements thereto as Purchaser may reasonably require.

7.9     New Hospital Lease.  Purchaser and Hospital Lessor shall have entered into the Hospital Lease.

7.10     New MOB Lease.  Purchaser and MOB Lessor shall have entered into the MOB Lease.

7.11     Closing Deliveries.  Purchaser shall have received (a) from Seller, the deliveries required by Section 2.7 hereof; (b) the definitive purchase agreement acceptable to Purchaser in its sole discretion with Equipment Lessors Group One and the Equipment Lessors Group Two; and (c) binding agreements with applicable unions relating to the Hired Employees on terms and conditions satisfactory to Purchaser in its sole discretion.

7.12     Confirmation Order; Encumbrances.  The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to Purchaser, and the Confirmation Order shall be a Final Order (as defined in the Bankruptcy Plan).  Purchaser shall have received one or more opinions, dated the Closing Date, of Foster Pepper PLLC, counsel for Seller, that: (i) the Confirmation Order has been entered on the docket in the Bankruptcy Court, that it is a Final Order (as defined in the Bankruptcy Plan), that it is in full force and effect and that all liens, claims and encumbrances relating to the Assets have been released in full, other than Permitted Encumbrances, (ii) Seller was validly created and is existing in compliance with and pursuant to the laws of the State of Washington, (iii) Seller has the power and authority to execute, deliver and perform all of its respective obligations under each of the Transaction Documents to which it is a party, (iv) the execution and delivery of each of the Transaction Documents to which Seller is a party, and the performance of Seller's obligations under each such Transaction Document, have been authorized by all requisite public, corporate or other action or approval, (v) each of the Transaction Documents to which Seller is a party has been duly executed and delivered by, for and on behalf of Seller, (vi) the execution, delivery and performance by Seller of each of the Transaction Documents to which it is a party do not conflict with Seller's Constituent Documents or applicable Law, and (vii) each Transaction Document to which Seller is a party constitutes a valid and binding obligation of Seller enforceable against Seller in accordance with its terms. Seller shall have delivered to Purchaser written evidence, in form satisfactory to Purchaser in its sole discretion, of the release of any liens, claims and encumbrances of Seller relating to the Business that are not included in the Bankruptcy Plan.

7.13     Waiver of Conditions.  Purchaser may waive any condition of this Article VII to the extent permitted by applicable Law.  Except as otherwise provided herein or agreed to by the Parties in writing prior to the Closing, the consequences of any knowing waiver shall be solely the elimination of the waived condition as a valid basis for Purchaser to refuse to close the transactions contemplated by this Agreement, but shall not be a release of Seller from any claim by Purchaser for resulting injuries and Damages with respect to that waived condition.

**ARTICLE VIII**
**CONDITIONS TO OBLIGATIONS OF SELLER**

Except as may be waived by Seller, the obligations of Seller to consummate the transactions contemplated hereby on the Closing Date shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 44 of 118

8.1    <u>Compliance with Agreement</u>.  On and as of the Closing Date:  (a) all representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects with the same force and effect as if made on and as of the Closing Date (other than those representations and warranties that address matters only as a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period); (b) Purchaser shall have performed and complied with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date and (c) Purchaser shall have delivered to Seller a certificate, dated as of the Closing Date and signed on behalf of Purchaser by an officer thereof, certifying the fulfillment of the conditions specified in (a) and (b) of this Section.

8.2    <u>Officer's Certificate</u>.  At the Closing, Seller shall have received copies of the following, in each case certified as of the Closing Date by an officer of Purchaser:  (a) resolutions of Purchaser authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein; (b) the signature and incumbency of the officers authorized to execute and deliver such agreements at the Closing and (c) true and complete copies of the Constituent Documents for Purchaser.

8.3    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to Seller, and the Confirmation Order shall be a Final Order (as defined in the Bankruptcy Plan).

8.4    <u>No Action or Proceeding</u>.  On the Closing Date, (a) no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be outstanding and (b) no action, suit, investigation or Proceeding brought by any Governmental Authority shall be pending before any court or other Governmental Authority to restrain, enjoin or otherwise prevent the consummation of this Agreement or the transactions contemplated hereby, which action, suit, investigation or Proceeding, in the reasonable opinion of Seller, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Purchaser to perform its obligations under this Agreement.

8.5    <u>Good Standing Certificates</u>.  At the Closing, Purchaser shall have delivered to Seller a Certificate of Good Standing issued with respect to Purchaser by the Secretary of State of the State of Delaware dated as of a date that is not more than ten (10) days prior to the Closing Date.

8.6    <u>Closing Deliveries</u>.  Purchaser shall have made the deliveries required to be made by them under <u>Section 2.7</u> hereof.

8.7    <u>Waiver of Conditions</u>.  Seller may waive any conditions of this <u>Article VIII</u> to the extent permitted by applicable Law.  Except as otherwise provided herein, the consequences of any knowing waiver shall be the elimination of the waived condition as a valid basis for Seller to refuse to close the transactions contemplated by this Agreement, but shall not be a release of Purchaser from any claim by Seller for resulting injuries and Damages with respect to that waived condition.

## ARTICLE IX
## INDEMNIFICATION

9.1    <u>Indemnification by Seller</u>.  Subject to the provisions of this <u>Article IX</u>, Seller shall indemnify and hold harmless Purchaser, any Affiliate of Purchaser, any financing source for Purchaser, and the respective officers, directors, employees, agents and representatives of Purchaser and its

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 45 of 118

Affiliates (each, a "Purchaser Indemnitee") from and after the Closing Date, from and against any Damages incurred by such Purchaser Indemnitee as a result of or arising from:

(a)     the Excluded Assets and Excluded Liabilities;

(b)     any breach, misrepresentation, or inaccuracy in any of the representations and warranties made herein by Seller;

(c)     any breach of any of the covenants or agreements made herein by Seller; and

(d)     the operation of the Business on or prior to the Closing Date.

9.2     Indemnification by Purchaser.  Purchaser shall indemnify and hold harmless Seller, any Affiliate of Seller, and the respective officers, directors, shareholders, employees, agents and representatives of Seller and its respective Affiliates (each, a "Seller Indemnitee") from and after the Closing Date from and against any Damages incurred by such Seller Indemnitee as a result of or arising from:

(a)     any breach, misrepresentation, or inaccuracy in any of the representations and warranties made herein by Purchaser;

(b)     any breach of any of the covenants or agreements made herein by Purchaser;

(c)     the Assumed Liabilities; and

(d)     the operation of the Business after the Closing Date.

9.3     Indemnification Claims.

(a)     The liability of a Party with respect to any claim for indemnity by an Indemnitee pursuant to this Article IX shall be offset dollar for dollar by (i) any insurance proceeds actually received and retained by such Indemnitee after the Closing Date in respect of the Damages involved, and (ii) any other recovery made by such Indemnitee from any third party on account of the Damages involved.

(b)     Except as otherwise provided in this Article IX, (a) each representation and warranty contained in Articles III and IV shall survive the Closing and shall expire thirty (30) days after the expiration of the relevant statute of limitations. Claims for Damages based on intentional or fraudulent actions, intentional or fraudulent misrepresentations or intentional or fraudulent breaches shall survive indefinitely.  All covenants and agreement of the Parties herein shall survive the Closing indefinitely or for the period explicitly specified therein.  No Party shall incur any liability whatsoever as a result of any inaccuracy in or breach of any applicable representation or warranty or any breach or nonperformance of any applicable covenant or agreement, except for indemnification obligations pursuant to this Article IX with respect to those inaccuracies, breaches, or failures as to which written notice of which has been received prior to the expiration of the applicable Survival Period.

(c)     The respective representations and warranties of the Parties contained in this Agreement and the rights to indemnification set forth in Article IX shall not be deemed waived or otherwise affected by any investigation made, or knowledge acquired, by a Party.

(d)     Any payment to be made to any of Seller or Purchaser, as the case may be, pursuant to this Article IX will be effected by wire transfer of immediately available funds from Seller or

Purchaser, as the case may be, to an account designated by the receiving party, within five (5) days after the determination thereof or as soon thereafter as reasonably practicable.

(e) If a Party seeks indemnification for Damages hereunder, the Party seeking indemnification (the "Indemnitee") shall promptly notify the Party from whom indemnification is sought (the "Indemnifying Party") in writing of the existence and nature of such Damages (a "Claim"), and shall include in the Claim a reasonably detailed description of all related claims, demands, actions or Proceedings, if any, out of which the Damages arise; provided, however, that so long as a Claim is delivered within the applicable Survival Period, failure or delay by the Indemnitee to deliver a Claim in compliance with this provision shall only reduce the obligation of the Indemnifying Party to the extent that such failure impairs the Indemnifying Party's ability to defend the claim or mitigate Damages.

(f) In the event of a Claim arising from or related to a claim by a third party (a "Third-Party Claim"), the Indemnifying Party may elect to retain counsel of its reasonable choice to represent the Indemnitee in connection with such Claim and shall pay the fees, charges and disbursements of such counsel. The Indemnifying Party may participate in the Proceeding, at its own expense and through legal counsel of its choice, and, with the consent of the Indemnitee may elect to control the defense of the Indemnitee in connection with such Third-Party Claim. The Indemnifying Party shall not settle any such Proceeding without the relevant Indemnitees' prior written consent (which shall not be unreasonably withheld), unless the terms of such settlement provide for no relief other than the payment of monetary damages.

(g) If, with respect to a Third-Party Claim, the Indemnifying Party shall, within a reasonable time after said notice, fail to defend, the Indemnitee shall have the right, but not the obligation, and without waiving any rights against the Indemnifying Party, to undertake the defense of, and with the consent of the Indemnifying Party (such consent not to be withheld unreasonably), to compromise or settle the Third-Party Claim on behalf, for the account, and at the risk and expense, of the Indemnifying Party and shall be entitled to collect the amount of any settlement or judgment or decree and all costs and expenses (including, without limitation, reasonable attorney's fees) in connection therewith from the Indemnifying Party. If the Indemnifying Party does not raise good faith objections delivered to the Indemnitee before the end of the 30-day period after delivery of the Claim (other than a Third-Party Claim), then the Indemnifying Party shall be conclusively deemed to have consented to the recovery by the Indemnitee of the full amount of Damages (subject to the limits contained in this Article IX) specified in the written Claim in accordance with this Article IX, and, without further notice, to have stipulated to the entry of a final judgment for Damages against the Indemnifying Party for such amount in any court having jurisdiction over the matter where venue is proper.

(h) If the Indemnitee or its Affiliates subsequently recover all or part of a third-party claim from any other Person legally obligated to pay the claim, the Indemnitee shall repay to the Indemnifying Party the amounts recovered up to an amount not exceeding the payment made by the Indemnifying Party to the Indemnitee by way of indemnity.

## ARTICLE X
## TERMINATION

10.1 <u>Termination Events</u>. This Agreement may be terminated at any time prior to Closing upon prior written notice by the Party electing to terminate this Agreement to the other Party:

(a) by mutual agreement of Seller and Purchaser (expressed in writing);

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 47 of 118

(b)     by either Seller or Purchaser if any permanent injunction, Court Order or other order, decree or ruling of any court or other Governmental Authority of competent jurisdiction permanently restraining, enjoining or otherwise preventing the consummation of the transactions contemplated hereby shall have been issued and become final and non-appealable;

(c)     by either party if the Closing shall not have occurred on or before December 31, 2018; or

(d)     by either party if the Bankruptcy Court does not approve the terms of this Agreement.

10.2     Effect of Termination.  In the event of termination of this Agreement pursuant to Section 10.1, all obligations of the Parties hereto shall terminate, except the obligations of the Parties pursuant to Articles X, XI and XII.  Moreover, in the event of termination of this Agreement pursuant to Section 10.1(c), nothing herein shall prejudice the ability of the non-breaching Party from seeking Damages from any other Party for any breach of this Agreement, including without limitation, attorneys' fees and the right to pursue any remedy at Law or in equity except as otherwise provided in that certain Letter Agreement between Purchaser and Seller **[dated as of _____].**

# ARTICLE XI
## NOTICES

11.1     Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, when delivered by reputable overnight courier, or if mailed, five (5) days after being deposited in the United States mail, certified or registered mail, first-class postage prepaid, return receipt requested, to the Parties at the following addresses or facsimile numbers:

| | |
|---|---|
| If to Purchaser, to: | RCCH Healthcare Partners<br>103 Continental Place, Suite 200<br>Brentwood, TN 37027<br>Attention: General Counsel |
| With copies to: | Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, Tennessee  37219-1760<br>Attention:  David C. Head<br>Fax No: (615) 244-6804 |
| and: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attention:  Jeffrey Saferstein<br>Fax No: (212) 492-0347 |
| If to Seller, to: | Kennewick Public Hospital District, d/b/a Trios Health<br>900 S. Auburn St.<br>Kennewick, WA 99336<br>Attention: [•]<br>Fax No: [•] |

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 48 of 118

<table>
<tr><td>With a copy to:</td><td>Foster Pepper PLLC<br>1111 Third Avenue, Suite 3000<br>Seattle, WA 98101<br>Attention: Jack Cullen and Bradley J. Berg<br>Fax No: (206) 749-2001</td></tr>
</table>

Any Party from time to time may change its address for the purpose of receipt of notices to that Party by giving a similar notice specifying a new address to the other notice parties listed above in accordance with the provisions of this Section 11.1.

## ARTICLE XII
## MISCELLANEOUS

12.1    Fees and Expenses.  Except as otherwise provided in this Agreement, Seller shall pay its own expenses and Purchaser shall pay its own expenses, subject to the following: (a) Purchaser shall bear all costs of the Real Property title commitments and the Title Policy and the fees or costs payable to the Washington State Department of Health or to the Attorney General of the State of Washington; (b) Purchaser shall bear (i) all costs of the ALTA surveys with respect to the Real Property and (ii) all costs of the Phase I Environmental Site Assessments with respect to the Real Property; and (c) to the extent payment of such taxes are required by Law, Seller shall (i) be liable for and pay any documentary stamp taxes, surcharges, transfer taxes, state and local personal property transfer taxes, sales and use taxes, and all other similar taxes (collectively, "Transfer Taxes") arising out of the transactions contemplated herein and (ii) shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and if required by applicable Law, Purchaser will join in the execution of any such Tax Returns or other documentation.

12.2    Submission to Jurisdiction; Consent to Service of Process.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated herein, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.1 hereof; provided, however, that if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of Washington sitting in Spokane Washington or any court of the State of Washington sitting in Benton County, Washington and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.1.

12.3    Entire Agreement.  Except for documents and agreements executed pursuant hereto and the other documents and agreements contemplated hereby or referenced herein, this Agreement supersedes all prior oral discussions and written agreements among the Parties with respect to the subject matter of this Agreement (including any letter of intent, term sheet or similar agreement or document relating to the transactions contemplated hereby).  This Agreement, including the exhibits and schedules hereto and other documents delivered in connection herewith and the other documents and agreements

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 49 of 118

contemplated hereby or referenced herein, contain the sole and entire agreement among the Parties hereto with respect to the subject matter hereof. In the event of a conflict between the Bankruptcy Plan, the Bankruptcy Disclosure Statement, or any other document in connection with the transactions contemplated hereby or referenced herein, and this Agreement, this Agreement will control.

12.4    <u>Waiver</u>.  Any term or condition of this Agreement may be waived at any time by the Party which is entitled to the benefit thereof.  Any such waiver must be in writing and must be duly executed by such Party.  A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach, provision or requirement on any other occasion.

12.5    <u>Amendment</u>.  This Agreement may be modified or amended only by a written instrument duly executed by Purchaser and Seller.

12.6    <u>Counterparts; Electronic Signatures; Reproductions</u>.  This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  Facsimile or other electronic imaging technology signatures on this Agreement and all documents relating hereto shall be deemed to be original signatures for all purposes.  This Agreement and all documents relating hereto, including (i) consents, waivers and modifications which may hereafter be executed, (ii) the documents delivered at the Closing, and (iii) financial statements, certificates and other information previously or hereafter furnished to Seller or to Purchaser, may be reproduced by Seller and by Purchaser by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and, unless otherwise required by Law, Seller and Purchaser may destroy any original documents so reproduced.  Seller and Purchaser agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative Proceeding (whether or not the original is in existence and whether or not such reproduction was made by Seller or Purchaser in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

12.7    <u>No Third-Party Beneficiary</u>.  The terms and provisions of this Agreement are intended solely for the benefit of Seller, Purchaser and their respective Affiliates, successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

12.8    <u>Governing Law</u>.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF WASHINGTON APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE.

12.9    <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including successors by merger or otherwise.

12.10    <u>No Assignment</u>.  Neither this Agreement nor any right hereunder or part hereof may be assigned by any Party hereto without the prior written consent of the other Party hereto; provided, however, that Seller, on the one hand, and Purchaser, on the other hand, may assign their respective rights and obligations under this Agreement, in whole or in part, to other Persons who (a) are Affiliates of Seller or Purchaser, respectively, and (b) agree to be bound by the terms and conditions of this Agreement; provided, however, that no such assignment shall release Seller or Purchaser from any liability or obligation under this Agreement.  Notwithstanding the foregoing, Purchaser may collaterally assign and grant a security interest in, all of its rights hereunder in favor of one or more lenders in

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 50 of 118

connection with any financing, whether now existing or hereafter entered into, to which Purchaser or any Affiliate is or becomes a party.

12.11   Public Announcement.   On or before the Closing Date, the Parties hereto will each consult with one another prior to making or issuing public statements or announcements with respect to this Agreement or the transactions contemplated hereby and will use good faith efforts to agree on the text of a joint public statement or announcement and/or will use good faith efforts to obtain the other Party's approval of the text of any public statement or announcement to be made solely on behalf of a Party; provided that the foregoing shall not preclude any Party from making such disclosure as may be required by applicable Law or the Bankruptcy Case or the rules of any securities exchange or market on which securities of such Party are listed or quoted.

12.12   Severability; Invalid Provisions.   If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

12.13   Waiver of Jury Trial.   EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY LITIGATION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.14   No Inferences.   Inasmuch as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, either Party shall be drawn from the fact that any portion of this Agreement or any document related hereto has been drafted by or on behalf of such Party.

12.15   Capital Expenditures.   This Agreement shall not be deemed to be an acquisition or obligation of a capital expenditure or of funds within the meaning of the certificate of need statute of any state, until the appropriate Governmental Authority shall have granted a certificate of need or the appropriate approval or ruled that no certificate of need or other approval is required.

12.16   Further Assurance Clause.   On and after the Closing Date, Seller and Purchaser will act in good faith to take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, within the context of the general intent of the Parties, including putting Purchaser in possession and operating control of the Assets and effecting the assumption by Purchaser of the Assumed Liabilities and putting Seller into possession and operating control of the Excluded Assets consistent with the terms and conditions of this Agreement.

12.17   Specific Performance.   The Parties acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy. Accordingly, the Parties agree that, in addition to any other remedies, each Party shall be entitled to enforce the terms of this Agreement by decrees of specific performance without the necessity of proving actual damages or posting bond.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 51 of 118

12.18    Non-Recourse.  Notwithstanding anything in this Agreement to the contrary, all Damages arising out of this Agreement and the transactions contemplated hereby will be limited to the Parties, and no Non-Recourse Party will have any liability hereunder or with respect to the transactions contemplated hereby. For the purpose of this Section 12.18 "Non-Recourse Party" means, with respect to a Party, any of such Party's former, current and future equity holders, controlling Persons, directors, officers, employees, agents, representatives, Affiliates, financing sources, members, managers, general or limited partners, or assignees (or any former, current or future equity holder, controlling Person, director, officer, employee, agent, representative, Affiliate, member, manager, general or limited partner, or assignee of any of the foregoing); provided, that, for the avoidance of doubt, no Party to this Agreement will be considered a Non-Recourse Party.

12.19    Schedules and Other Instruments.  Each Schedule and Exhibit to this Agreement shall be considered a part hereof as if set forth herein in full. Seller and Purchaser shall each have the right through five (5) Business Days prior to the Closing Date to supplement the schedules attached to this Agreement as of the date hereof (a "Schedule Supplement") prepared by it (including the addition of a Schedule not referenced in this Agreement), as necessary, so that the representations and warranties contained in Article III and Article IV, respectively, shall be true and correct as of the Closing in all material respects.  Seller shall provide reasonable assistance in identifying any changes in the Schedules set forth in a Schedule Supplement delivered to Purchaser pursuant to this Section 12.19. Either Party may determine in its reasonable discretion the Schedule Supplement provided by the other Party discloses material facts, circumstances or state of affairs that would, but for the Schedule Supplement, result in the condition in Section 7.1 or Section 8.1, as the case may be, not to be satisfied at Closing. Notwithstanding any provision herein to the contrary, no Schedule Supplement shall prejudice or otherwise affect a Party's right to (a) determine that a condition set forth in Section 7.1 or Section 8.1, as applicable, has not been satisfied or (b) seek indemnification relief hereunder for the other Party's breach of a representation or warranty or covenant, in both (a) and (b) based upon the schedules attached to this Agreement as of the date hereof without taking into account or giving effect to any modification, update or amendment set forth in any Schedule Supplement.

12.20    Tax Advice and Reliance.  Except as expressly provided in this Agreement, (i) none of the Parties (nor any of the Parties' respective counsel, accountants or other representatives) has made or is making any representations to any other Party (or to any other Party's counsel, accountants or other representatives) concerning the consequences of the transactions contemplated hereby under applicable Tax Laws and (ii) each Party has relied solely upon the Tax advice of its own employees or of representatives engaged by each Party and not on any such advice provided by any other party.

[The following page is the signature page.]

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 52 of 118

IN WITNESS WHEREOF, the Parties have caused this Master Asset Purchase Agreement to be executed as of the date first above written.

**PURCHASER:**

RCCH TRIOS HEALTH, LLC

By: _____
Name: _____
Title: _____

**SELLER:**

KENNEWICK PUBLIC HOSPITAL DISTRICT, D/B/A TRIOS HEALTH

By: _____
Name: _____
Title: _____

# EXHIBIT 2

# Form of Community Care Agreement

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 54 of 118

# COMMUNITY CARE AGREEMENT

This **COMMUNITY CARE AGREEMENT** (the "Agreement") is made and entered into this ___ day of _____, 2018 (the "Effective Date"), by and between **KENNEWICK PUBLIC HOSPITAL DISTRICT, d/b/a TRIOS HEALTH**, a Washington municipal corporation (the "District"), and **RCCH TRIOS HEALTH, LLC**, a Delaware limited liability company ("RCCH").

## RECITALS

**WHEREAS**, RCCH operates (i) Trios Southridge Hospital, an acute care hospital located at 3810 Plaza Way, Kennewick, Washington (the "Southridge Campus"), and (ii) Trios Women's & Children's Hospital, an acute care hospital located at 900 S. Auburn Street, Kennewick, Washington (the "Auburn Campus" and, collectively with the Southridge Campus, the "Hospital"), and certain other healthcare related assets (collectively with the Hospital, the "Facilities");

**WHEREAS**, the District is a debtor in chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101 et seq.  (the "Bankruptcy Code") and, on June 30, 2017, filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Washington (the "Bankruptcy Court");

**WHEREAS**, the District and RCCH have closed a transaction pursuant to a Master Asset Purchase Agreement (the "Purchase Agreement"), pursuant to which RCCH purchased from the District certain of the assets relating to the ownership and operation of the Facilities subject to the terms and conditions set forth in the Purchase Agreement;

**WHEREAS**, the District desires to continue to support the health and wellness of residents of the Community (as defined below) by providing financial support to RCCH for its continued operations of the Facilities and provision of certain agreed health care services to residents of the Community, as further described below, all of which is consistent with the mission and purposes of the District;

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the adequacy and receipt of which hereby are acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## AGREEMENT

1. **Defined Terms.**

(a) "Community" means the greater Tri-Cities area, including Kennewick, Pasco and Richland and the surrounding areas in Benton and Franklin Counties, Washington State.

(b) "Community Care Fund" means a separate account established and maintained by the District to be utilized in accordance with the terms and conditions of this Agreement.

(c) "Hospital Lease" means that certain Hospital Facility Lease by and between RCCH, as lessee, and Kennewick Holdings, LLC, as lessor, dated as of [•], 2018.

(d) "Permitted Expenses" means, and in the following order of priority, (i) reimbursement for payment of administrative claims in the Bankruptcy Case not paid by the District at the closing of the

Proposed Transaction; (ii) payment of District's operating expenses pursuant to a reasonable budget not to exceed twenty percent (20.0%) of the District's annual revenue from its "regular property taxes"; and (iii) indemnification claims made against the District pursuant to the terms and conditions of the Purchase Agreement, including obligations to pay RCCH for Losses arising as a result of the operation of the Business prior to the closing of the Proposed Transaction.

(e)     "Services" means inpatient and outpatient licensed hospital services, including emergency services, obstetric services, surgery services, diagnostic services and related, ancillary services necessary for the operation of a licensed hospital, as well as related services of professional providers, all as determined in the exercise of RCCH's reasonable business judgment.

(f)     Capitalized terms not defined in this Agreement shall have the meanings ascribed to them in the Purchase Agreement.

2.     **Term and Termination.**     Unless earlier terminated pursuant to the written agreement of the parties hereto, the term of this Agreement shall commence on the Effective Date and shall continue in effect until the termination or expiration after any renewal terms, of the Hospital Lease (the "Term").  The District's obligation to make the Community Service Payments as defined above will not extend beyond the term, including any renewal terms, of the Hospital Lease, by amendment or otherwise, unless agreed upon by the parties.

3.     **Operation of the Facilities.**     In order to receive the Community Service Payments (as defined below), RCCH shall operate the Facilities and provide services consistent with a general community acute care hospital, including but not limited to the Services, all subject to RCCH's good faith business judgment in the operations of the Facilities.  For so long as RCCH is operating the Facilities, it shall obtain and maintain all necessary licenses, accreditations, provider numbers, certifications and other items necessary for the operation of a licensed, general acute care hospital in the State of Washington. For so long as RCCH is operating the Facilities, it shall operate the Facilities in a reasonable business manner and shall comply with all laws applicable to the operation of a licensed, general acute care hospital in the State of Washington.  Additionally, for so long as RCCH is operating the Facilities RCCH shall:

(a)     adopt a charity care policy in compliance with applicable state law and charity care consistent with applicable state law;

(b)     make available to the District on a nonexclusive basis suitable working space within the Facilities to conduct the District's administrative duties and to conduct periodic meetings of the District's board of commissioners at no cost to the District;

(c)     make available a suitable executive from RCCH to meet with the District's superintendent on a regular basis, not less than quarterly, to discuss the general status and operations of the Facilities, and upon reasonable advance notice and request, make available a suitable executive to attend regular and/or special meetings of the District;

(d)     accept the Facilities existing medical staff and for a period of one (1) year from the Effective Date not reduce or restrict a medical staff member's clinical privileges except in the ordinary course of hospital and medical staff activities;

(e)     maintain capacity for health science research and health care provider education subject to RCCH's good faith business judgment in the operations of the Facilities; and

(f)     adopt and maintain a compliance program that promotes operations in compliance with laws regulating patient referrals and avoids conflicts of interest in patient referral.

**4.     Compensation.**  Each year, the District shall pay RCCH as compensation for the Services provided by RCCH pursuant to the terms of this Agreement the less of (a) $_____ [INSERT THE ACTUAL PROPERTY TAX REVENUE FOR 2017] or (b) the amount of "regular property taxes" (as defined in RCW 84.04.140) received by the District in that calendar year, and either (a) or (b) less the amount of the Permitted Expenses for such calendar year (pro-rated for any partial year of Facility operations) (the "Community Service Payments").  The Community Service Payments shall be paid by the District within thirty (30) days of the end of each calendar quarter as property tax revenue is received by the District and after payment of or set-aside for the Permitted Expenses.  **[DISCUSSION POINT]**

**5.     District' Rights and Covenants.**

(a)     **District Operations**.  The District will retain control over district functions and may provide (a) wellness services and (b) health care services that are not provided by RCCH.

(b)     **Covenants**.  The District hereby pledges it full faith and credit in support of this Agreement. Furthermore, the District shall: (i) continue to **[tax at the regular rate]**; and (ii) not use **[the tax revenues]** to resolve other obligations or liabilities other than as contemplated by this Agreement.

**6.     Examination.**

(a)     **By the District**.  The District and/or its authorized representative(s) shall have the right to examine the records and books of account of RCCH relative to the Services, at any time on at least thirty (30) days advance written notice during regular business hours.  The District shall also be entitled to procure an audit, at the District's sole cost and expense, relating to the Services.  The District shall ensure that any third party or auditor who examines RCCH's records, books of account and medical records (if necessary) complies with this Agreement and the applicable provisions of the Uniform Health Care Information Act, Ch. 70.02 RCW and the Health Insurance Portability and Accountability Act, as amended.

(b)     **By RCCH**.  RCCH and/or its authorized representative(s) shall have the right to examine the records and books of account of the District relative to the Community Service Payments, at any time on at least thirty (30) days advance written notice during regular business hours.  RCCH shall also be entitled to procure an audit, at RCCH's sole cost and expense, relating to Community Service Payments.  RCCH shall ensure that any third party or auditor who examines the District's records and books of account complies with this Agreement.

**7.     Nondiscrimination; Compliance with Law.**  The parties will not discriminate on the basis of race, color, sex, age, religion, national origin, or handicap in providing Services or in paying funds from the Community Care Fund under this Agreement.  Payment of amounts from the Community Care Fund shall be made in a consistent manner without regard to patient status or identity of patient's treating physician(s).

**8.      Determination of Appropriate Medical Care.**  Notwithstanding any provisions of this Agreement to the contrary, the determination of appropriate medical care shall be exclusively within the professional medical discretion of the treating physicians and the Hospital.

**9.      Notices.**  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by receipted overnight courier, or five (5) days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to the District, to: | Kennewick Public Hospital District d/b/a Trios Health |
| | _____ |
| | _____ |
| | Attn: _____ |
| With a copy to: | Foster Pepper PLLC<br>1111 Third Avenue Suite 3000<br>Seattle, Washington 98101<br>Attn:  Bradley J. Berg |
| If to RCCH, to: | RCCH Trios Health, LLC<br>103  Continental Place, Suite 200<br>Brentwood, Tennessee 37027<br>Attn: Legal Department |
| With a copy to: | Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, Tennessee 37219<br>Attn: George W. Bishop, III |

Any party from time to time may change its address for the purpose of receipt of notices to that party by giving a similar notice specifying a new address to the other notice parties listed above in accordance with the provisions of this Section 9.

**10.      Fees and Expenses.**  Except as otherwise provided in this Agreement, the District shall pay its own expenses and RCCH shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby.

**11.      Entire Agreement.**  This Agreement supersedes all prior oral discussions and written agreements between the parties with respect to the subject matter of this Agreement (including any term sheet or similar agreement or document relating to the transactions contemplated hereby).  Except for documents and agreements executed pursuant hereto, and the other documents and agreements contemplated hereby, this Agreement contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

**12.      Amendment.**  This Agreement may be modified or amended only by a written instrument duly executed by the District and RCCH.

**13.      Counterparts; Facsimile Signatures; Reproductions.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  Facsimile signatures on this Agreement shall be deemed to be original signatures for all purposes.  This Agreement and all documents relating hereto may be

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 58 of 118

reproduced by the District and by RCCH by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and, unless otherwise required by Law, the District and RCCH may destroy any original documents so reproduced. The District and RCCH agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the District or RCCH in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

14. **No Third Party Beneficiary.** The terms and provisions of this Agreement are intended solely for the benefit of the District, RCCH and their respective Affiliates, successors or assigns, and shall not confer third party beneficiary rights upon any other Person.

15. **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF WASHINGTON APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE.

16. **Construction.** Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter. The term "person" means any individual, corporation, partnership, trust or other entity. No provision of this Agreement shall be interpreted for or against either party hereto on the basis that such party was the draftsman of such provision, each party having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

17. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including successors by merger or otherwise.

18. **No Assignment.** Neither this Agreement nor any right hereunder or part hereof may be assigned by any party hereto without the prior written consent of the other parties hereto; provided, however, that RCCH may assign its rights under this Agreement to other Persons who (a) are controlled (directly or indirectly) by RegionalCare Hospital Partners Holdings, Inc. d/b/a/ RCCH Healthcare Partners, and (b) agree to be bound by the terms and conditions of this Agreement, provided that no such assignment shall relieve RCCH of its obligations hereunder. The parties expressly acknowledge and agree that any such permitted assignee of RCCH shall be deemed to be in direct privity of contract with the District with respect to any party's enforcement of their respective rights and obligations as set forth in this Agreement.

19. **Severability; Invalid Provisions.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

20. **Regulatory Compliance.** The parties agree to conduct their relationship in full compliance with all applicable state, federal and local laws and regulations, including, but not limited to,

the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations (45 C.F.R. Parts 160 and 164) and the Health Information Technology for Economic and Clinical Health Act and its implementing regulations (Title XIII, Subtitle D).

21. **No Referral Requirement.**  The parties agree that the compensation provided hereunder is not intended to be and is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties.

22. **Right to Offset.**  To the extent that RCCH or its Affiliates have any claim against the District under this Agreement or otherwise, including without limitation, any claim for indemnification or liquidated damages, RCCH (on behalf of itself or its Affiliates) shall have the right to (i) offset and retain (or distribute to RCCH or its Affiliates) any payments or contributions that would otherwise be payable to the Community Care Fund or to RCCH for Services under this Agreement and (ii) offset any other amounts payable to the District under any agreement between RCCH or its Affiliates and the District up to the amount of such claim against the District hereunder.  Any such right of offset shall be in addition to any other remedies available under any agreement, at law or in equity.

23. **Limitation of Remedies to District.**  The parties acknowledge and agree that the District shall not have a to right to equitable remedies, including the remedies of injunctive relief and specific performance, upon a breach of the Agreement by RCCH.  The District's sole remedy shall be to terminate the Agreement.

*(Signature page follows)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals by their authorized officers, all as of the date first above written.

DISTRICT:

**KENNEWICK PUBLIC HOSPITAL DISTRICT D/B/A TRIOS HEALTH**

By: _____

Name: _____

Title: _____

**RCCH:**

**RCCH TRIOS HEALTH, LLC**

By: _____

Name: _____

Title: _____

# EXHIBIT 3

# Form of Articles Governing Creditors Trust

## ARTICLES GOVERNING CREDITORS TRUST

All capitalized terms not otherwise defined in these Articles Governing Creditors Trust (these "Articles") shall have the meaning set forth herein or in the Plan or, if not therein, the Disclosure Statement.

**1.      Funding and Administration of the Creditors Trust.**

The Creditors Trust will be administered by the Trust Administrator to the extent set forth herein. The Creditors Trust will comprise and be funded as follows: within ten (10) Business Days after the Effective Date, or as soon as practicable thereafter, the Reorganized Debtor will transfer (a) the Retained Claims and Defenses, (b) its rights and interests in the Retained Assets *exclusive of* any legal title, which legal title shall remain vested in the Reorganized Debtor, in any Retained Assets for which the District's transfer of such Retained Assets must comply with RCW 70.44.300,[1] and (c) $150,000.00 Cash (the "Creditors Trust Deposit" and with the Retained Claims and Defenses and the Retained Assets, collectively, the "Trust Property") to the Creditors Trust.

The initial and ongoing day-to-day expenses of the Creditors Trust will be funded by the Creditors Trust Deposit, of which $50,000 shall be held and used solely for the purpose of paying the Trust Administrator's fees and costs until (a) first, all fees and costs incurred by the Trust Administrator and, (b) second, all other fees and expenses incurred by and for the Creditors Trust have been paid in full. Any further expenses of the Creditors Trust will be funded by proceeds of the Retained Assets and the Retained Claims and Defenses, as described in Section 3.14 below. After paying and making provision for the necessary and reasonable expenses incurred and to be incurred by the Creditors Trust, Cash and Cash Proceeds from the Trust Property will be distributed by the Trust Administrator to holders of Allowed Class 7 Claims in accordance with the terms of the Plan and these Articles.

### 1.1.      Oversight of Creditors Trust by the Board of Commissioners.

The administration of the Creditors Trust, including the performance of the Trust Administrator's duties, shall be overseen by the Reorganized Debtor's Board of Commissioners.

---

[1]      The Reorganized Debtor's retention of legal title to any Remaining Assets comprising real estate is necessary to comply with RCW 70.44.300, Washington's surplus property transfer laws applicable to public hospital districts. As provided by the Plan and the terms of these Articles, the Trust Administrator together with the Reorganized Debtor will obtain any necessary appraisals and sell such real property Remaining Assets in compliance with RCW 70.44.300 as soon as practicable. Further thereto, the Reorganized Debtor will undertake such acts and transfer legal title as necessary to consummate such sales. Any proceeds from such sales received by the Reorganized Debtor will be promptly transferred to the Creditors Trust and distributed by the Trust Administrator in accordance with the terms of the Plan and these Articles.

### 1.2. Compensation of the Board of Commissioners.

Except as provided in the Plan or these Articles, neither the Board of Commissioners nor any of its members shall be entitled to reimbursement of its/their expenses or otherwise compensated for or in connection with its/their oversight duties for the Creditors Trust.

### 1.3. Role and Standing of Board of Commissioners; No Fiduciary Obligations.

The Board of Commissioners shall act as advisors to the Trust Administrator. Any advice given or recommendations made individually by any of the members of the Board of Commissioners or collectively by the Board of Commissioners shall be made in their respective capacities as Commissioners of the District, and except as otherwise expressly provided in these Articles, shall not be binding upon the Trust Administrator. The Trust Administrator shall provide regular reports on such basis as may reasonably be requested by the Board of Commissioners. The Reorganized Debtor shall have standing to file motions or seek other forms of relief, and to appear and be heard on any matter relating to the Reorganized Debtor or any activities of the Trust Administrator as may be appropriate under the circumstances. The individual members of the Board of Commissioners shall in no event be deemed to have any fiduciary or other obligations to any creditor or party in interest in their respective roles as members of the Board of Commissioners; and shall in no event be liable or otherwise responsible to any other person, firm or corporation by reason of any action or failure to act in their respective capacities as members of the Board of Commissioners, except for conduct constituting gross negligence or willful misconduct for which they would otherwise be liable in the absence of these Articles.

### 1.4. Indemnification of the Board of Commissioners.

Each member of the Board of Commissioners shall be indemnified and receive reimbursement from the assets of the Creditors Trust against and from any and all loss, liability, cost, damage or expense which he, she or it may incur or sustain in the exercise and performance of any of his, her or its duties and responsibilities in connection with the Creditors Trust unless such loss, liability, cost, damage or expense shall be incurred or sustained as the result of the Board of Commissioners' member's gross negligence or willful misconduct.

## 2. Cooperation and Powers Retained by Reorganized Debtor.

### 2.1. Cooperation With the Trust Administrator.

The Reorganized Debtor shall cooperate with the Trust Administrator and undertake any and all acts as may be required and reasonably necessary to allow the Trust Administrator to carry out its duties under these Articles, including in connection with the sale and transfer of any real property Retained Assets.

### 2.2. Specific Powers Retained.

Notwithstanding anything to the contrary in these Articles, the Reorganized Debtor shall exclusively retain the power to (a) object to, settle, or otherwise resolve all Administrative Claims against the Debtor and (b) in consultation with RCCH, identify and file with the Bankruptcy Court a schedule of potential targets for Avoidance Actions.

2

## 3. The Trust Administrator

The Confirmation Order shall provide for the Trust Administrator to control and administer the Creditors Trust. Solely for the purpose of administering the Creditors Trust, the Trust Administrator shall be deemed the representative of the Reorganized Debtor and shall have all powers, authority, and responsibilities specified in the Plan and as assigned and designated by the Reorganized Debtor pursuant and at all times subject to the terms of the Plan and these Articles. All of the assets being transferred to the Creditors Trust shall vest with the Trust Administrator, subject to the terms of the Plan and these Articles for purposes of carrying out the provisions of the Plan.

### 3.1. Responsibilities of the Trust Administrator.

The Trust Administrator will have those responsibilities created by the Plan and these Articles, and will, for the benefit of Creditors holding Allowed Class 7 Claims, and in consultation with the Board of Commissioners, exercise the rights and powers vested in it by the Plan and these Articles in the same manner, and use the same degree of care and skill in their exercise, as a prudent person would exercise and use under the circumstances in the conduct of its own affairs, and further agrees to receive and disburse all of the Trust Property in accordance with the terms of these Articles. More specifically, the Trust Administrator is empowered to:

(a)     perform all of the obligations and agreements of the Plan related to the Creditors Trust provided for herein;

(b)     keep and maintain bank accounts in the name of the Creditors Trust into which the Trust Administrator shall deposit all proceeds (unless such proceeds shall theretofore have been invested in Permitted Investments pursuant to these Articles) resulting from the initial receipt or from the sale or other disposition of, or from the income resulting from, all or any part of the Trust Property. The Trust Administrator shall not permit any person other than a designated representative of the Trust Administrator to have authority to make withdrawals from, or to issue drafts against, any accounts maintained with any bank, unless such bank has been furnished a copy of the Plan and these Articles;

(c)     commence or continue litigation of, settle, or otherwise resolve the Retained Claims and Defenses, in accordance with the terms of the Plan, the Confirmation Order, and these Articles, including Articles 2.2 and 3.14 hereof, for the purpose of liquidating the Trust Property and maximizing the value of the Creditors Trust;

(d)     dispute, object to, settle, or otherwise resolve any Claims, other than Administrative Claims, against the Debtor, without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules of the Bankruptcy Court, or the guidelines and requirements of the United States Trustee, other than those restrictions expressly imposed by the Plan, the Confirmation Order, and these Articles including Articles 2.2 and 3.14; and to seek Bankruptcy Court approval for any settlement of any Claim in an amount greater than $250,000.00;

3

(e)     market, negotiate, and enter into and perform agreements for the sale or other disposition of the Trust Property as may be required by the Plan, these Articles, or the Bankruptcy Court;

(f)     seek a determination of tax liability under Section 505 of the Bankruptcy Code and to pay taxes, if any, related to the Creditors Trust or the sale of the Trust Property;

(g)     collect, receive, and give receipt for all sums of money or other property due to the Debtor or the Creditors Trust and, if necessary, foreclose upon any security agreement or the like securing any liability or obligation owed to the Debtor or the Creditors Trust, liquidate any securities held by the Trust Administrator as a pledge, or take any other actions necessary to the collection, receipt or disposition of any Trust Property;

(h)     execute and deliver all releases, satisfactions, and termination statements as may be required in connection with payment of any debt obligation secured by any lien or security interest;

(i)     seek Bankruptcy Court approval to enter into financing agreements to the extent necessary to supplement the cash flow of the Creditors Trust so as to allow the Trust Administrator to maximize the liquidation value of the Creditors Trust, maximize the amounts collected in connection with the Trust Property, and minimize amounts paid to settle any liabilities, including but not limited to disputes;

(j)     engage and compensate professionals, including attorneys, accountants, investment advisors and others, to assist the Trust Administrator in carrying out its duties hereunder which professionals include, without limitation, those retained to assist the Trust Administrator in any litigation related to the liquidation of the Trust Property or the settlement of any liabilities of the Creditors Trust. All professionals employed by the Trust Administrator shall be compensated from the assets of the Creditors Trust.

(k)     file or cause to be filed all required tax returns for the Creditors Trust and pay any and all taxes, if any, when due from the Trust Property.

### 3.2.    Compensation of the Trust Administrator.

In lieu of any commission or fees which may be fixed by applicable law for trustees or fiduciaries (and which are hereby waived by the Trust Administrator), the Trust Administrator shall be compensated from the Trust Property based on the Trust Administrator's standard hourly rate then in effect (and the standard hourly rates of others in his office then in effect, as applicable), plus reimbursement of reasonable and necessary expenses. The Trust Administrator shall be entitled to reimbursement from the assets of the Creditors Trust of all out-of-pocket expenses, and costs and expenses of making Distributions from the Creditors Trust. The Trust Administrator shall exercise its own business judgment to assure that the duties of the Trust Administrator are performed on the most economical basis.

The Trust Administrator's compensation shall be paid monthly by the Trust Administrator from the assets of the Creditors Trust as of each calendar month end for all claimed fees and expenses incurred during such calendar month. The Trust Administrator shall promptly prepare

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 66 of 118

and provide upon request of any party-in-interest quarterly reports of all fees and expenses incurred and paid by the Creditors Trust during such quarterly reporting period.

### 3.3. Claims Against the Trust Administrator.

Any and all entities having any claim against the Trust Administrator in connection with its performance or exercise of its rights, powers, or duties as Trust Administrator shall only look to the Trust Property for payment or satisfaction thereof.

### 3.4. Commingling of Assets of the Creditors Trust.

The Trust Administrator shall not commingle any of the assets of the Creditors Trust with its own property or the property of any other Entity.

### 3.5. Maintenance of Books and Records.

The Trust Administrator shall maintain records and books of account relating to the assets of the Creditors Trust. The Trust Administrator shall prepare, as soon as practicable after the end of each calendar year and each calendar quarter, a financial statement. In addition, at least annually, the Trust Administrator will furnish a report showing all sales or other dispositions of assets of the Creditors Trust, proceeds received from settlements or judgment and payment thereon of assets of the Creditors Trust, proceeds received relating to the Retained Assets or the Retained Claims and Defenses, settlement of liabilities, and expenses relating to the operation of the Creditors Trust consummated during the reporting period. The Trust Administrator shall file or cause to be filed all required tax returns for the Creditors Trust and pay any and all taxes, if any, when due from the Trust Property.

### 3.6. Reliance on Others.

The Trust Administrator may rely upon and shall be protected in acting or refraining from acting upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper person or persons, provided, however, that the Trust Administrator shall be under a duty to have examined the same to determine whether or not such writings conform to the requirements of the Plan.

### 3.7. Reliance by persons dealing with the Trust Administrator.

In the absence of actual knowledge to the contrary, any person dealing with the Trust Administrator or the Creditors Trust shall be entitled to rely on the authority of the Trust Administrator to act on behalf of the Creditors Trust and shall have no obligation to inquire into the existence of such authority.

### 3.8. Liability for Errors and Omissions.

The Trust Administrator and its agents shall not be liable for any error of business judgment or with respect to any action taken or omitted to be taken by it in its capacity as Trust Administrator, unless it shall be proved that the Trust Administrator or its agents shall have been grossly negligent or shall have acted with willful misconduct in ascertaining the pertinent facts or

in performing any of its rights, powers, or duties according to the Plan. The Trust Administrator makes no representations as to: (a) the value or condition of the Trust Property or any part thereof, (b) the amount at which liabilities may be settled, or (c) the security afforded by the Plan, or as to the validity, execution (except its own execution), enforceability, legality or sufficiency of the Plan, and the Trust Administrator shall incur no liability or responsibility in respect of such matters.

### 3.9. Indemnification of Trust Administrator.

The Trust Administrator shall be indemnified by and receive reimbursement from the assets of the Creditors Trust against and from any and all loss, liability, cost, damage, or expense which it may incur or sustain in the exercise and performance of any of its powers and duties as the Trust Administrator pursuant to the Plan and these Articles unless such loss, liability, cost, damage, or expense shall be incurred or sustained as a result of the Trust Administrator's gross negligence or willful misconduct. Other than claims by the Trust Administrator for indemnification or reimbursement resulting from its own gross negligence or willful misconduct, all claims of the Trust Administrator for indemnification or reimbursement under these Articles shall offset by the Trust Administrator against any of the Trust Property the assets of the Creditors Trust.

### 3.10. Resignation of the Trust Administrator.

The Trust Administrator may resign at any time by giving at least thirty (30) days prior written notice to all parties in interest, such resignation not to be effective until at least thirty (30) days after the date of such notice.

### 3.11. Removal of Trust Administrator.

The Reorganized Debtor may, upon written notice delivered by hand, courier, or first-class mail to the Trust Administrator, remove the Trust Administrator for cause, at any time, upon the Trust Administrator's violation of any provision of the Plan or these Articles. Such notice shall be effective immediately upon receipt by the Trust Administrator, provided that the Trust Administrator may, within ten (10) business days after receiving such notice, petition the Bankruptcy Court for reinstatement as Trust Administrator on such further terms and conditions as may be ordered by the Bankruptcy Court in its discretion.

### 3.12. Appointment of Successor to Trust Administrator

Upon resignation or removal for cause of the Trust Administrator, the Board of Commissioners, subject to the terms of any order by the Bankruptcy Court pursuant to Article 3.11, select a successor to the former Trust Administrator and execute a supplement to the Plan appointing the successor Trust Administrator, holding beneficial interests in the Trust Property. The indemnification afforded to the Trust Administrator as set forth in Article 3.9 above as well as the provisions of Articles 3.3, 3.6 and 3.8 shall indefinitely survive the removal of the Trust Administrator. Further, the Trust Administrator shall be entitled to reasonable compensation for fees and expenses incurred as a result of such removal as provided for under Section 3.2.

### 3.13. Requirements to be Fulfilled by Successor to Trust Administrator.

Any successor Trust Administrator shall execute and deliver to the Class 7 Creditors entitled to Distributions from the Creditors Trust and to the predecessor Trust Administrator an instrument accepting such appointment, the terms and conditions of which shall be the same as those contained in the Plan and these Articles, and thereupon such successor Trust Administrator, without further act, shall be vested with all the estates, properties, rights, powers, duties and trusts of the predecessor Trust Administrator in the Creditors Trust with like effect as if originally named as Trust Administrator herein; but nevertheless, upon the written request of such Trust Administrator, the predecessor Trust Administrator shall (a) execute, acknowledge and deliver such instruments of conveyance and further assurances and do such other things as may reasonably be required for more fully and certainly vesting and confirming unto said Trust Administrator all the right, title and interest of the predecessor Trust Administrator in and to the Trust Property; (b) duly assign, transfer, deliver, account for and pay over to such Trust Administrator any property or money then held by such predecessor Trust Administrator in trust for the beneficiaries of the Creditors Trust; and (c) deliver to such Trust Administrator any and all records, or copies thereof in respect of the Creditors Trust which the predecessor Trust Administrator may have.

### 3.14. Adversary Proceedings.

The Trust Administrator shall have the exclusive right to pursue all Retained Claims and Defenses, including adversary proceedings brought or to be brought under Chapter 5 of the Bankruptcy Code. The Trust Administrator may pursue, abandon, or release any or all Retained Claims and Defenses as it deems appropriate, without the need to obtain approval or any or other further relief from the Bankruptcy Court, except that the Trust Administrator shall be permitted (a) to pursue Avoidance Actions against only those potential targets for Avoidance Actions scheduled and filed with the Bankruptcy Court by the District pursuant to Article 5.6.3 of the Plan and (b) continue and conduct litigation of the UPS Adversary Proceeding in accordance with the terms of the Confirmation Order and any other applicable Final Order of the Bankruptcy Court. The Trust Administrator, in its sole discretion, may offset any such claim held against an Entity, against any payment due such person or entity under the Plan.

The Trust Administrator, in its sole discretion, may accept or reject any offers to compromise or settle any Retained Claims or Defenses for $250,000.00 or less without Bankruptcy Court approval. For settlements of any Retained Claims or Defenses for more than $250,000.00, the Trust Administrator shall file a motion pursuant to Bankruptcy Rule 9019 seeking Bankruptcy Court approval to consummate settlement of any such Retained Claims or Defenses. All parties-in-interest shall have the right to object to any motion brought under Bankruptcy Rule 9019 to settle any Retained Claims or Defenses and nothing contained herein shall prejudice those rights or alter the provisions of Bankruptcy Rule 9019 in any way.

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 69 of 118

**4. Permitted Investments of the Creditors Trust.**

    **4.1. Types of Permitted Investments.**

Monies constituting part of the Trust Property shall, to the extent permitted by applicable law, be invested by the Trust Administrator: (a) in debt securities issued by the United States of America or by any agency or instrumentality thereof with a maturity of six (6) months or less, or (b) in certificates of deposit issued with a maturity of six (6) months or less by banks which are members of the Federal Reserve System having a capital stock and surplus aggregating at least $100,000,000 or (c) commercial paper rated no less than A-l, P-l or F-l, money market accounts such as Vanguard or Fidelity provided however, that (i) each Permitted Investment shall be held solely in the name of the Trust Administrator as Trust Administrator for the Creditors Trust, (ii) to the extent practicable, the Trust Administrator shall take physical possession of all such securities and secure them in a safe deposit box registered solely in the name of the Trust Administrator as Trust Administrator for the Creditors Trust, and (iii) no Permitted Investment may be made unless the Trust Administrator shall furnish the bank through which such Permitted Investment is made or in whose certificates of deposit such Permitted Investment is made with a copy of this Plan and such bank shall have acknowledged to the Trust Administrator in writing that upon the maturity of such Permitted Investment the proceeds thereof; if not reinvested in a Permitted Investment in accordance with the instructions of the Trust Administrator, shall be deposited solely in a bank account of the Creditors Trust.

    **4.2. Trust Administrator Bank Account.**

The Trust Administrator shall deposit cash received from the assets of the Creditors Trust into the Trust Administrator Bank Account, a FDIC or FSLIC insured demand deposit account controlled by the Trust Administrator and/or its agents.

    **4.3. Terms of Permitted Investments.**

All Permitted Investments shall be on terms which will allow Distributions to be made consistent with the requirements of the Plan and these Articles and shall mature in such amounts and at such times as may be necessary to provide funds when needed to make payments, as required by the Trust Administrator on behalf of the Creditors Trust as the case may be.

    **4.4. Valuation and Redemption of Permitted Investments.**

Any of the foregoing investments purchased with any of the Trust Property shall be deemed a part of the Trust Property and, for the purposes of determining the value of the Creditors Trust, the securities shall be valued at their market value. Any earned interest from Permitted Investments shall accrue ratably for the benefit of the Creditors Trust. At such time as it shall be necessary that some or all of the Permitted Investments be redeemed or sold in order to raise monies to comply with the provisions of the Plan or these Articles, the Trust Administrator shall effect such redemption or sale, in such manner and at such time as the Trust Administrator, in its discretion, deems reasonable.

17-02025-FPC9   Doc 905   Filed 06/01/18   Entered 06/01/18 14:57:43   Pg 70 of 118

## 5. Distributions Under the Plan

### 5.1. Plan Distributions.

The Trust Administrator shall make Distributions to Creditors holding Allowed Claims in accordance with the Plan and these Articles. The Trust Administrator may withhold from amounts distributable to any person and all amounts determined in the Trust Administrator's reasonable sole discretion to be required by any law, regulation rule, ruling, directive or other governmental requirement. Creditors holding Allowed Claims shall, as a condition to receiving Distributions, provide such information and take such steps as the Trust Administrator may reasonably require to ensure compliance with withholding and reporting requirements and to enable the Trust Administrator to obtain certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

As soon as is reasonably practicable after all Disputed Claims have been resolved, the Trust Administrator shall make the Distributions required to be made under the Plan. The date or dates of Distributions will be determined by the Trust Administrator based on a review and evaluation of the projected cash needs of the Creditors Trust in comparison to the assets of the Creditors Trust available for distribution. When the Trust Administrator believes that a Distribution can be made, then the amount and timing of the Distribution will be subject to the Trust Administrator's sole discretion in accordance with the Plan and these Articles.

### 5.2. Record Date for Distributions.

The Trust Administrator shall have no obligation to recognize any Claims occurring or filed after the applicable Bar Date or Rejection Claim Bar Date, as applicable. Any Claim filed after the applicable Bar Date or Rejection Claim Bar Date shall be null and void unless (a) the claimant files a motion with and is granted authority to file the Claim after the applicable Bar Date or Rejection Claim Bar Date or (b) the Claim is otherwise Allowed by the Bankruptcy Court. In making any Distribution with respect to any Claim, the Trust Administrator shall be entitled to recognize, for all purposes hereunder, only the entity that is listed on the proof of Claim filed with respect thereto or listed on the List of Creditors as the holder thereof as of the close of business on the applicable Bar Date or Rejection Claim Bar Date and upon such other evidence or record of transfer or assignment that are known to the Debtor as of the applicable Bar Date or Rejection Claim Bar Date.

### 5.3. General Provisions; Undeliverable Distributions.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Trust Administrator at (a) the address of each holder as set forth in the List of Creditors, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is Filed or if the Trust Administrator has been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Trust Administrator may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the Trust Administrator deems appropriate, but no Distribution to any holder shall be made unless and until the Trust Administrator has determined the then-current

address of the holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Trust Administrator shall be returned to, and held in trust by, the Trust Administrator until the Distributions are claimed or are deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code as set forth below in this Section. The Trust Administrator shall have the discretion to determine how to make the Distributions in the most efficient and cost-effective manner possible; provided, however, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

### 5.4. Minimum Distributions.

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim (other than the final Distribution) would be $25 or less in the aggregate, no such Distribution will be made to that holder.

### 5.5. Unclaimed Property.

Except with respect to Trust Property not Distributed because it represents a minimum Distribution under these Articles, Distributions that are not cashed by the claimant by the expiration of one hundred twenty (120) days from the date of the distribution check shall be deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code and shall vest or re-vest in the Creditors Trust, and the Claims with respect to which those Distributions are made shall be automatically canceled. After the expiration of that 120-day period, the claim of any entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Trust Administrator to attempt to locate any holder of an Allowed Claim. All funds or other property that vests or re-vests in the Creditors Trust pursuant to this Section shall be Distributed by the Trust Administrator to the other holders of Allowed Class 7 Claims in accordance with the provisions of the Plan. If the Trust Administrator believes the amounts vested or re-vested in the Creditors Trust are too immaterial to redistribute to the applicable claimants in accordance with the Plan, the Trust Administrator may contribute said amounts to a charity of its choosing. Such contribution will be made by Trust Administrator in its sole discretion.

### 5.6. Manner of Payments Under the Plan.

Payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Trust Administrator or by wire transfer from a domestic bank, at the option of the Trust Administrator.

### 5.7. Time Bar to Payments by Check.

Checks issued by the Trust Administrator on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to these Articles shall be made directly to the Trust Administrator by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim. After that date, all Claims in respect of

void checks shall be discharged and forever barred and the proceeds of those checks shall re-vest in and become the property of the Trust Administrator as unclaimed property in accordance with Section 347(b) of the Bankruptcy Code.

### 5.8. Compliance with Tax Requirements.

In connection with making Distributions under the Plan or these Articles, to the extent applicable, the Trust Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Trust Administrator may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Trust Administrator to the appropriate authority. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within one-hundred twenty (120) days from the date of first notification to the holder of the need for such information or for the cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable distribution in accordance with these Articles.

### 5.9. No Payments of Fractional Cents.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole cent.

### 5.10. Interest on Claims.

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

### 5.11. No Distribution in Excess of Allowed Amount of Claim.

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

### 5.12. Setoff and Recoupment.

The Trust Administrator may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that the Trust Administrator or the Debtor may have against

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 73 of 118

the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Trust Administrator or the Debtor of any right of setoff or recoupment that any of them may have against the holder of any Claim.

### 5.13. Late Filed Claims Not Entitled to Distribution.

Unless otherwise provided by the Plan or order of the Bankruptcy Court, any and all Claims filed after the applicable Bar Date or Rejection Claim Bar Date in the Chapter 9 Case shall not be entitled to a Distribution and the Trust Administrator is not required to take any further action with respect to said Claims and the Plan shall constitute an objection to any such claim filed after the applicable Bar Date or Rejection Claim Bar Date.

## 6. Disputed Claims

### 6.1. Estimation of Claims.

At any time, the Trust Administrator may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Trust Administrator has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Trust Administrator may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 6.2. Prosecution of Objections and Requests for Estimation.

Except as otherwise ordered by the Bankruptcy Court, responsibility for the filing, litigation, settlement, or withdrawal of all objections to Disputed Claims or requests for estimation thereof, including objections and estimation requests pending on the Effective Date, shall be the responsibility of the Trust Administrator and the costs of such litigation, settlement, or withdrawal shall be borne by the Creditors Trust. The Trust Administrator shall file and serve a copy of each objection upon the holder of the Disputed Claim to which the objection is being made as soon as practicable, but in no event later than one hundred eighty (180) days after the Effective Date unless such date is extended by order of the Bankruptcy Court. From and after the Confirmation Date, all objections shall be litigated to a Final Order, except to the extent the Trust Administrator elects to withdraw any such objection or the Trust Administrator and the claimant elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

12

7.   **Abandonment of Property by the Trust Administrator.**

The Trust Administrator shall have the right to abandon in any commercially reasonable manner (including abandonment or donation to a charitable organization of the Trust Administrator's choice) any other property that the Trust Administrator reasonably concludes is of no benefit to the Creditors or that it reasonably determines, at the conclusion of Distributions to be too impractical to distribute. Such abandonment shall be (a) affected by a separate order of the Bankruptcy Court on proper notice to the relevant parties and (b) be deemed to have been made under the Plan.

8.   **Effects of Confirmation**

8.1.   **Vesting of Assets.**

(a)    Except as set forth in the Plan and these Articles, title to the Trust Property of the assets being transferred to the Creditors Trust shall vest or re-vest in the Creditors Trust as of the Effective Date subject to the Trust Administrator's obligation to administer, liquidate and distribute the property in accordance with the terms of the Plan.

(b)    As of the Effective Date, all assets of the Reorganized Debtor shall be free and clear of all claims except as provided for in the Plan or the Confirmation Order.

9.   **Preservation of Claim Objections and Retained Claims and Defenses.**

Unless a claim or cause of action against a Creditor or other entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Trust Administrator expressly reserves such claim or cause of action for later adjudication by the Trust Administrator (including without limitation, claims and causes of action not specifically identified or which the Trust Administrator may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Trust Administrator at this time or facts or circumstances which may change or be different from those which the Trust Administrator now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or causes of action upon or after the confirmation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except for such claims or causes of action have been released in the Plan or any other Final Order.

# EXHIBIT 4

# Form of Medical Office Building Lease (as amended and restated) (TO COME)

# EXHIBIT 5

## Form of New Hospital Lease

**AMENDED AND RESTATED HOSPITAL FACILITY LEASE**

by and between

**KENNEWICK HOLDINGS, LLC,**
a Delaware limited liability company

and

**KENNEWICK PUBLIC HOSPITAL DISTRICT,**
a Washington public hospital district

Dated as of [_____], 2018

## AMENDED AND RESTATED HOSPITAL FACILITY LEASE

**THIS AMENDED AND RESTATED HOSPITAL FACILITY LEASE** dated as of [_____], 2018, by and between **KENNEWICK HOLDINGS, LLC**, a Delaware limited liability company ("**Landlord**"), and **KENNEWICK PUBLIC HOSPITAL DISTRICT**, a Washington public hospital district ("**Tenant**").

## WITNESSETH:

**WHEREAS**, Kennewick WA 2012 LLC, a Wisconsin limited liability company ("**Original Landlord**"), and Tenant entered into that certain Hospital Facility Lease, dated as of April 20, 2012 (the "**Original Lease**"; the Original Lease, as heretofore amended, modified and/or supplemented from time to time, the "**Existing Lease**"), pursuant to which Original Landlord leased the Premises (as defined in the Existing Lease) to Tenant on the terms and conditions provided for therein;

**WHEREAS**, Landlord has succeeded to the interest of Original Landlord under the Existing Lease, pursuant to that certain Deed In Lieu of Foreclosure and Notice of Assignment of Ground Lease, dated as of October 4, 2017, by Original Landlord to Landlord;

**WHEREAS**, contemporaneously with the effective date of this Amended and Restated Lease, Kennewick Public Hospital District, a Washington public hospital district, shall transfer fee simple title to real property described in Exhibit A attached hereto (the "**Land**") to the Landlord in exchange for the "Forgiven Rent" (as defined below) and terminate the ground lease of the Land (as defined below) dated as of April 20, 2012, by and between Tenant, as ground lessor, and Landlord as assignee of Original Landlord, as ground lessee; and

**WHEREAS**, Landlord and Tenant desire to amend and restate the terms and provisions of the Existing Lease on the terms and conditions provided for herein;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree to amend and restate the Existing Lease in its entirety as follows:

## ARTICLE I

## DEFINED TERMS

For purposes of this Lease, the following term or terms shall have the following meaning or meanings:

"**Affiliate**" means, as to a person or entity, any other person or entity which, directly or indirectly, Controls, is Controlled by or is under common Control with such first person or entity.

"**Chapter 9 Case**" means Tenant's case under chapter 9 of the Bankruptcy Code, which was commenced by the filing of a voluntary petition for relief in the United States Bankruptcy Court of the Eastern District of Washington (the "**Bankruptcy Court**") on **[June 30]**, 2017.

"**Control**" means possession by a person or an entity, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether by contract, ownership of voting securities, membership or partnership interests or otherwise.

"**Determination Date**" means August [__], 2018.

"**Forgiven Rent**" means $**4,281,000** of administrative priority rent in Tenant's Chapter 9 Case, which has been forgiven and released in exchange for the transfer of fee simple title to the Land, free and clear of all liens, claims and interests other than Permitted Encumbrances.

"**Replacement Condition**" means the date on which both of the following have occurred (i) Replacement Tenant takes possession of the Premises pursuant to the Replacement Lease and (ii) Replacement Tenant receives all necessary regulatory and governmental approvals, including the entry by the Bankruptcy Court of an order confirming Tenant's plan of reorganization, and approval of the transfer of certain of Tenant's assets, including, without limitation, its leasehold interest in the Premises under this Lease to Replacement Tenant, by the Washington Department of Health.

"**Replacement Lease**" means the second amended and restated lease of the Premises contemplated to be entered into with RCCH Trios Health, LLC, a Delaware limited liability company ("**Replacement Tenant**"), contemporaneously with the closing of the transfer of certain assets of Tenant to Replacement Tenant, to amend and restate this Lease.

In addition, the terms set forth below are defined in the provisions of this Lease set forth beside such terms:

| **Defined Term** | **Lease Provision** |
| --- | --- |
| Accrued Rent | Section 4.8 |
| Additional Rent | Section 4.3 |
| Base Rent | Section 4.1 |
| Base Rent Commencement Date | Section 4.1 |
| Building | Section 2.2 |
| Competitive Facility | Section 17.2(a) |
| Contamination | Section 7.1 |
| Disqualified Person | Section 17.2(a) |
| Encumbrance | Section 6.4 |
| Environmental Laws | Section 7.1 |
| Event of Default | Section 14.1 |
| Existing Lease | Preamble |
| Hazardous Material Claims | Section 7.1 |
| Hazardous Material | Section 7.1 |
| Impositions | Section 5.1(a) |

2

Initial Term                    Section 2.3(b)
Interest Rate                   Section 4.5
Landlord                        Preamble
Land                            Preamble
Legal Requirements             Section 3.2
Monthly Base Rent              Section 4.1
Mortgage                        Section 3.3
Mortgagee                       Section 3.3
Notice Addresses               Section 18.9
Notices                         Section 18.9
Original Lease                  Preamble
Permitted Uses                 Section 2.5
Premises                        Section 2.2
Renewal Term                   Section 2.3(c)
Rent                            Section 2.4
Security Deposit               Section 2.9
Tenant                          Preamble
Term                            Section 2.3(a)

## ARTICLE II

## LEASE OF PREMISES; POSSESSION

Section 2.1.    <u>Lease to Tenant</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises described in Section 2.2 below, for the Term provided for in Section 2.3 below, at the Rent provided for herein, and under the other terms and conditions provided for in this Lease.

Section 2.2.    <u>Premises</u>.  The "**Premises**" being leased under this Lease consists of the Land, and the improvements on the Land which consists of an approximately 168,200 gross square foot building (the "**Building**").  Tenant shall have sole and exclusive use of the entire Building, including without limitation the roof and exterior surfaces thereof, and the Land including all access ways, driveways, sidewalks and parking areas thereof.  Tenant shall also have the right to select and change from time to time the name of the Building and Premises in its sole discretion.

Section 2.3.    <u>Term</u>

(a)    The term of this Lease (the "**Term**") shall include the Initial Term and all Renewal Terms, if any.

(b)    The "**Initial Term**" of this Lease commenced on the date of the Original Lease and shall end on May 14, 2044, subject to earlier termination as provided herein.

(c)    Tenant shall have the option to extend this Lease for five consecutive terms of 10 years each (each a "**Renewal Term**") upon the same terms and conditions as are provided in this Lease, provided that no uncured Event of Default exists under this Lease on

3

either the date of notice of the exercise of such option as provided below, or on the commencement date of the such Renewal Term. Said options shall be exercised by written notice from Tenant to Landlord not less than one year prior to the expiration of the Initial Term of this Lease or the then current Renewal Term, as the case may be.

Section 2.4.    Rent.  The "**Rent**" payable by Tenant under this Lease shall consist of the Base Rent provided for in Section 4.1 hereof and the Additional Rent provided for in Section 4.3 hereof; provided, however, such Rent shall accrue as set forth in Section 4.8 hereof but shall be forgiven if the Replacement Condition has occurred on or before the Determination Date.

Section 2.5.    Permitted Uses.  Tenant may use the Premises for the purpose of operating a hospital facility, medical office use, hospital departments, clinics, programs, the practice of medicine by medical, osteopathic and/or podiatric doctors, related medical professional services performed in their offices, related uses (including administrative and office purposes), any activity or service permitted to be engaged in or offered by a public hospital district pursuant to Chapter 70.44 RCW, and any other services determined by Tenant to be necessary for the conduct of Tenant's delivery of health care services (the "**Permitted Uses**"), and for no other purpose whatsoever.

Section 2.6.    [Intentionally Omitted].

Section 2.7.    Delivery of Possession; Condition of Land and Title.  Landlord has delivered actual and exclusive possession of the Premises to Tenant, and Tenant has accepted possession of the Premises on July 14, 2014.  Tenant acknowledges having had the opportunity to make and having made all investigations and inspections of the Land (including, without limitation, the environmental condition of the Land) it deemed appropriate, and Tenant assumes all risks in the condition of the Land in all respects as of the date of the Original Lease and as of the date of this Lease.  Without limitation on the generality of the foregoing, Tenant acknowledges receipt of a copy of the environmental site assessment on the Land entitled "Phase I Environmental Site Assessment Report" (Job Number:  P2012/0102) dated January 13, 2012, prepared by Blue Mountain Environmental Consulting.  Tenant acknowledges that Landlord's title to the Land is subject to the matters set forth in Exhibit D attached to this Lease (the "**Permitted Exceptions**"), each of which has been examined by and is acceptable to Tenant.

Section 2.8.    Surrender of Possession.  Tenant shall surrender actual and exclusive possession of the Land, the Building and all other improvements located on the Land to Landlord at the end of the Term, and at such time same shall be free and clear of all tenancies and occupancies and any encumbrances other than the Permitted Exceptions.

Section 2.9.    Security Deposit.  If the Replacement Condition has not occurred on or before the Determination Date, Tenant shall be required to pay all Rent then accrued but unpaid, excluding the Forgiven Rent, and to post a security deposit with Landlord in the sum of $4,902,456 (as from time to time adjusted, the "**Security Deposit**") as security for the full and faithful performance of every provision of this Lease to be performed by Tenant.  The Security Deposit shall at all times be in the form of either cash or an irrevocable, unconditional standby letter of credit issued to Landlord as beneficiary by a bank and in a form acceptable to Landlord. If the Security Deposit is in the form of a letter of credit, Landlord shall be entitled to draw on

4

such letter of credit at any time if (i) Landlord is entitled to use, apply or retain the Security Deposit under the terms of this Section, or (ii) less than 30 days remain prior to the expiration date of such letter of credit and Tenant has not provided a replacement letter of credit. Any amount drawn on such a letter of credit thereupon become the Security Deposit and shall be held, used, applied and retained in accordance with the provisions of this Section and any other applicable provisions of this Lease. If an Event of Default has occurred and is continuing with respect to any provision of this Lease, including, but not limited to, the provisions relating to the payment of Rent, Landlord may use, apply or retain all or any part of the Security Deposit for the payment of any Rent and any other sum which is the subject of such Event of Default, or for the payment of any other amount which Landlord may spend or become obligated to spend by reason of such Event of Default or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of such Event of Default. If any portion of the Security Deposit is to be used or applied, Tenant, within five days after written demand therefor, shall deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount, and Tenant's failure to do so shall constitute an Event of Default under this Lease. Landlord shall not be required to keep the Security Deposit separate from its general funds and Tenant shall not be entitled to interest on the Security Deposit. If Tenant fully and faithfully performs every provision of this Lease to be performed by it, the Security Deposit or any balance thereof shall be returned to Tenant after the expiration of the Term and Tenant's vacation of the Premises.

**ARTICLE III**

**USE AND QUIET ENJOYMENT OF PREMISES**

Section 3.1.  Use of Premises.  Tenant shall use the Premises solely for Permitted Uses. Tenant shall not keep or permit to be kept any property on or about the Premises, or conduct any activity on or at the Premises, which exceeds the rated capacities of the Premises. Tenant shall not make or permit any use of the Premises, or perform or permit any acts, that will cause a cancellation of any insurance policy covering the Premises or any part thereof, or that will increase the rate of insurance on the Premises or any part thereof. Tenant shall pay all additional insurance premiums that may be caused by the use which Tenant shall make of the Premises. Tenant shall not do anything or permit anything to be done on the Premises that in any way may create a nuisance, disturb the occupants of neighboring property, or injure the reputation of the Premises. Tenant in its use of the Premises shall comply with all Legal Requirements respecting the Premises and shall not conduct or permit to be conducted on the Premises any business that is in violation of any applicable Legal Requirements.

Section 3.2.  Compliance with Legal Requirements.  Tenant shall, at its sole cost and expense, comply with the following ("**Legal Requirements**"):  (i) all applicable laws, ordinances, rules and regulations relating to the Premises or Tenant's activities on or about the Premises, including, without limitation, those relating to environmental, toxic or regulated substances or materials, whether or not such substances or materials existed on the Land on or prior to the date of this Lease or in the Premises on or prior to the date on which Tenant takes possession of the Premises unless such substances or materials were placed on the Premises by Landlord, (ii) all orders of court and all other tribunals and governmental or quasi-governmental departments and agencies relating to the Premises or Tenant's activities on or about the

5

Premises, (iii) Permitted Exceptions, and (iv) any covenants, conditions and restrictions recorded after the date of this Lease provided that they do not have a material adverse effect on the use of the Premises for the Permitted Uses or result in a material increase in Tenant's monetary obligations under this Lease or in connection with the Premises.

Section 3.3.    Quiet Enjoyment.  Landlord agrees that unless an Event of Default has occurred and is continuing, Tenant shall have quiet and peaceable possession of the Premises throughout the Term, without hindrance by Landlord or any persons claiming under Landlord, subject only to (i) this Lease, (ii) any mortgage, deed of trust or other security device serving at any time a similar function, together with any and all amendments and supplements thereto (collectively, a "**Mortgage**" and the holder thereof a "**Mortgagee**") upon Landlord's interest in the Land and the Premises, and (iii) Landlord's right to show the Premises, without material interference with Tenant's use of the Premises, at any time to prospective purchasers of the Premises, and to prospective tenants of the Premises during the last six months of the Term.

Section 3.4.    Nuisance and Waste Prohibited.  Tenant shall keep and maintain the Premises in good and neat order and repair and free of nuisance, and shall not commit or suffer to be committed any waste of the Premises.

## ARTICLE IV

## RENT

Section 4.1.    Base Rent.  Commencing on May 15, 2014 (the "**Base Rent Commencement Date**"), and continuing throughout the Term of this Lease, Tenant has been obligated to pay and shall in the future pay base rent in the amount of $9,804,912 per year (as from time to time adjusted, the "**Base Rent**"), less the Forgiven Rent and if the Replacement Condition has occurred on or before the Determination Date the additional forgiveness of Rent under Section 4.8.  The annual Base Rent  as of the date hereof is $10,558,817.81 and shall be increased from time to time in accordance with the provisions of Section 4.2 of this Lease. Except for the Forgiven Rent and subject to Section 4.8, the Base Rent shall be payable in equal monthly installments (the "**Monthly Base Rent**") in advance on the Base Rent Commencement Date and on the first day of each and every calendar month thereafter during the Term.  The Monthly Base Rent payable for any calendar month shall be an amount equal to 1/12th of the annual Base Rent in effect during such calendar month.  The Base Rent for any partial calendar month shall be prorated on a daily basis.  The Base Rent shall be payable to Landlord in the manner provided in Section 4.5 hereof.

Section 4.2.    Increases in Base Rent.  On each anniversary of the Base Rent Commencement Date, Base Rent shall be increased by an amount equal to 2.5% of the amount of the annual Base Rent payable under this Lease in the immediately preceding calendar year.

Section 4.3.    Additional Rent.  It is intended by Landlord and Tenant that the income from the Base Rent shall be net to Landlord and shall not be subject to deduction or expense of any kind in connection with the ownership or maintenance of the Premises.  Without limitation on the generality of the foregoing, throughout the Term of this Lease, Tenant shall pay to Landlord, in addition to the Base Rent, the amounts provided for in Sections 6.1, 6.3, 6.4, 7.3 and

6

other provisions of this Lease as additional rent under this Lease ("**Additional Rent**").  Subject to Section 4.8, the Additional Rent shall be payable to Landlord in the manner provided in Section 4.5 hereof.

Section 4.4.    [Intentionally omitted]

Section 4.5.    Payment of Rent; Late Charge.  All Rent shall be paid by Tenant to Landlord at the address set forth in Section 18.9 hereof or at such other address as Landlord shall designate in writing from time to time.  Past due Rent payments shall be deemed involuntary extensions of credit by Landlord and shall accrue interest at an annual rate equal to the lesser of the prime rate as reported from time to time in The Wall Street Journal plus 5% or the highest rate of commercial interest allowed by applicable law (the "**Interest Rate**").  If any payment of Rent due hereunder is not made when such payment is due in accordance with the terms hereof, then, in addition to the payment of the amount so due, Tenant shall pay to Landlord a "late charge" of five cents for each whole dollar so overdue to defray part of the cost of collection and handling such late payment.  Tenant agrees that the damages to be sustained by Landlord for the detriment caused by any late payment are extremely difficult and impractical to ascertain, and that the amount of five cents for each one dollar due is a reasonable estimate of such damages, does not constitute interest, and is not a penalty.

Section 4.6.    Net Lease; Rent Absolute.  This Lease is and shall be an absolutely net lease, and Landlord shall not be required to provide any services or do any act or thing with respect to the Premises except as specifically provided herein.  All obligations of Tenant under this Lease for the payment of Rent shall constitute independent obligations of Tenant and shall be paid by Tenant without abatement, deduction or setoff and shall, to the extent not satisfied, survive the termination of this Lease.  Notwithstanding any provision of this Lease to the contrary, unless the Replacement Condition occurs on or before the Determination Date, Tenant's obligation to pay the Rent is absolute and unconditional and shall survive and not be limited, abated or otherwise affected by any occurrence, event or circumstance whatsoever, including, without limitation, any of the following:  (i) failure of Landlord to deliver possession of the Premises to Tenant on or before any particular date, regardless of the reason or reasons for such failure; (ii) [intentionally omitted]; (iii) except where such termination occurs because the Replacement Condition occurs on or before the Determination Date, expiration or termination of this Lease, regardless of the reason or reasons for such expiration or termination, including, without limitation, by reason of Landlord's breach of its obligations under this Lease or Landlord's breach of any express or implied covenants of suitability, habitability, title or quiet enjoyment; (iv) except as otherwise expressly provided in Article VIII and Article X hereof, any partial or complete damage to or destruction or condemnation of the Land, the Building or the Premises; (v) any constructive or actual eviction or dispossession of Tenant from the Premises, or the failure of Tenant to occupy the same; (vi) any foreclosure of any mortgage or other lien with respect to the Land, the Building or the Premises; (vii) any sale of all or part of the Land or the Building; (viii) any merger of Tenant's interest under this Lease with the fee simple title to the Premises; (ix) any bankruptcy or insolvency of Landlord; (x) any action or inaction by Landlord or any other person with respect to Tenant, the Premises, the Building or the Land; or (x) any "act of God" or "force majeure."  **TENANT, AFTER RECEIVING ADVICE FROM ITS COUNSEL, KNOWINGLY, IRREVOCABLY, UNCONDITIONALLY AND ABSOLUTELY WAIVES ANY RIGHTS, CLAIMS, SETOFFS AND DEFENSES THAT**

7

**IT NOW HAS OR MAY HAVE IN THE FUTURE (BUT FOR THE EFFECT OF THIS SECTION) UNDER OR PURSUANT TO ANY LAW, STATUTE, JUDICIAL DOCTRINE OR REGULATION RELATING TO ITS OBLIGATION TO PAY THE RENT**.

Section 4.7.    Revenue Obligation of Tenant; No General Obligation.  Notwithstanding any other provision of this Lease, Tenant's obligation to pay Rent and all other amounts coming due under this Lease shall be a revenue obligation and not a general obligation.  Nothing contained in this Section 4.7 shall be deemed to limit Landlord's recourse under this Lease to the revenues Tenant derives from the Premises only, but Landlord shall have recourse to the revenues of Tenant from any of its healthcare facilities; provided, however, in no event shall Landlord have recourse to any taxes levied or collected by Tenant.

Section 4.8.    Accrued Rent. Notwithstanding anything to the contrary contained herein, it is acknowledged and agreed by Landlord and Tenant that: (a) the Forgiven Rent shall be irrevocably deemed fully satisfied by the transfer of the Land to Landlord; and (b) from and after the date of this Lease until the Determination Date, Tenant shall not be required to pay Rent under this Lease on a current basis, which Rent shall instead accrue and continue to be due and owing hereunder ("**Accrued Rent**").  If the Replacement Condition has been satisfied on or prior to the Determination Date, immediately prior to Landlord's delivery of the Premises to the Replacement Tenant under the Replacement Lease, the Term of this Lease shall end and all Accrued Rent from and after the commencement of the Chapter 9 Case shall be forgiven.  Accrued Rent that accrued prior to the Chapter 9 Case shall be an allowed claim that shall receive the treatment provided under the Tenant's Plan of Adjustment.  If the Replacement Condition has not been satisfied on or prior to the Determination Date, all Accrued Rent shall be immediately due and payable and all future Rent under this Lease shall be payable monthly on the first day of each month, and the other terms and provisions of this Article 4 governing payment of Rent shall apply on a current basis.

Section 4.9.    Books and Records.  It is anticipated that most items of Additional Rent will be payable by Tenant directly to the party to whom the respective items are payable.  If and to the extent that Landlord pays items which become Additional Rent, Landlord shall keep books and records concerning such items of Additional Rent.  Tenant shall have the right, no more than once with respect to each calendar year during the Term of this Lease, and no later than one year following the end of any such calendar year, to audit such books and records of Landlord concerning such items of Additional Rent for such calendar year.  Landlord shall have no obligation to retain such books and records for more than one year following the end of such calendar year.  Any such audit by Tenant shall be conducted by an accounting firm retained by Tenant and acceptable to Landlord in its reasonable discretion.  All expenses of such audit shall be borne by Tenant, unless such audit establishes that Landlord's calculation of such items of Additional Rent for a calendar year was in error by more than 5% in excess of such auditor's determination, in which case Landlord shall pay for the cost of such audit.

Section 4.10.    Tenant's Financial Reporting.  Tenant shall deliver to Landlord (i) Tenant's unaudited monthly financial reports within 30 days of the completion of each month, and (ii) Tenant's unaudited quarterly and full year annual financial reports within 45 days of the completion of each of Tenant's fiscal quarters and year-ends respectively.  Tenant shall further deliver to Landlord Tenant's audited full year annual financial reports not less than once per year

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 86 of 118

on the earlier of (i) 10 business days of the completion of and Tenant's approval of said audited financial reports, or (ii) 150 calendar days following completion of Tenant's fiscal year end. Tenant shall also deliver to Landlord such additional financial information as is reasonably requested by Landlord.

**ARTICLE V**

**TAXES AND ASSESSMENTS; UTILITIES**

Section 5.1.    Taxes and Assessments.  If and to the extent that the Premises are not exempt from real estate taxes and assessments, Tenant shall pay directly to the appropriate governmental entities on or before the due date thereof, all property taxes, assessments and other governmental charges of any kind or nature now or in the future (collectively, "**Impositions**") levied upon the Premises or personal property located at or used in connection with operating the Premises which become payable during any tax assessment year or period which is within or partially within the Term, including all Impositions which may be assessed, levied or imposed in replacement of, or in addition to, all or any part of same, whether or not measured, calculated by or based upon the Premises or any estate or interest in the Premises or the revenue or income generated by the Premises, regardless of the time at which, or period for which, such Impositions are assessed or charged or the time that such Impositions become a lien against the Premises.  All Impositions which become payable during the tax assessment year or period in which the Term commences and ends shall be prorated between Landlord and Tenant based upon the amount of the Impositions for such full assessment year or period and the number of days during such tax assessment year or period which are within the Term so that Tenant shall pay only that percentage of such Impositions which is equal to the percentage of such tax assessment year or period which is within the Term.

Section 5.2.    Utilities.  Tenant shall be responsible for the cost of all utilities for the Premises, including, without limitation, electricity, gas, water and sewer, telephone and all other communication services.  Tenant shall cause all such utility services to the Premises to be metered in its own name and shall pay or cause to be paid all charges and deposits for such utilities.  Tenant shall use utilities only within the capacity of the circuits in the Premises.  Landlord shall not be liable for damages resulting from utility interruptions caused by casualty, accident, labor dispute or any other cause, nor shall any interruptions be deemed an actual or constructive or partial eviction or result in any abatement of Rent.

**ARTICLE VI**

**COVENANTS OF TENANT CONCERNING MAINTENANCE, INDEMNIFICATION AND OTHER MATTERS**

Section 6.1.    Maintenance.  Tenant shall maintain, and make all structural and non-structural repairs, alterations and replacements necessary to maintain, the Premises in good condition and repair suitable for a first class health care facility and in compliance with all applicable Legal Requirements, and shall surrender the Premises when required by this Lease in such condition, reasonable use and wear excepted consistent with the foregoing standards excepted.  Tenant shall undertake a regular program of repair, maintenance and replacement to

9

ensure that the Premises meet the foregoing standard at all times through the expiration of this Lease and reasonable use and wear shall not excuse any deferred maintenance. Landlord may, but shall not be obligated to, perform any of Tenant's maintenance, repair, alteration or replacement responsibilities if Tenant has not completed same and Tenant shall reimburse Landlord in the amount of 115% of all costs so incurred by Landlord within 10 days after receipt of Landlord's invoice therefor. All such amounts shall constitute Additional Rent.

Section 6.2.    Alterations.  Tenant may make, at its sole cost and expense, such non-structural alterations, improvements and additions of any kind to the Premises, including without limitation interior and exterior signage, as Tenant deems desirable in the conduct of the Permitted Uses so long as same do not change the exterior of any building on the Premises (other than signage) or decrease the then fair market value of the Premises. Tenant shall not make any structural alterations, improvements or additions of any kind to the Premises without Landlord's prior written consent. All alterations, improvements, and additions to the Premises shall be made in compliance with applicable Legal Requirements. All alterations, improvements and additions which are not movable trade fixtures, including, without limitation, the Building, shall be the property of Landlord and shall remain upon and be surrendered with the Premises.

Section 6.3.    Landlord's Nonliability; Indemnification of Landlord.  Landlord shall not be liable for any loss, damage or injury of any kind or character to any person or property, arising from any use of the Premises or any part thereof, or caused by any defect in the Premises, or in any equipment or other facility therein, or caused by or arising from any act or omission of Tenant, or of any subtenants, employees, agents, licensees, contractors or invitees of Tenant, or by or from any accident on the Premises or any fire or other casualty thereon, or occasioned by the failure of Tenant to maintain the Premises in safe condition, or arising from any other cause whatsoever. Tenant, as a material part of the consideration of this Lease, hereby waives on its behalf all claims and demands against Landlord and each Mortgagee for any such loss, damage or injury of Tenant, and hereby agrees to indemnify and hold Landlord and each Mortgagee entirely free and harmless from all liability for any such loss, damage or injury of all other persons, and from all costs and expenses arising therefrom, including reasonable attorneys' fees and expenses. Tenant agrees to pay, and to protect, indemnify, and save harmless Landlord and each Mortgagee from and against any and all liabilities, losses, damages, costs, expenses, including reasonable attorneys' fees and expenses, causes of action, suits, claims, demands or judgments of any nature whatsoever arising from (i) any injury to, or the death of, any person, or damage to property, on the Premises, or in any manner growing out of or connected with the use, nonuse, condition or occupation of the Premises or any part thereof; (ii) violation by Tenant of any agreement or condition of this Lease; and (iii) violation by Tenant of any contract or agreement to which Tenant is a party or of any Legal Requirement, in each case affecting the Premises or any part thereof or the ownership, occupancy or use thereof. Any indemnification of Landlord and each Mortgagee under this Section shall constitute Additional Rent payable within 10 days of demand. Anything herein to the contrary notwithstanding, nothing contained in this Section shall release Landlord from or indemnify Landlord against any willful or negligent act of Landlord. The representations, warranties and agreements contained in this Section 6.3 are made and entered into by Tenant with the intention that each Mortgagee will be the third party beneficiary of such representations, warranties and agreements. The provisions of this Section 6.3 shall survive the expiration or earlier expiration of this Lease.

Section 6.4.   No Liens.  Except for the Permitted Exceptions, Tenant shall not create or suffer to be created or to remain, directly or indirectly, and will discharge or promptly cause to be discharged, any lien, charge or encumbrance on, or pledge of, all or any part of the Premises (each, an "**Encumbrance**"), including, without limitation, any mechanic's, materialmen's, contractor's or subcontractor's liens arising from or any claim for damage growing out of any construction, repair, restoration, replacement or improvement related to the Premises. If Tenant fails to remove any such Encumbrance within 10 days after written notice thereof from Landlord, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or otherwise, without any investigation or contest of the validity thereof, and any amounts expended by Landlord in so doing, including costs, expenses and reasonable attorneys' fees, shall constitute Additional Rent payable within 10 days of demand. The provisions of this Section are subject to the provisions of Article VIII of this Lease. The provisions of this Section 6.4 shall survive the expiration or earlier expiration of this Lease.

## ARTICLE VII

## HAZARDOUS MATERIALS

Section 7.1.   Defined Terms.  For purposes of this Lease, the following terms shall have the following respective meanings:

"**Contamination**" means the uncontained presence of Hazardous Materials at the Premises, or arising from activities at the Premises, which may require remediation under any applicable law.

"**Environmental Laws**" means the Comprehensive Environmental Response, Compensation, and Liability Act, the Model Toxics Control Act (RCW 70.105D et. seq.) any so called "**Superfund**" or "**Superlien**" law, The Toxic Substances Control Act, or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, now or hereafter in force, regulating, relating to, or imposing liability or standards of conduct concerning any Hazardous Material.

"**Hazardous Material**" means any hazardous substance or any pollutant or contaminant defined as such in, or for purposes of, the Comprehensive Environmental Response, Compensation, and Liability Act, any so called "**Superfund**" or "**Superlien**" law, The Toxic Substances Control Act, or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, now or hereafter in force, regulating, relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material; asbestos or any substance or compound containing asbestos; polychlorinated biphenyls or any substance or compound containing any polychlorinated biphenyl; petroleum and petroleum products; pesticides; medical wastes; and any other hazardous, toxic or dangerous waste, substance or material.

"**Hazardous Material Claims**" means all claims made or threatened by any third party against Landlord or Tenant relating to damage, contributions, cost recovery compensation, loss or injury resulting from any Hazardous Materials.

Section 7.2.  Environmental Covenants.

(a)  If requested by Landlord or any Mortgagee, Tenant shall provide, or cause to be provided, to Landlord and such Mortgagee copies of (i) applications or other materials submitted by Tenant to any governmental agency in compliance with Environmental Laws, (ii) any notifications submitted by Tenant to any person pursuant to Environmental Laws, (iii) any permit, license, approval, amendment or modification thereto granted to Tenant pursuant to Environmental Laws, (iv) any record or manifest required to be maintained by Tenant pursuant to Environmental Laws, and (v) any correspondence, notice of violation, summons, order, complaint or other document received by Tenant pertaining to Contamination, the costs of remediating Contamination, or compliance with any Environmental Laws.

(b)  Tenant shall not (i) use, generate, manufacture, store or dispose of, nor will it permit the use, generation, storage, or disposal of, Hazardous Materials on, under or about the Premises, nor will it transport or permit the transportation of Hazardous Materials to or from the Premises, except in compliance with applicable Environmental Laws, or (ii) create or permit to continue in existence any lien (whether or not such lien has priority over the lien created by the Mortgage of any Mortgagee) upon the Premises imposed pursuant to any Environmental Law.

(c)  Tenant shall, if requested by Landlord or any Mortgagee to comply with any regulatory requirement applicable to Landlord or any Mortgagee, obtain a report, satisfactory to Landlord and any Mortgagee, prepared by a registered professional engineer acceptable to Landlord and any Mortgagee, certifying that the Premises were not used during the Term for any activities involving, directly or indirectly, the use, generation, treatment, storage or disposal of any Hazardous Material other than in compliance with all Environmental Laws.  Tenant acknowledges and agrees that Landlord and any Mortgagee shall have the right to retain, at Tenant's expense, an independent professional consultant to review any report prepared by or for Tenant and/or to conduct their own investigation of the Premises with respect to the use of the Premises during the Term.

(d)  Tenant shall immediately advise Landlord and any Mortgagee in writing of (i) any and all Contamination or Hazardous Materials Claims of which it has knowledge on the Premises or on any real property adjoining or in the vicinity of the Premises, and (ii) any remedial action taken by Tenant in response to any Hazardous Materials on, under or about the Premises or Hazardous Materials Claims.

(e)  Tenant shall provide Landlord and any Mortgagee with copies of all communications with federal, state and local governments or agencies relating to Environmental Laws and all communications by Tenant with any person relating to Hazardous Materials Claims.

Section 7.3.  Indemnification.  Tenant agrees to pay, and to protect, indemnify, and save harmless Landlord and each Mortgagee from and against any and all liabilities, losses, damages, costs, expenses, including reasonable attorneys' fees and expenses, causes of action, suits, claims, demands or judgments of any nature whatsoever arising from (i) the presence of any Hazardous Material in, or the escape, seepage, leakage, spillage, discharge, emission,

12

discharging or release of any Hazardous Material from, the Premises or any part thereof, other than any Hazardous Material placed on the Premises by Landlord after the date hereof, (ii) any liens against the Land or the Building permitted or imposed by any Environmental Laws, or any actual or asserted liability or obligations of Landlord, any Mortgagee or any of their affiliates or subsidiaries under any Environmental Laws, based on the presence of any Hazardous Material in, or the escape, seepage, leakage, spillage, discharge, emission, discharging or release of any Hazardous Material from, the Premises or any part thereof, other than any Hazardous Material placed on the Premises by Landlord, and (iii) any actual or asserted liability or obligations of Tenant or any of its affiliates or subsidiaries under any Environmental Laws. Landlord and Mortgagee, as used in this Section, shall include any beneficiary of any trust or any member, manager, agent, employee or representative of Landlord, Mortgagee or any trustee. Any indemnification under this Section shall constitute Additional Rent payable within 30 days of demand.

Section 7.4.    Survival; Mortgagee as Third Party Beneficiary.  The representations, warranties and agreements contained in this Article shall survive the termination of this Lease. The representations, warranties and agreements contained in this Article are made and entered into by Tenant with the intention that each Mortgagee will be the third party beneficiary of such representations, warranties and agreements.

# ARTICLE VIII

# TENANT'S RIGHT TO CONTEST

Notwithstanding any other provision of this Lease, Tenant shall not be required to pay any Impositions, comply with any Legal Requirements, or remove any Encumbrance, so long as Tenant shall contest, in good faith and at Tenant's expense, the existence, the amount or the validity or applicability thereof, the amount of the damages caused thereby, or the extent of its liability therefor, by appropriate proceedings, which together with any bond or title insurance protection that Tenant may elect to obtain, shall operate during the pendency of such contest to prevent (i) the collection of, or other realization upon, the Impositions or Encumbrance so contested, (ii) the sale, forfeiture or loss of the Premises or any part thereof, or any Rent or any portion thereof, to satisfy the same or to pay any damages caused by the alleged violation of any such Legal Requirement, (iii) any interference with the use or occupancy of the Premises or any part thereof, (iv) any interference with the payment of any Rent or any portion thereof or (v) any default under any Mortgage or any Permitted Exception. While such proceedings are pending, Landlord shall not have the right to pay, remove, or cause to be discharged the Impositions or Encumbrance thereby being contested unless such payment is necessary to avoid the sale, forfeiture, or loss of Landlord's title in the Premises, to prevent a default under any Mortgage or any Permitted Exception or to facilitate any refinancing. Tenant further agrees that each such contest shall be promptly prosecuted to a final conclusion. If necessary in the prosecution of any such contest, Landlord shall join with Tenant as a party to such contest at no cost to Landlord, and Tenant shall pay, and save Landlord harmless against, any and all losses, judgments, decrees and costs (including reasonable attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final settlement, compromise, or determination of such contest, fully pay and discharge the amounts that shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, and perform all acts, the

13

performance of which shall be ordered or decreed as a result thereof. No such contest shall subject Landlord or any Mortgagee to the risk of any civil or criminal liability, and Tenant shall give such reasonable indemnity or security to Landlord and any Mortgagee as may be demanded by Landlord or any Mortgagee to ensure compliance with the foregoing provisions of this Lease.

## ARTICLE IX

### DAMAGE OR DESTRUCTION BY FIRE OR OTHER CASUALTY

If, during the Term, the Premises are partially or totally damaged or destroyed by fire or other casualty, Tenant shall, at its sole cost and expense, repair and restore the Premises, as speedily as possible, to the condition existing prior to such damage or destruction, subject to reasonable delays for insurance adjustments and delays caused by matters beyond Tenant's reasonable control. If the proceeds of the insurance covering any such damage or destruction are payable to a Mortgagee, then the obligation of Tenant to so repair and restore the Premises shall be subject to the availability to Tenant of such insurance proceeds to the extent needed to pay for such repair and restoration. Landlord shall use its best efforts in good faith at Tenant's expense to cause such insurance proceeds to be made available to Tenant for such purpose. Tenant shall be obligated to meet all reasonable conditions imposed on the use of any such insurance proceeds by such Mortgagee, or, if there is no Mortgage and the amount of the loss exceeds $100,000, Landlord. If such insurance proceeds are made available to Tenant by such Mortgagee and such proceeds are insufficient to repair and restore the Premises as described above, Tenant shall be required to make up such deficiency out of Tenant's own funds. There shall be no abatement or reduction of any Rent under this Lease due to any such damage, destruction or repair or restoration.

## ARTICLE X

### INSURANCE AND WAIVER OF SUBROGATION

Section 10.1. <u>Property Insurance</u>. Tenant shall, at its sole cost and expense, insure the Premises against loss or damage from fire, lightning, windstorm, explosion, earthquake, flood and such other risks usually included under extended coverage policies (or such other policy form as is generally used in the commercial insurance market from time to time provided that Tenant must obtain Landlord's approval of any change in policy type) and otherwise with such coverages, deductibles and exclusions as are typical for owners of real estate similar to the Premises. Such insurance shall be for the full insurable value (actual replacement value without deduction for physical deterioration) of the Premises, shall name Landlord, Tenant and any Mortgagee as named insureds as their interests may appear, and shall provide that such insurance shall not be cancelled or changed without not less than 30 days' prior written notice to Landlord and any Mortgagee. Notwithstanding anything to the contrary contained in this Section, such insurance shall at all times be in such amounts and on such terms and conditions as to fully satisfy all of the requirements of any Mortgage on the Premises. Tenant shall from time to time furnish Landlord with ACORD certificates or other evidence acceptable to Landlord in its reasonable judgment that such insurance is in effect.

Section 10.2.  Liability and Other Insurance.  Tenant shall, at its sole cost and expense, obtain and keep in force a policy or policies of comprehensive general liability insurance covering the Premises and any losses or claims arising in whole or in part from the use of the Premises, and malpractice insurance, naming Landlord and any Mortgagee as additional named insureds, with such coverages and in such amounts as are from time to time typically obtained by operators of real estate similar to the Premises, which shall be with minimum single limit of coverage for any one occurrence of not less than $5,000,000.00, as adjusted on each 10th anniversary of the date of the Original Lease to a dollar amount which bears the same ratio to the such dollar amount as the Consumer Price Index referred to below for the latest month prior to the date such adjustment is to be effective bears to such Consumer Price Index for the latest month prior to the date of the Original Lease. The Consumer Price Index referred to above is the index prepared by the Department of Labor of the United States, Bureau of Labor Statistics, and entitled Consumer Price Index, All Urban Consumers, All Items, West-C (1982-84=100)..  Such insurance shall provide that it is primary coverage and not excess over or contributory with any other insurance coverage.  In addition to but without duplication of the insurance coverage described in Section 10.1 above, Tenant shall also at all times, at its sole cost and expense, obtain and keep in force insurance against loss or damage to the Premises by fire and other risks, written on an "all risk" special perils, 100% full replacement cost basis, without deduction for foundations and footings, and without co-insurance, and with not more than $10,000 deductible from the loss payable for any casualty.  Tenant shall, at its sole cost and expense, also obtain such other insurance coverages, such as boiler and machinery, war risk, workers compensation and rent loss insurance, as are required by applicable laws or by any Mortgagee.  All such insurance shall provide that such insurance shall not be cancelled or changed without not less than 30 days' prior written notice to Landlord and any Mortgagee.  Notwithstanding anything to the contrary contained in this Section, all such insurance shall at all times be in such amounts and on such terms and conditions as to fully satisfy all of the requirements of any Mortgage on the Premises, provided that such requirements are customary.  Tenant shall from time to time furnish Landlord with ACORD certificates or other evidence acceptable to Landlord in its reasonable judgment that such insurance is in effect.

Section 10.3.  Waiver of Claims.    Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each hereby waives any and all rights of recovery, claim, action or cause of action against the other for any loss or damage that may occur to the Premises or any improvements thereto, or any personal property of Landlord or Tenant, arising from any cause that (i) would be insured against under the terms of any fire or other casualty insurance required to be carried hereunder; or (ii) is insured against under the terms of any fire or other casualty insurance actually carried, regardless of whether the same is required hereunder.  The foregoing waiver shall apply regardless of the cause or origin of such claim, including but not limited to the negligence of a party, or such party's agents, officers, employees or contractors. The foregoing waiver shall not apply if it would have the effect, but only to the extent of such effect, of invalidating any insurance coverage of Landlord or Tenant.  The foregoing waiver shall also apply to any deductible, as if the same were a part of the insurance recovery.

Section 10.4.  Waiver of Subrogation.  Any fire or other casualty and liability insurance maintained by either Landlord or Tenant shall provide that the insurer waives all rights of subrogation against the other party, its employees and agents, with respect to losses payable under the policy.

15

Section 10.5.   Intentionally Omitted.

Section 10.6.   Waiver of Worker's Compensation Immunity.  To the extent permitted by law, each party hereby waives its immunity with respect to the parties indemnified under this Lease under The Industrial Insurance Act (RCW Title 51) and/or any equivalent Acts, and expressly agrees to assume potential liability for actions brought against an indemnified party by the waiving party's employees.  This waiver has been specifically negotiated by the parties to this Lease and each party has had the opportunity to, and has been encouraged to, consult with independent counsel regarding this waiver.  This waiver is solely for the benefit of Landlord and Tenant and not for the benefit of any third party or employee.

Section 10.7.   Limitation of Indemnities.  If and only to the extent that the laws of the State of Washington (including RCW 4.24.115, as the same may be amended) are deemed to apply to all or any part of this Lease, then the indemnities set forth in this Lease shall be limited to provide the maximum protection allowed under such law.  If this Lease is deemed to be a contract subject to RCW 4.24.115, this indemnity shall be modified such that (i) neither party is indemnifying the other party for damages arising out of services described therein or out of bodily injury to persons or damage to property caused by, or resulting from, the sole negligence of the indemnified party or its agents or employees; and (ii) any indemnity against liability for damages arising out of services described therein or out bodily injury to persons or damage to property caused by or resulting from, the concurrent negligence of (A) Landlord or its agents or employees, and (B) Tenant or its agents or employees, is limited to the extent of the indemnitor's negligence or as otherwise permitted under the laws of the State of Washington.  The parties hereby acknowledge that the foregoing waiver was mutually negotiated by the parties.

## ARTICLE XI

## EMINENT DOMAIN

If the Premises are taken in their entirety under the power of eminent domain by, or conveyed in lieu of such exercise to, any public authority, then Tenant's obligations as to the Premises shall terminate as of the date upon which title to the Premises shall become vested in the condemning authority.  If less than all of the Premises is so taken or conveyed, Tenant's obligations as to the Premises shall not terminate, Rent shall not abate or be reduced, and Tenant shall, at its sole cost and expense, restore the balance of the Premises to a complete structural unit that can be operated on an economically feasible basis under the provisions of this Lease.  If the condemnation proceeds resulting from such taking or conveyance are payable to any Mortgagee, then the obligation of Tenant to so restore the balance of the Premises shall be subject to the availability to Tenant of such proceeds to the extent needed to pay for such restoration.  Landlord shall use its best efforts in good faith at Tenant's expense to cause such proceeds to be made available to Tenant for such purpose.  Tenant shall be obligated to meet all reasonable conditions imposed on the use of any such proceeds by such Mortgagee.  If such proceeds are made available to Tenant by such Mortgagee and such proceeds are insufficient to restore the Premises as described above, Tenant shall be required to make up such deficiency out of Tenant's own funds.  All damages awarded for any taking of all or any part of the Premises shall belong to Landlord, except that Tenant shall be entitled to any award made for removal and

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 94 of 118

reinstallation of Tenant's fixtures, moving expenses, loss of business and loss of its leasehold interest.

# ARTICLE XII

## ASSIGNMENT AND SUBLETTING

(a)     With the exception of subleases of space to providers of hospital-based services with a term not exceeding five years and not containing any option or right of first refusal to purchase, Tenant shall not assign or encumber its interest in this Lease in whole or in part, or sublease the Premises or any part thereof, without Landlord's prior written consent, which consent may be given or withheld by Landlord in its sole and absolute discretion.  In the event Tenant is a corporation or other entity, any dissolution, merger, consolidation or other reorganization of Tenant, or the sale or other transfer during the Term of in excess of 25% of the capital stock or other ownership interests in Tenant, or the sale or other transfer during the Term of in excess of 25% of the value of the assets of Tenant, shall be deemed a voluntary assignment by Tenant of its interest under this Lease.  Any unpermitted assignment, encumbrance or sublease without Landlord's prior written consent shall be voidable and, at Landlord's election, shall constitute an Event of Default.  Landlord's consent to any assignment, encumbrance or sublease shall not constitute a waiver of the consent provisions of this Lease with respect to any subsequent assignment, encumbrance or sublease, and shall not operate to relieve Tenant from primary liability to perform each and every covenant and obligation hereunder.  Tenant shall pay all reasonable costs and expenses that may be incurred by Landlord in processing, documenting or administering any request of Tenant for Landlord's consent under this Article.  Landlord may impose such conditions to consenting to any proposed assignment or subletting as Landlord shall deem appropriate in its sole and absolute discretion, including, without limitation, requirements that the proposed assignee or subtenant have and demonstrate to Landlord a net worth equal to or in excess of that of Tenant, and that the rent from such proposed assignee or subtenant be paid directly to Landlord to the extent of the rent due to Landlord hereunder.

(b)     If Tenant shall assign this Lease as permitted herein, the assignee shall expressly assume all of the obligations of Tenant hereunder in a written instrument satisfactory to Landlord and furnished to Landlord not later than 15 days prior to the effective date of such assignment.  If Tenant shall sublease the Premises as permitted herein, Tenant shall obtain and furnish to Landlord, not later than 15 days prior to the effective date of such sublease, the written agreement of such subtenant in form satisfactory to Landlord, to the effect that the subtenant will attorn to Landlord, at Landlord's option and written request, in the event this Lease terminates before the expiration of the sublease.

17-02025-FPC9     Doc 905     Filed 06/01/18     Entered 06/01/18 14:57:43     Pg 95 of 118

## ARTICLE XIII

## INTENTIONALLY OMITTED

## ARTICLE XIV

## EVENTS OF DEFAULT; LANDLORD'S REMEDIES; EXPENSES OF ENFORCEMENT

Section 14.1. <u>Events of Default</u>. The occurrence of any one or more of the following shall constitute an "**Event of Default**" under this Lease:

(a)     Tenant shall fail to pay when due any Rent or other amount owed to Landlord under this Lease, and such failure shall continue for a period of 10 days after written notice to Tenant.

(b)     The Premises or the Building are threatened with, or subject to, any unreasonable depreciation in value, waste or loss due to any act or omission on the part of Tenant.

(c)     Intentionally omitted.

(d)     Tenant shall fail to perform any other covenant or agreement in this Lease and such failure shall continue for a period of 30 days after written notice to Tenant, or if any such failure involves a hazardous condition, such failure is not cured by Tenant immediately upon notice to Tenant.

(e)     Excluding the Chapter 9 Case, Tenant shall make a general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts as they become due, or shall file or have filed against it a petition in any proceeding seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such proceeding shall not be dismissed within 30 days, or shall be adjudicated insolvent or bankrupt, or a receiver, trustee, custodian or other similar official shall be appointed for Tenant or for all or any substantial part of its property, or a substantial part of its property shall be attached, executed upon or otherwise impressed with a lien in favor of one or more creditors, and such appointment, attachment, execution or lien shall not be vacated or discharged within 30 days.

(f)     Any event of default shall continue after the expiration of all applicable notice and cure periods under any obligation of Tenant under any present or future revenue bonds, or under any other present or future obligation for borrowed money having an outstanding principal amount in excess of $500,000, and as a result of such event of default, the holder or holders or trustee for the holder or holders thereof have accelerated the maturity date of such revenue bonds or other obligation for borrowed money.

Section 14.2. <u>Termination of Lease; Reletting</u>. Upon the occurrence of any Event of Default which has not been cured within any applicable notice or cure period, or otherwise cured

18

with the written consent of both Landlord and any Mortgagee, each in its sole and absolute discretion, in addition to any other remedies provided by this Lease or by law, Landlord may terminate this Lease, or Landlord may, without terminating this Lease, re-enter the Premises and dispossess Tenant or any other occupant of the Premises and remove Tenant's and/or such other occupant's effects and relet the Premises for the account of Tenant for such rent and on such terms as shall be satisfactory to Landlord, crediting the actual proceeds of reletting (after deducting the costs and expenses of re-entry, alterations and additions and the expense of reletting) to the unpaid amounts due under this Lease during the remainder of the Term and Tenant shall remain liable to Landlord for the balance owed. Tenant shall not be entitled to any rents received by Landlord which exceed the balance owed by Tenant to Landlord calculated as provided in the immediately preceding sentence.

Section 14.3.   Termination of Lease; Money Judgment.  Upon termination of this Lease as a result of the occurrence of an Event of Default, Landlord shall be entitled to a money judgment against Tenant in the amount of the aggregate of the following:  (i) all unpaid Rent due on or before the date of termination, together with interest thereon at the Interest Rate; (ii) the excess, if any, of all Rent which would have become due on or before the date of the judgment but for the termination over the fair rental value of the Premises for such period, taking into account a reasonable vacancy and lease up factor, together with interest thereon at the Interest Rate; and (iii) the excess, if any, of all Rent which would come due after the date of the judgment through the schedule expiration date but for the termination over the fair rental value of the Premises, taking into account a reasonable vacancy and lease up factor, reduced to present value using as a discount factor the discount rate of the Federal Reserve Bank of San Francisco in effect at the time of judgment.

Section 14.4.   Expenses of Enforcement.  Tenant shall pay to Landlord upon demand all expenses incurred by Landlord in the enforcement of this Lease, including reasonable attorneys' fees and expenses, or incurred by Landlord in or with respect to any litigation, claim, negotiation or transaction which is related to or arises from any dispute, act or omission of or involving Tenant and which causes Landlord without Landlord's fault to become involved or concerned.

## ARTICLE XV

## HOLDING OVER IN POSSESSION

If Tenant shall retain possession of all or any part of the Premises beyond the expiration or termination of this Lease, such possession shall be deemed to be against Landlord's will unless Landlord consents to such possession in writing.  Unless Landlord has consented to such possession in writing, Tenant shall pay to Landlord 1/15th of the Monthly Base Rent payable for the last month of the Term of this Lease for each day that Tenant holds possession of any part of the Premises after expiration or termination of this Lease, and shall also pay all costs incurred and damages sustained by Landlord, whether direct or consequential, on account of such holding over.  Landlord's acceptance of payment of such amount shall not constitute consent to Tenant's possession.  In the event Landlord gives written consent to Tenant to hold over in possession, such tenancy shall be month to month and otherwise upon such terms and conditions (including rent) as Landlord shall specify in its written consent.

19

# ARTICLE XVI

# MORTGAGES

Section 16.1.  Subordination and Attornment; Lender Modifications.  This Lease shall automatically be subject and subordinate to any present or future Mortgage on the Premises and to all amounts secured thereby, and to all renewals, replacements and extensions of any of the foregoing, except to the extent that any Mortgage provides otherwise, subject to the condition that the mortgagee under such Mortgage shall agree in writing to recognize Tenant and this Lease, and not to disturb Tenant's possession of the Premises, so long as Tenant is not then in default.  Tenant further agrees that, in the event of a foreclosure of any Mortgage or of a conveyance in lieu thereof, it will attorn to the mortgagee or to the purchaser at any foreclosure sale, upon the condition that such mortgagee or purchaser shall agree in writing to recognize Tenant and this Lease, and not to disturb Tenant's possession of the Premises, so long as Tenant is not then in default.  Tenant shall at Landlord's request execute such further instruments or assurances as any mortgagee or purchaser may request to evidence the subordination of this Lease or to acknowledge the superiority of this Lease, as the case may be, and Tenant's attornment agreement.  Tenant shall enter into such modifications of this Lease as shall be reasonably requested by any Mortgagee so long as such modifications do not result in any material increase in the obligations or material reduction in the rights of Tenant under this Lease.

Section 16.2.  No Personal Liability.  In no event shall any mortgagee of the Premises, its nominee, the purchaser at a foreclosure sale have any personal liability whatsoever for any representations, warranties, covenants or agreements of Landlord hereunder or in connection herewith, or any liability for any security deposit or other sums deposited with Landlord, or for any previous prepayment of Rent to Landlord.

Section 16.3.  Notices to Mortgagee.  Provided Tenant receives written notice of the name and address of a mortgagee having an interest in the Premises, Tenant agrees that in the event of any act or omission by Landlord hereunder which could give Tenant the right to terminate this Lease or to claim a partial or a total eviction, Tenant shall not exercise any such right until it has notified in writing such mortgagee and such party shall have failed to commence the curing of such act or omission within 30 days of such notice and to diligently pursue the cure thereof until completed.

Section 16.4.  Foreclosure; Deed in Lieu of Foreclosure.  The provisions of this Article shall apply in the event of a foreclosure of any Mortgage or conveyance in lieu of foreclosure, notwithstanding the fact that the mortgagee thereunder may, directly or indirectly, own or have an interest in Landlord or an interest in the Premises in addition to its interest under such Mortgage.

# ARTICLE XVII

# CERTAIN RIGHTS OF LANDLORD

Section 17.1.  Right of Entry.  Landlord and its agents shall have the right to enter the Premises at all reasonable hours, upon reasonable prior notice, or at any time in case of

20

emergency, to inspect the Premises or make any repairs, alterations, improvements or additions which Landlord is permitted to make under this Lease, and Landlord shall be allowed to take all material into the Premises as may be required for such purpose.

Section 17.2.   Sale or Transfer of Premises.

(a)     Landlord shall have the right to sell or assign its interest in this Lease; provided, however, that so long as this Lease is in effect and there is no existing Event of Default under this Lease, rights in the landlord interest under this Lease shall not at any time be owned by any person or entity which is a Disqualified Person (as defined below) or an Affiliate of a Disqualified Person, unless the prior written approval of Tenant is obtained, which approval may be given or withheld in Tenant's sole discretion. For purposes of this Lease, the term "**Disqualified Person**" means any person or entity which directly or indirectly develops, owns, leases, operates or manages hospitals, acute care facilities, outpatient clinics, ambulatory centers, or medical office buildings (each a "**Competitive Facility**") in Benton or Franklin County, Washington; provided, however, that mere ownership of a Competitive Facility shall not result in such person or entity being a Disqualified Person so long as (i) such ownership is limited to (A) owning title to or a ground lease estate in the real estate on which such Competitive Facility is located, and (B) leasing such real estate to the holder of the license to operate such Competitive Facility, and (ii) such person or entity does not hold the licenses necessary to operate such Competitive Facility or have any right, whether by contract or by control of the holder of the licenses to operate such Competitive Facility, to participate in managing the operations of such Competitive Facility, or to otherwise share in any net revenues derived from the operations of such Competitive Facility.

(b)     In the event of any sale or transfer (by operation of law or otherwise) of the Premises, Landlord shall be relieved from all obligations of Landlord under this Lease, except for such as shall have accrued during Landlord's period of ownership.

**ARTICLE XVIII**

**MISCELLANEOUS**

Section 18.1.   Estoppel Certificates.  Tenant shall from time to time at the written request of Landlord deliver to Landlord within 20 days, a statement in writing certifying (i) that this Lease is unmodified and in full force and effect or, if there have been modifications, an itemized description of such modifications and that this Lease as modified is in full force and effect; (ii) the dates to which Rent and other amounts payable hereunder have been paid; (iii) that to the best of the knowledge of Tenant, Landlord is not in default under any provision of this Lease, or, if in default, the nature thereof in detail; and (iv) such further matters as may be reasonably requested by Landlord.  Tenant acknowledges that it is the intention of the parties that any such certificate may be relied upon by any mortgagees or prospective mortgagees, or any prospective or subsequent transferee of all or a part of Landlord's interest in the Premises.  In the event Tenant fails to provide such a certificate within such 20 day period after written request therefor, Landlord may supply same and all obligations of Tenant to be attested to hereunder shall be deemed to have been satisfied and this Lease deemed to be in full force and effect; or, at the sole

21

election of Landlord, Tenant shall be in default under this Lease upon the expiration of such 20 day period.

Section 18.2.  Effect of Payments by Tenant.  No payment by Tenant or receipt by Landlord of a lesser amount than the total amount then due and payable shall be deemed to be other than on account, nor shall any such payment be deemed an accord and satisfaction. Landlord may accept any payment without prejudice to any outstanding demand or action for possession, notice of default or notice of termination.  No payment by Tenant after termination of this Lease shall reinstate this Lease or extend the Term or waive or affect any notice given or proceedings commenced.

Section 18.3.  Waiver of Jury Trial.  **LANDLORD AND TENANT WAIVE TRIAL BY JURY IN CONNECTION WITH ANY PROCEEDINGS FOR POSSESSION OF THE PREMISES AND IN CONNECTION WITH ANY OTHER MATTERS WHICH MAY BE DETERMINED IN SUCH PROCEEDINGS**.

Section 18.4.  No Joint Venture.  This Lease does not create a joint venture or partnership between Landlord and Tenant.

Section 18.5.  Effect of Waiver.  The rights and remedies of the parties to this Lease are cumulative and not alternative.  Neither the failure nor any delay by any party in exercising any right, power or privilege under this Lease shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (i) no claim or right arising out of this Lease shall be deemed to be waived or renounced, in whole or in part, except by a waiver or renunciation of the claim or right in writing signed by the party sought to be bound by such waiver or renunciation; (ii) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given; and (iii) no notice to or demand on one party shall be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Lease.

Section 18.6.  Real Estate Brokers.  Landlord and Tenant each represents and warrants to the other that it has not dealt with any real estate broker or brokers in connection with this Lease.

Section 18.7.  Recitals.  The recitals hereto are hereby incorporated into and made a part of this Lease.

Section 18.8.  Time of Essence.  Time is of the essence of this Lease and each and every provision hereof.

Section 18.9.  Notices.  All notices and other communications provided for in this Lease ("**Notices**") shall be in writing.  The "**Notice Addresses**" of the parties for purposes of this Lease are as follows:

Landlord:                    Kennewick Holdings, LLC
                             2001 Ross Avenue

22

|  | Suite 2800 |
|  | Dallas, TX  75201 |
|  | Attention:  Realty Management Division – Loan Asset Management |

| with a copy to: | Kennewick Holdings, LLC |
|  | 2001 Ross Avenue |
|  | Suite 2800 |
|  | Dallas, TX  75201 |
|  | Attention:  Legal Department |

|  | Gibson, Dunn & Crutcher LLP |
|  | 200 Park Avenue |
|  | New York, NY  10166-0193 |
|  | Attention:  Matthew Kidd, Esq. |

| Tenant: | Kennewick Public Hospital District |
|  | 900 South Auburn Street |
|  | Kennewick, Washington 99336 |
|  | Attention:  Chief Executive Officer |

or such other address as a party may designate by notice duly given in accordance with this Section to the other parties.  A Notice to a party shall be effective when delivered to such party's Notice Address by any means, including, without limitation, personal delivery by the party giving the Notice, delivery by United States regular, certified or registered mail, or delivery by a commercial courier or delivery service.  If the Notice Address of a party includes an electronic mail address, Notice given by electronic mail shall be effective when delivered at such email address.  If delivery of a Notice is refused, it shall be deemed to have been delivered at the time of such refusal of delivery.  The party giving a Notice shall have the burden of establishing the fact and date of delivery or refusal of delivery of a Notice.

Section 18.10. <u>Further Assurances</u>.  Each party shall furnish upon request to the other party such further information, execute and deliver to the other party such other documents, and do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent and purposes of this Lease.

Section 18.11. <u>Successors and Assigns</u>.  The rights and obligations of the parties to this Lease shall inure to the benefit of, and shall be binding upon, their respective successors and permitted assigns.

Section 18.12. <u>Severability</u>.  In the event any provision of this Lease shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

Section 18.13. <u>Execution of Counterparts</u>.  This Lease may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute

but one and the same document. Receipt of an executed signature page to this Lease which has been duly notarized and is delivered by facsimile or other electronic transmission shall constitute effective delivery thereof.

Section 18.14. <u>Entire Agreement; No Reliance</u>. This Lease sets forth all of the covenants, promises, agreements, conditions and understandings of the parties relating to the subject matter of this Lease, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them relating to the subject matter of this Lease other than as are herein set forth. This Lease supersedes all prior written and oral communications relating to the subject matter of this Lease. Each party hereto acknowledges that such party is executing this Lease without relying on any statements, representations or warranties, either oral or written, that are not expressly set forth in this Lease.

Section 18.15. <u>Modification, Waiver and Termination</u>. This Lease and each provision hereof may be modified, amended, changed, altered, waived, terminated or discharged only by a written instrument signed by the party sought to be bound by such modification, amendment, change, alteration, waiver, termination or discharge.

Section 18.16. <u>Construction</u>.

(a) The words "hereof," "herein," "hereunder," and other words of similar import refer to this Lease as a whole not to the individual Sections in which such terms are used.

(b) References to Sections and other subdivisions of this Lease are to the designated Sections and other subdivisions of this Lease as originally executed.

(c) The headings of this Lease are for convenience only and shall not affect its construction or interpretation.

(d) Where the context so requires, words used in the singular shall include the plural and vice versa, and words of one gender shall include all other genders.

(e) Each party to this Lease and legal counsel to each party have participated in the drafting of this Lease, and accordingly the general rule of construction to the effect that any ambiguities in a contract are to be resolved against the party drafting the contract shall not be employed in the construction and interpretation of this Lease.

Section 18.17. <u>Governing Law</u>. This Lease shall be governed exclusively by and construed in accordance with the applicable laws of the State of Washington.

**[SIGNATURE PAGE(S) AND EXHIBIT(S),
IF ANY, FOLLOW THIS PAGE]**

**IN WITNESS WHEREOF**, the parties have executed this Lease as of the date first above written.

**LANDLORD:**

**KENNEWICK HOLDINGS, LLC**

By _____

Printed Name: _____

Title: _____

**TENANT:**

**KENNEWICK PUBLIC HOSPITAL DISTRICT**

By _____

Printed Name: _____

Title: _____

## **TENANT'S ACKNOWLEDGMENT**

STATE OF WASHINGTON   )
                                ) ss.
COUNTY OF BENTON      )

      I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that he/she signed this instrument, on oath stated that he/she was authorized to execute the instrument and acknowledged it as the _____ of Kennewick Public Hospital District, a Washington public hospital district, to be the free and voluntary act of such party for the uses and purposes mentioned in this instrument.

      Dated this _____ day of _____, 2018.

 

_____
(Signature of Notary)

_____
(Legibly Print Stamp Name of Notary)

Notary public in and for the state of Washington, residing at _____
My appointment expires _____

## **LANDLORD'S ACKNOWLEDGMENT**

STATE OF _____      )
                             ) ss.
COUNTY OF _____   )

      I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the _____ of Kennewick Holdings, LLC, a Delaware limited liability company, to be the free and voluntary act of such party for the uses and purposes mentioned in this instrument.

      Dated this _____ day of _____, 2018.

 

_____
(Signature of Notary)

_____
(Legibly Print Stamp Name of Notary)

Notary public in and for the state of _____,
residing at ____
My appointment expires _____

# EXHIBIT A

## LEGAL DESCRIPTION

PARCEL A:

A PORTION OF LOTS 2 AND 3, SHORT PLAT NO. 3333, RECORDED UNDER
AUDITOR'S FILE NO. 2011-029308 ACCORDING TO THE SHORT PLAT THEREOF
RECORDED IN VOLUME 1 OF SHORT PLATS, PAGE 3333, RECORDS OF BENTON
COUNTY, WASHINGTON, LOCATED IN SECTION 16, TOWNSHIP 8 NORTH, RANGE 29
EAST, WILLAMETTE MERIDIAN, CITY OF KENNEWICK, BENTON COUNTY,
WASHINGTON, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:


BEGINNING AT A 5/8" IRON REBAR MARKING THE MOST NORTHERLY
NORTHEAST CORNER OF SAID LOT 3, SAID POINT ALSO BEING THE NORTHWEST
CORNER OF SAID LOT 2;

THENCE FOLLOWING ALONG THE COMMON BOUNDARY OF LOTS 2 AND 3 THE
FOLLOWING (2) COURSES AND DISTANCES:
SOUTH 51°52'16" WEST, 256.30 FEET;
SOUTH 29°06'42" WEST, 248.43 FEET TO THE ADJUSTED BOUNDARY OF SAID LOT 3;

THENCE LEAVING THE COMMON BOUNDARY OF SAID LOTS 2 AND 3 ALONG THE
ADJUSTED BOUNDARY THE FOLLOWING (2) COURSES AND DISTANCES: SOUTH
41°23'21" EAST, 29.21 FEET;
SOUTH 29°11'41" WEST, 26.54 FEET TO THE COMMON BOUNDARY OF SAID LOTS 2
AND 3;

THENCE ALONG THE COMMON BOUNDARY OF SAID LOTS 2 AND 3 SOUTH
60°47'41" EAST, 383.98 FEET TO THE WESTERLY RIGHT-OF-WAY OF PLAZA WAY,
SAID POINT BEING 30,00 FEET WESTERLY OF THE CENTERLINE THEREOF, WHEN
MEASURED AT RIGHT ANGLES;

THENCE FOLLOWING ALONG THE WESTERLY RIGHT-OF-WAY OF SAID PLAZA
WAY SOUTH 42°21'03" WEST, 658.37 FEET TO THE SOUTHEAST CORNER OF SAID
LOT 3;

THENCE LEAVING THE WESTERLY RIGHT-OF-WAY OF SAID PLAZA WAY
FOLLOWING ALONG THE SOUTHERLY BOUNDARY OF SAID LOT 3 THE
FOLLOWING (3) COURSES AND DISTANCES:
NORTH 47°38'57" WEST, 112.67 FEET;
NORTH 60°47'44" WEST, 378.08 FEET;
NORTH 49°48'06" WEST, 380.26 FEET TO THE SOUTHWEST CORNER OF SAID LOT 3,
SAID POINT ALSO BEING ON THE EASTERLY RIGHT-OF-WAY OF SOUTHRIDGE

BOULEVARD, AT A POINT 30.00 FEET EASTERLY OF THE CENTERLINE THEREOF, WHEN MEASURED AT RIGHT ANGLES;

THENCE FOLLOWING ALONG SAID EASTERLY RIGHT-OF-WAY THE FOLLOWING (3) COURSES AND DISTANCES:
NORTH 38°37'58" EAST, 358,55 FEET;
NORTHEASTERLY, ALONG THE ARC OF A 1115,92 FOOT RADIUS, TANGENT CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 13°14'18" (THE RADIUS OF WHICH BEARS SOUTH 51°22'02" EAST) FOR AN ARC DISTANCE OF 257.84 FEET;
NORTH 51°52'16" EAST, 626.00 FEET TO THE NORTHWEST CORNER OF SAID LOT 3;

THENCE LEAVING SAID EASTERLY RIGHT-OF-WAY OF SOUTHRIDGE BOULEVARD FOLLOWING ALONG THE BOUNDARY OF SAID LOT 3 THE FOLLOWING (2) COURSES AND DISTANCES:
SOUTH 38°07'44" EAST, 309.09 FEET;
SOUTH 67°15'53" EAST, 41,60 FEET TO THE TRUE POINT OF BEGINNING AND THE END OF THIS DESCRIPTION,

PARCEL B:

RECIPROCAL ACCESS EASEMENT AS DELINEATED ON SHORT PLAT NO. 3333, RECORDED UNDER AUDITOR'S FILE NO. 2011-029308.

PARCEL C:

A RECIPROCAL PERPETUAL NON-EXCLUSIVE EASEMENT FOR INGRESS, EGRESS, ACCESS AND PARKING DURING NORMAL BUSINESS HOURS, RECORDED MARCH 25, 2014 UNDER AUDITOR'S FILE NO. 2014-006682.

PARCEL D:

A RECIPROCAL PERPETUAL NON-EXCLUSIVE EASEMENT FOR INGRESS, EGRESS, ACCESS AND PARKING DURING NORMAL BUSINESS HOURS, RECORDED OCTOBER 15, 2014 UNDER AUDITOR'S FILE NO. 2014-025986.

# **EXHIBIT D**

PERMITTED EXCEPTIONS

# EXHIBIT 6

## Current 13-Week Cash Flow Forecast

**Trios Health**
**Cash Flow Projection**
**May 25 thru August 31, 2018**

| | Actual 5/25 | Projected 6/1 | Projected 6/8 | Projected 6/15 | Projected 6/22 | Projected 6/29 | Projected 7/6 | Projected 7/13 | Projected 7/20 | Projected 7/27 | Projected 8/3 | Projected 8/10 | Projected 8/17 | Projected 8/24 | Projected 8/31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **L# Week Ending** | | | | | | | | | | | | | | | |
| **Volume** | | | | | | | | | | | | | | | |
| 5 Gross Charges for Collection in 45 Days | 9,076,789 | 10,169,575 | 7,357,910 | 8,287,963 | 6,844,217 | 6,844,217 | 6,844,217 | 8,747,552 | 8,045,939 | 8,259,145 | 7,983,840 | 7,892,072 | 7,800,304 | 7,708,536 | 7,616,767 |
| 11 Beginning Cash Balance | 2,636,802 | 1,250,792 | 879,280 | (362,142) | (36,403) | (569,495) | 54,926 | (956,873) | (255,781) | (2,148,782) | (1,790,764) | (3,677,592) | (3,924,256) | (5,667,803) | (5,430,207) |
| 13 Collections Actual/Projected (Hospital & Clinics) | 3,183,900 | 3,141,649 | 2,866,214 | 2,950,058 | 3,601,345 | 2,934,857 | 2,723,037 | 3,050,872 | 2,307,373 | 2,486,389 | 2,053,265 | 2,053,265 | 2,053,265 | 2,624,266 | 2,413,782 |
| 16 Total Cash Available | 5,820,702 | 4,392,441 | 3,745,494 | 2,587,915 | 3,564,942 | 2,365,362 | 2,777,962 | 2,093,999 | 1,951,592 | 337,607 | 262,501 | (1,624,327) | (1,870,991) | (3,043,538) | (3,016,426) |
| **Operating Expenses (Routine Must Pay)** | | | | | | | | | | | | | | | |
| 17 TRIOS Salaries | 2,002,690 | | 2,309,564 | | 2,117,505 | | 2,039,496 | | 2,026,930 | | 2,210,871 | | 2,099,658 | | 2,028,079 |
| 20 Benefits | | | | | | | | | | | | | | | |
| 21 Federal Tax Payments | | 779,046 | | 898,420 | | 823,709 | | 793,364 | | 788,476 | | 860,029 | | 816,767 | |
| 22 Health Insurance | 165,000 | 445,000 | 165,000 | 165,000 | 165,000 | 445,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 | 165,000 |
| 23 Pension | 335,000 | | 386,332 | | 354,206 | | 341,157 | | 339,055 | | 369,823 | | 351,220 | | 339,247 |
| 24 Total Benefits | 500,000 | 1,224,046 | 551,332 | 1,063,420 | 519,206 | 1,268,709 | 506,157 | 958,364 | 504,055 | 953,476 | 534,823 | 1,025,029 | 516,220 | 981,767 | 504,247 |
| 21 Supplies | 1,478,136 | 966,110 | 662,212 | 704,477 | 547,537 | 547,537 | 487,993 | 623,700 | 573,675 | 588,877 | 569,248 | 562,705 | 556,162 | 549,619 | 543,076 |
| 25 Other Expenses (See Note 1) | 589,084 | 860,005 | 477,528 | 537,889 | 444,190 | 444,190 | 594,190 | 567,716 | 522,181 | 536,019 | 518,151 | 512,195 | 506,240 | 500,284 | 494,328 |
| 26 Operating Expenses (Routine) | 4,569,910 | 3,050,162 | 4,000,636 | 2,305,786 | 3,628,437 | 2,260,436 | 3,627,835 | 2,149,781 | 3,626,841 | 2,078,371 | 3,833,093 | 2,099,929 | 3,678,280 | 2,031,670 | 3,569,730 |
| 27 Cash Remaining for Other Expenditures | 1,250,792 | 1,342,280 | (255,142) | 282,129 | (63,495) | 104,926 | (849,873) | (55,781) | (1,675,250) | (1,740,764) | (3,570,592) | (3,724,256) | (5,549,271) | (5,075,207) | (6,586,155) |
| **Chapter 9 (Cost, Due Diligence, Other and Capital)** | | | | | | | | | | | | | | | |
| 33 Bankruptcy/Sale Transaction Costs | - | 463,000 | | | 506,000 | 50,000 | | | 355,000 | 50,000 | | - | - | 355,000 | 50,000 |
| 36 Capital Expenditures - for patient safety & protect assets value | | | | | | | | | | | | | | | |
| 37 Category Total | - | 463,000 | - | - | 506,000 | 50,000 | - | - | 355,000 | 50,000 | - | - | - | 355,000 | 50,000 |
| 38 Cash Remaining for Creditors | 1,250,792 | 879,280 | (255,142) | 282,129 | (569,495) | 54,926 | (849,873) | (55,781) | (2,030,250) | (1,790,764) | (3,570,592) | (3,724,256) | (5,549,271) | (5,430,207) | (6,636,155) |
| **Payment on Debt Obligations (including Partial Pymts)** | | | | | | | | | | | | | | | |
| 39 Building Lease | | | | | | | | | | | | | | | |
| 40 Equipment Lease | | | 107,000 | 200,000 | | | 107,000 | 200,000 | | | 107,000 | 200,000 | | | |
| 41 Bond - Principle | | | | | | | | | | | | | | | |
| 42 Bond - Interest | | | | | | | | | | | | | | | |
| 43 IT Support Payment to Change Health Care and eMDS | | | | 118,532 | | | | | 118,532 | | | | 118,532 | | |
| 44 Total Payments to Creditors | - | - | 107,000 | 318,532 | - | - | 107,000 | 200,000 | 118,532 | - | 107,000 | 200,000 | 118,532 | - | - |
| 45 Cash @ End of Week | 1,250,792 | 879,280 | (362,142) | (36,403) | (569,495) | 54,926 | (956,873) | (255,781) | (2,148,782) | (1,790,764) | (3,677,592) | (3,924,256) | (5,667,803) | (5,430,207) | (6,636,155) |
| **Additional Funding** | | | | | | | | | | | | | | | |
| Net Available Cash | 1,250,792 | 879,280 | (362,142) | (36,403) | (569,495) | 54,926 | (956,873) | (255,781) | (2,148,782) | (1,790,764) | (3,677,592) | (3,924,256) | (5,667,803) | (5,430,207) | (6,636,155) |
| Accounts Payable Current Trade | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 |
| Cash Reserve Funds | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 |
| Walgreens Transaction | | | | | | | | | | | | | | | |
| Home Health Transaction | | | | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 |
| Total Potential other funds available | 2,026,328 | 2,026,328 | 2,026,328 | 2,026,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 | 2,826,328 |
| Net available after coverage. | 3,277,120 | 2,905,608 | 1,664,186 | 1,989,925 | 2,256,833 | 2,881,254 | 1,869,455 | 2,570,547 | 677,546 | 1,035,564 | (851,264) | (1,097,928) | (2,841,475) | (2,603,879) | (3,809,827) |

**Note 1 Other Expenses**
Includes Professional Fees, ( net of Chap 9 costs), agency,
Utilities, Purchased Services, Insurance, Rent, Licenses, Taxes
and Other misc. direct operating expenses.

**Note 2 Bankruptcy Other Costs**
Foster Pepper

**Note 3 Other Expenses Non-Routine**
Quorum

**Note 4 Other**
Ombudsman, Appraisers, Audit, Cost report, Other Legal

**Note 5 Equipment Leases**
Agreed upon payment to Group One Lessors and Group
Two Lessors

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 111 of 118

# EXHIBIT 7

## Description of the Hospital Related Real Property

# DESCRIPTION OF HOSPITAL RELATED REAL PROPERTY

## Legal Description

**Parcel A:**

A portion of Lots 2 and 3, Short Plat No. 3333, recorded under Auditor's File No. 2011-029308 according to the short plat thereof recorded in Volume 1 of Short Plats, page 3333, records of Benton County, Washington, located in Section 16, Township 8 North, Range 29 East, Willamette Meridian, City of Kennewick, Benton County, Washington, and more particularly described as follows:

BEGINNING at a 5/8" iron rebar marking the most northerly northeast corner of said Lot 3, said point also being the northwest corner of said Lot 2;

Thence following along the common boundary of Lots 2 and 3 the following (2) courses and distances:

South 51°52'16" West, 256.30 feet;

South 29°06'42" West, 248.43 feet to the adjusted boundary of said Lot 3;

Thence leaving the common boundary of said Lots 2 and 3 along the adjusted boundary the following (2) courses and distances:

South 41°23'21" East, 29.21 feet;

South 29°11'41" West, 26.54 feet to the common boundary of said Lots 2 and 3;

Thence along the common boundary of said Lots 2 and 3 South 60°47'41" East, 383.98 feet to the westerly right-of-way of Plaza Way, said point being 30.00 feet westerly of the centerline thereof, when measured at right angles;

Thence following along the westerly right-of-way of said Plaza Way South 42°21'03" West, 658.37 feet to the southeast corner of said Lot 3;

Thence leaving the westerly right-of-way of said Plaza Way following along the southerly boundary of said Lot 3 the following (3) courses and distances:

North 47°38'57" West, 112.67 feet;

North 60°47'44" West, 378.08 feet;

North 49°48'06" West, 380.26 feet to the southwest corner of said Lot 3, said point also being on the easterly right-of-way of Southridge Boulevard, at a point 30.00 feet easterly of the centerline thereof, when measured at right angles;

Thence following along said easterly right-of-way the following (3) courses and distances:

1

17-02025-FPC9    Doc 905    Filed 06/01/18    Entered 06/01/18 14:57:43    Pg 113 of 118

North 38°37'58" East, 358.55 feet;

Northeasterly, along the arc of a 1115.92 foot radius, tangent curve to the right through a central angle of 13°14'18" (the radius of which bears South 51°22'02" East) for an arc distance of 257 .84 feet;

North 51°52'16" East, 626.00 feet to the northwest corner of said Lot 3;

Thence leaving said easterly right-of-way of Southridge Boulevard following along the boundary of said Lot 3 the following (2) courses and distances:

South 38°07'44" East, 309.09 feet;

South 67°15'53" East, 41.60 feet to the TRUE POINT OF BEGINNING and the end of this description.

**Parcel B:**

Reciprocal access easement as delineated on Short Plat No. 3333, Recorded under Auditor's File No. 2011-029308.

**Parcel C:**

A reciprocal perpetual non-exclusive easement for ingress, egress, access and parking during normal business hours, recorded March 25, 2014 under Auditor's file No. 2014-006682.

**Parcel D:**

A reciprocal perpetual non-exclusive easement for ingress, egress, access and parking during normal business hours, recorded October 15, 2014 under Auditor's File No. 2014-025986.

53058009.1

# EXHIBIT 8

# Description of the Medical Office Building Related Real Property

# DESCRIPTION OF MEDICAL OFFICE BUILDING RELATED REAL PROPERTY

## Legal Description

A portion of Lot 2, Short Plat No. 3333, according to the Short Plat thereof, recorded in Volume 1 of Short Plats, Page 3333, records of Benton County, Washington, located in Section 16, Township 8 North, Range 29 East, Willamette Meridian, City of Kennewick, Benton County, Washington, and more particularly described as follows:

BEGINNING at a 5/8" Iron Rebar marking the Northeast corner of said Lot 2, said point being on the Westerly Right-of-Way of Plaza Way, at a point 38.00 feet Westerly of the centerline thereof when measured at right angles;

Thence following along the Westerly Right-of-Way line of Plaza Way the following (3) courses and distances:

South 21°29'51" West, 361.57 feet; Southwesterly, along the arc of 255.00-foot radius, tangent curve to the right through a central angle of 20°51'12" (the radius of which bears North 68° 30' 09" West) for an arc distance of 92.81 feet;

South 42°21 '03" West, 106.75 feet to the Southeast corner of said Lot 2, said point also being the most easterly Northeast corner of said Lot 3;

Thence leaving the Westerly Right-of-Way of said Plaza Way following along the common boundary of said Lots 2 & 3 North 60°47'41" West, 383.98 feet to the adjusted boundary of said Lot 2;

Thence leaving the common boundary of said Lots 2 & 3 along the adjusted boundary the following (2) courses and distances:

North 29°11'41" East, 26.54 feet;

North 41°23'21" West, 29.21 feet to the common boundary of said Lots 2 & 3;

Thence along the common boundary of said Lots 2 & 3 the following (2) courses and distances:

North 29°06'42" East, 284.68 feet;

North 51°52'16" East, 256.30 feet to the Northwest corner of said Lot 2;

Thence leaving the common boundary of said Lots 2 & 3 along the Northerly boundary of said Lot 2, South 67°15'53" East, 295.22 feet to the TRUE POINT OF BEGINNING and the end of this description;

Containing 4.89 acres, more or less.

53058017.1

# EXHIBIT 9

# Updated Summary of Appraisals

**REAL ESTATE VALUE SUMMARY**

| Property Address | Colliers International | Kidder Mathews Valuation Advisory | Lembeck Appraisal & Consulting | Average of the Three | 90% of Average |
|---|---|---|---|---|---|
| 3000 W Kennewick Avenue | $1,065,000 | $900,000 | $895,000 | $953,333 | $858,000 |
| 7201 W Grandridge | $2,560,000 | $3,300,000 | $2,350,000 | $2,736,667 | $2,463,000 |
| 3730 Plaza Way (MOB GROUND) | $1,070,000 | $1,920,000 | $1,870,000 | $1,620,000 | $1,458,000 |
| 3620 Plaza Way (PARKING) | $2,030,000 | $3,250,000 | $2,700,000 | $2,660,000 | $2,394,000 |
| 14 N. Auburn | $310,000 | $282,000 | $320,000 | $304,000 | $273,600 |
| 521 N. Young | $9,800,000 | $10,000,000 | $8,960,000 | $9,586,667 | $8,628,000 |
| 533 N. Young | $530,000 | $680,000 | $437,000 | $549,000 | $494,100 |
| 553 N. Young | $370,000 | $600,000 | $413,000 | $461,000 | $414,900 |
| 7319 W. Hood Place | $640,000 | $1,030,000 | $870,000 | $846,667 | $762,000 |
| 7350 W. Deschutes Ave | $850,000 | $1,100,000 | $918,000 | $956,000 | $860,400 |
| 805 S. Auburn | $50,000 | $38,000 | $50,000 | $46,000 | $41,400 |
| 807 S. Auburn | $70,000 | $8,000 | $60,000 | $46,000 | $41,400 |
| 815 S. Auburn | $130,000 | $130,000 | $120,000 | $126,667 | $114,000 |
| 900 S. Auburn | $8,500,000 | $7,500,000 | $8,725,000 | $8,241,667 | $7,417,500 |
| 911 South Dayton | $4,000,000 | $7,980,000 | $5,350,000 | $5,776,667 | $5,199,000 |
| 921 S. Auburn | $410,000 | $420,000 | $350,000 | $393,333 | $354,000 |
| 3810 Plaza Way (HOSPITAL GROUND) | $2,310,000 | $6,560,000 | $5,400,000 | $4,756,667 | $4,281,000 |
| 3840 Plaza Way (VACANT) | $1,530,000 | $3,400,000 | $2,870,000 | $2,600,000 | $2,340,000 |
| Vacant land - 318.58 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 153.91 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 137.30 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 607.40 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 119.93 ac. | In Process | In Process | In Process | $0 | $0 |
| Quarry Property - 193.35 ac. | In Process | In Process | In Process | $0 | $0 |
| Quarry Property - 20.01 ac. | In Process | In Process | In Process | $0 | $0 |
| Quarry Property 88.11 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 66.63 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 307.20 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 160.00 ac. | In Process | In Process | In Process | $0 | $0 |
| Vacant land - 149.84 ac. | In Process | In Process | In Process | $0 | $0 |
| | | | | | |
| TOTAL | $36,225,000 | $49,098,000 | $42,658,000 | $42,660,333 | $38,394,300 |